# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE MIDDLE DISTRICT OF ALABAMA
### EASTERN DIVISION

CHRISTOPHER MCCULLOUGH,)

PETITIONER,    )

vs.    )    CASE NO. 3:07-CV-71-WHA

DANIEL JONES, WARDEN, et al.,)

RESPONDENTS.    )

RECEIVED

2007 FEB 20  P 1: 18

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

## NOTICE OF CONVENTIONAL SUBMISSION OF EXHIBIT

Come now the Respondents, by and through the Attorney General for the State of Alabama, and hereby respectfully submit to this Court, in paper form, Exhibit 1A to the Respondents' Answer. This exhibit is submitted in this manner, rather than by electronic filing, due to its length. The remaining exhibits to the Respondents' Answer are electronically filed on today's date.

Respectfully submitted,

Troy King(KIN047)
Attorney General
By:

Marc A. Starrett
Assistant Attorney General
ID #STARM1168

## EXHIBIT:

**EXHIBIT 1A:**    Record on appeal in McCullough's attempted burglary conviction, <u>McCullough v. State</u>, Alabama Court of Criminal Appeals CR-03-1103

## CERTIFICATE OF SERVICE

I hereby certify that on this the 20th day of February, 2007, I filed the instant

document and Exhibit 1A with the Clerk of the Court by hand delivery, and hereby

certify that I have mailed by United States Postal Service the document to the

following:

> CHRISTOPHER MCCULLOUGH, AIS # 174909
> Inmate, Donaldson Correctional Facility
> 100 Warrior Lane
> Bessemer, Alabama 35023

> Marc A. Starrett (STARM1168)
> Office of the Attorney General
> Alabama State House
> 11 South Union
> Montgomery, AL 36130-0152
> Telephone: (334) 242-7300
> Fax: (334) 242-2848
> E-Mail: MStarrett@AGO.State.Al.US

ADDRRESS OF COUNSEL;

Office of the Attorney General
Criminal Appeals Division
11 South Union Street
Montgomery, Alabama 36130-0152
(334) 242-7300

**Vol. 1 of 2**

## Court of Criminal Appeals No. __CR-03-1103__

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS
### FROM
# CIRCUIT COURT OF CHAMBERS COUNTY, ALABAMA

### Circuit Court Case Number: CC 2002-318
### Circuit Judge: Honorable Ray Martin

Type of Conviction / Order Appealed From: __State Conviction__

Sentence Imposed: __40 years__

Defendant Indigent: _X_ YES  __ NO

## CHRISTOPHER MCCULLOUGH

NAME OF APPELLANT

## KYLA KELIM
**APPELLANT'S ATTORNEY**                    (TELEPHONE NO.)

## Post Office Box 1977
ADDRESS

## ALEXANDER CITY     ALABAMA        35010
CITY                STATE          ZIP CODE

v.

## STATE OF ALABAMA

NAME OF APPELLEE

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
Name and address of municipal attorney below.

(For Court of Criminal Appeals use only)



# ALABAMA COURT OF CRIMINAL APPEALS
## APPEAL FROM CHAMBERS COUNTY, ALABAMA
## APPELLANT: CHRISTOPHER MCULLOUGH
### CHAMBERS COUNTY CASE NUMBER:CC 2002-318

### INDEX

| | PAGES |
|---|---|
| GRAND JURY INDICTMENT | 001 |
| GRAND JURY ARREST WARRANT | 002 |
| PLEA OF NOT GUILTY & WAIVER OF ARRAIGNMENT | 004 |
| MOTION TO WITHDRAW-MORRIS | 005 |
| ORDER, MORRIS TO WITDRAW | 006 |
| MOTION TO WITHDRAW-WOOTEN | 007 |
| ORDER, CUSTODY OF WITNESS | 008 |
| ORDER, CUSTODY OF WITNESS | 009 |
| DEFENDANT'S REQUESTED JURY CHARGES | 010 |
| ORDER ON DEFENDNAT'S REQUESTED JURY CHARGES | 015 |
| STATE'S REQUESTED JURY CHARGES | 017 |
| HANDWRITTEN JURY CHARGES | 019 |
| JURY VERDICT FORM | 021 |
| PRO-SE MOTION FOR ACQUITTAL | 022 |
| PRO-SE MOTION FOR RENDITION OF JUDGMENT | 024 |
| VERDICT ORDER | 026 |
| ORDER, CONTINUATION | 027 |
| SENTENCING ORDER | 028 |
| MOTION FOR A NEW TRIAL | 029 |
| ORDER, NEW TRIAL DENIED | 036 |
| CASE ACTION SUMMARY SHEET | 037 |
| NOTICE OF APPEAL | 039 |
| COURT OF CRIMINAL APPEALS DOCKETING STATEMENT | 041 |
| REPORTER'S TRANSCRIPT ORDER | 043 |
| CLERK'S NOTICE OF APPEAL TO CRIMINAL APPEALS | 044 |
| CERTIFICATE OF COMPLETION AND TRANSMITTAL OF RECORD | 045 |
| REPORTER'S TRANSCRIPT NUMBERED PAGES 1 THROUGH PAGE 247 | |
| REPORTER'S TRANSCRIPT OF SENTENCING NUMBERED PAGES 1 THRU 017 | |

## THE STATE OF ALABAMA, CHAMBERS COUNTY

### CIRCUIT COURT, FALL TERM, 2002

The Grand Jury of Said County charges that before the finding of this Indictment, Christopher McCullough, alias and Billy Norris, alias, whose names are otherwise unknown to the Grand Jury, did, with the intent to commit the crime of burglary first degree (Section 13A-7-5 of the Code of Alabama), attempt to commit said offense by attempting to knowingly and unlawfully enter or remain unlawfully in a dwelling of another, to-wit: Mike Gragg, with intent to commit a crime therein, to-wit: theft, and while effecting entry or while in the dwelling or in immediate flight therefrom, the said Christopher McCullough and/or Billy Norris was armed with an explosive or deadly weapon, to-wit: a pistol, a further description of which is otherwise unknown the Grand Jury, in violation of Section 13A-4-2 of the Code of Alabama, against the peace and dignity of the State of Alabama.

District Attorney of the Fifth Judicial Circuit

ORIGINAL 02

ACH375                    ALABAMA JUDICIAL DATA CENTER
                       GRAND JURY OF CHAMBERS COUNTY
                             WARRANT OF ARREST                    GJ 2002 000270.00
                                                                 TERM #: FALL

----------------------------------------------------------------

TO ANY LAW ENFORCEMENT OFFICER OF THE STATE OF ALABAMA:

AN INDICTMENT HAS BEEN RETURNED BY THE GRAND JURY OF CHAMBERS COUNTY

AGAINST        MCCULLOUGH CHRISTOPHER
               604 S 1ST AVE

               LANETT         AL 36863-0000

CHARGING THE OFFENSE OF:

      ATTEMPT - BURGLARY 1  13A-004-002        CNTS:   1

YOU ARE THEREFORE ORDERED TO ARREST THE PERSON NAMED ABOVE AND BRING THAT

PERSON BEFORE A JUDGE OR MAGISTRATE OF THIS COURT TO ANSWER THE CHARGES

AGAINST THAT PERSON AND HAVE WITH YOU THEN AND THERE THE WARRANT OF ARREST

WITH YOUR RETURN THEREON.  IF A JUDGE OR MAGISTRATE OF THIS COURT IS

UNAVAILABLE, OR IF THE ARREST IS MADE IN ANOTHER COUNTY, YOU SHALL TAKE

THE ACCUSED PERSON BEFORE THE NEAREST OR MOST ACCESSIBLE JUDGE OF

MAGISTRATE IN THE COUNTY OF ARREST.


 BOND SET AT:      $50,000.00

DATE ISSUED: 08/26/2002    CHARLES W. STORY        BY_____
                                  CLERK

----------------------------------------------------------------

    EXECUTED THIS __26____ DAY OF _Aug_____ 2002_ BY

ARRESTING THE WITHIN NAMED DEFENDANT _Christopher McCullough_.

_C.M. Williams (DM)___

                           LAW ENFORCEMENT OFFICER

                           BY: _____

-------------------------------------------
 DEFENDANT'S FEATURES:
-------------------------------------------
 HT: 0'00"  HAIR:      DOB: 11/27/1972              Received in office this
 WT: 000  SEX: M  EYE:      RACE: B
 SSN: 912000270                                          SEP 03 2002

 ADDTL COMMENTS: _____                  Sid Lockhart, Sheriff
 _____              Chambers Co. Sheriff's Dept.
 _____
 _____

08/26/2002 RHM

03

ACR375

ALABAMA JUDICIAL DATA CENTER
GRAND JURY OF CHAMBERS COUNTY
WARRANT OF ARREST

GJ 2002 000270.00
TERM #: FALL

---

TO ANY LAW ENFORCEMENT OFFICER OF THE STATE OF ALABAMA:

AN INDICTMENT HAS BEEN RETURNED BY THE GRAND JURY OF CHAMBERS COUNTY

AGAINST          MCCULLOUGH CHRISTOPHER
                 604 S 1ST AVE

                 LANETT          AL 36863-0000

CHARGING THE OFFENSE OF:

        ATTEMPT - BURGLARY I  13A-004-002          CNTS:   1

YOU ARE THEREFORE ORDERED TO ARREST THE PERSON NAMED ABOVE AND BRING THAT

PERSON BEFORE A JUDGE OR MAGISTRATE OF THIS COURT TO ANSWER THE CHARGES

AGAINST THAT PERSON AND HAVE WITH YOU THEN AND THERE THE WARRANT OF ARREST

WITH YOUR RETURN THEREON.  IF A JUDGE OR MAGISTRATE OF THIS COURT IS

UNAVAILABLE, OR IF THE ARREST IS MADE IN ANOTHER COUNTY, YOU SHALL TAKE

THE ACCUSED PERSON BEFORE THE NEAREST OR MOST ACCESSIBLE JUDGE OF

MAGISTRATE IN THE COUNTY OF ARREST.


 BOND SET AT:       $50,000.00

DATE ISSUED: 08/26/2002   CHARLES W. STORY        BY_____
                               CLERK

---

        EXECUTED THIS _____ DAY OF _____, _____, BY

ARRESTING THE WITHIN NAMED DEFENDANT _____


                                    LAW ENFORCEMENT OFFICER

                                    BY: _____

---

 DEFENDANT'S FEATURES:
 _____

 HT: 0'00"  HAIR:        DOB: 11/27/1972
 WT: 000  SEX: M   EYE:      RACE: B
 SSN: 912000270

 ADDTL COMMENTS: _____

 _____

 _____

 _____

08/26/2002 RHM

04

| State of Alabama<br>Unified Judicial System<br>Form CR-9    Rev. 3/95 | PLEA OF NOT GUILTY AND WAIVER OF ARRAIGNMENT | Case Number<br>CC 2002 ~~289~~<br>CC 2002   304, 312,<br>3/3<br>323 |
| --- | --- | --- |

IN THE ___Circuit___ COURT OF ___Chambers___ ALABAMA
(Circuit, District, or Municipal)    (Name of County or Municipality)

☐ STATE OF ALABAMA  v. ___Chris    McCollough___ , Defendant

COMES NOW the Defendant in the above styled matter, and to the offense charged enters a plea of

☑ Not Guilty

☐ Not Guilty by Reason of Mental Disease or Defect

☐ Not Guilty and Not Guilty by Reason of Mental Disease or Defect

Defendant acknowledges receipt of the copy of the charge against him and further waives the right to have an Arraignment at which the Defendant is present in person, or at which the Defendant is represented by an attorney.

But, the Defendant specifically and expressly reserves the right upon the filing hereof to hereafter, but before trial or before such date as may be set by the Court, to interpose any defenses, objections, or motions which the Defendant had the right as a matter of law or rule to interpose in this cause, prior to the filing hereof.

Defendant's date of birth is ___11/27/72___ . Defendant's age is ___29___

The Defendant is not eligible for consideration by the Court for Youthful Offender status as provided by law.

___Sept 23, 02___
Date

___Sept 23, 02___
Date

___Chris McCullough___
Defendant

___Steve R Morris___
Attorney for Defendant

This is to certify that I am the Attorney for the Defendant in this matter, and that I have fully explained this form and all matters set forth herein, and pertaining hereto, to the Defendant. I further state to the Court that I have explained to the Defendant his right to be Arraigned in person and his right to have me represent him at Arraignment. I further certify to the Court that my client hereby knowingly, voluntarily, and intelligently waives these rights after a full and complete explanation of each and every one of them to him by me. BOTH MYSELF AND THE DEFENDANT UNDERSTAND THAT I AM RESPONSIBLE FOR ASCERTAINING WHAT DATE, IF ANY, HAS BEEN SET BY THE COURT FOR THE MAKING OR FILING OF ANY DEFENSES, OBJECTIONS, OR MOTIONS. I FURTHER UNDERSTAND THAT I AM RESPONSIBLE FOR NOTIFYING MY CLIENT OF THE DATE HIS CASE IS SET FOR TRIAL, AND THAT I HAVE ADVISED AND INFORMED HIM THAT IN THE EVENT HE FAILS TO APPEAR ON THE DATE HIS CASE IS SET FOR TRIAL, ALL APPROPRIATE LEGAL ACTION WILL BE TAKEN BY THE COURT AGAINST THE DEFENDANT AND HIS BOND. I further certify to the Court that I have advised my client that he is responsible for obtaining the date his case is set for trial in this matter and that in the event he fails to appear on the date his case is set for trial all appropriate legal action will be taken by the Court against the Defendant and his bond, and I hereby certify that the Defendant knows that he is personally responsible for obtaining the date his case is set for trial and for being present in Court on that date.

___Sept 23, 02___
Date

___Steve R Morris___
Attorney for Defendant Signature

I certify that I served a copy of the foregoing plea and waiver of arraignment on the Prosecutor by mailing/delivering a copy of the same to him on

_____
(Date)

___Steve R Morris___
Printed or Typed Attorney's Name

___P.O. Box 814   Wedowee AL    36278___
Address

This is to certify that my Attorney has explained each and every matter and right set forth in this form and I have completely and fully read and do so understand each and every matter set forth in this form. I further state to the Court that I do not wish to be personally present at an Arraignment in this case and that I do not want to have an Attorney represent me at an Arraignment and WITH FULL KNOWLEDGE OF EACH OF THESE RIGHTS, I HEREBY EXPRESSLY WAIVE SUCH RIGHTS. I further state to the Court that I have been informed of the charge against me and have received a copy of the charge.

___9-23-02___
Date

___Chris McCullough___
Defendant Signature

Filed in office this date _____    By: _____
                                    Clerk

05

IN THE CIRCUIT COURT OF CHAMBERS COUNTY, ALABAMA

STATE OF ALABAMA,          )
                           :
        PLAINTIFF,         )
                           :    CASE NUMBER: CC: 2002-304, 312
                           )                      ,318 & 325
VS.                        :
                           )
CHISTOPHER MCCULLOUGH,     :
                           )
        DEFENDANT.         :

## MOTION TO WITHDRAW

**COMES NOW** the undersigned attorney, Steve R. Morris, and respectfully requests this Honorable Court to allow him to withdraw as attorney of record in the above referenced case . As grounds therefore, the undersigned states that the following, to-wit:

1.     Christopher McCullough has threatened me physically in a letter he wrote me.

2.     Christopher McCullough has filed a complaint with the Bar against me.

**WHEREFORE THESE PREMISES CONSIDERED,** I respectfully request this Honorable Court to allow me to withdraw from the above referenced cases involving the Defendant, Christopher McCullough.

Respectfully submitted this _24_ day of March, 2003.

Steve R. Morris
Attorney at Law
Post Office Box 814
Wedowee, Alabama 36274
(256) 357-9211 - Telephone
(256) 357-9222 - Facsimile

FILED IN OFFICE THIS

MAR 3 1 2003

CHARLES W. STORY
CIRCUIT CLERK
CHAMBERS COUNTY, ALABAMA

IN THE CIRCUIT COURT OF CHAMBERS COUNTY, ALABAMA

| | | |
|---|---|---|
| STATE OF ALABAMA | ) | |
| | ) | |
| VS. | ) | CASE NO. CC-02-304, 312, |
| | ) | 318, and 325 |
| CHRISTOPHER McCULLOUGH | ) | |

### ORDER

For good and sufficient cause, Hon. Steve R. Morris' Motion to Withdraw is GRANTED. It is further Ordered that Hon. Nick Wooten be appointed to represent the defendant in the cases.

Let a copy of this Order issue to the defendant, counsel, and the District Attorneys Office.

Signed this the 1st day of April, 2003.

RAY D. MARTIN
CIRCUIT JUDGE

FILED IN OFFICE THIS

APR    2003

CHARLES W. STORY
CIRCUIT CLERK
CHAMBERS COUNTY, ALABAMA

S. Morris, N. Wooten, DA, jail, SO, C. McCullough

IN THE CIRCUIT COURT OF
CHAMBERS COUNTY, ALABAMA

STATE OF ALABAMA,                    )
                                     )
VS.                                  )          CC-02-304, 312, 318
                                     )                  325
CHRISTOPHER McCULLOUGH,              )
                                     )
            DEFENDANT.               )

<u>MOTION TO WITHDRAW</u>

Comes now Nicholas Wooten and moves this Court for an order allowing

him to withdraw.  As grounds therefore this attorney would show as follows:

1.    That he withdrew from the active practice of criminal law after the spring
      term of 2001 and does not at this time accept on an appointed or retained
      basis any criminal defense work.
2.    That he was appointed on April 1, 2003.
3.    That no harm will inure to the Defendant by allowing this attorney to
      withdraw.

Wherefore, this attorney moves Your Honor for an order allowing him to withdraw
from this case for the above stated grounds.

DONE this the _____9_____ day of _____April____, 2003.

FILED IN OFFICE THIS

APR  9 2003

CHARLES W. STORY
CIRCUIT CLERK
CHAMBERS COUNTY, ALABAMA

_____
Nicholas H. Wooten (WOO084)
Attorney for Defendant
P.O. Drawer 290
Lafayette, Al. 36862



IN THE CIRCUIT COURT OF CHAMBERS COUNTY, ALABAMA

| | | |
|---|---|---|
| STATE OF ALABAMA | ) | |
| | ) | CASE NO. CC 02-312,318 |
| VS. | ) | |
| | ) | |
| CHRISTOPHER McCULLOUGH | ) | |

## ORDER

It has been brought to the attention of the Court that Billy Norris, AIS #225773, a witness in the above styled case may be presently in the custody of the Draper Correctional Facility, and said witness must be before this Court to provide testimony on behalf of the State on November 4, 2003, at 9:00 a.m. CST.

**IT IS ORDERED** that the Chambers County Sheriff's Office make arrangements with the Draper Correctional Facility to transport the said witness to this County for trial on the date and time indicated above. Upon the completion of the trial scheduled in this case, **IT IS ORDERED** that the Sheriff of Chambers County, Alabama, return custody of the witness to the Draper Correctional Facility.

The Clerk of the Court is to mail a copy of this Order to counsel of record for the defendant, the Office of the District Attorney, the Chambers County Sheriff's Office and the Department of Corrections.

SIGNED this _16th_ day of _October_, 2003.


_Howard F. Bryan_
Circuit Judge


FILED IN OFFICE THIS

OCT 1 6 2003

CHARLES W. STORY
CIRCUIT CLERK
CHAMBERS COUNTY, ALABAMA


K K.im DA. SO. DOC, Jail

IN THE CIRCUIT COURT OF CHAMBERS COUNTY, ALABAMA

STATE OF ALABAMA                         )
                                         )
                                         )
vs.                                      )          CASE NO. CC-02-304, 312, 318, 325
                                         )
CHRIS McCULLOUGH                         )

## ORDER

It has been brought to the attention of the Court that the above defendant is scheduled to appear before the Court on November 13, 2003, at 9:00 a.m.

The Chambers County Sheriffs Department is Ordered to make arrangements with the Department of Corrections to transport the defendant to said hearing. Upon completion of the hearing, the defendant shall be returned to the Department of Corrections.

Let a copy of this Order issue to the defendant, counsel, the District Attorneys Office, the Chambers County Sheriffs Department, and the Department of Corrections.

Signed this the 3rd day of November, 2003.

RAY D. MARTIN
CIRCUIT JUDGE



FILED IN OFFICE THIS

NOV 4 2003

CHARLES W. STORY
CIRCUIT CLERK
CHAMBERS COUNTY, ALABAMA

K. Kelin, DA, SO, Jail, DOC, C. McCullough

10

## IN THE CIRCUIT COURT FOR CHAMBERS COUNTY
## AT LAFAYETTE, ALABAMA

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case NO.:    CC 2002-318 |
| | ) | |
| CHRISTOPHER MCCULLOUGH, | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT'S REQUESTED JURY INSTRUCTION REGARDING ATTEMPT

COMES NOW the Defendant, Christopher McCullough, and by and through the undersigned, requests this Honorable Court give, in addition to standard instructions regarding this matter, the following instruction of law to the jury that are particular to the facts of this case:

1. REQUESTED INSTRUCTION NUMBER SIX

The Court charges the jury that the following is a principle of law that applies to someone who attempts a burglary.

An attempted burglary consists of "an act done with the intent to effectuate a burglary, carried beyond mere preparation to commit it but falling short of its actual commission. An indictable attempt thus consists of two important elements: (1) an attempt to commit burglary, and (2) a direct ineffectual act done toward its commission."

13 Am. Jur. 2d Burglary §§ 29 (1964). See also Popwell v.. State, 480 So.2d 41, 44 (Ala.Cr.App. 1985).

"In order to prove an attempted burglary, the State must show an act done with the intent to effectuate the alleged burglary. Intent has been defined as "'a state of mind existing at the time a person commits an offense. If intent required definite and substantive proof, it would be almost impossible to convict, absent facts disclosing a culmination of the intent. The mind of an alleged offender, however, may be read from his acts, conduct, and inferences fairly deductible from all the circumstances.' "13 Am. Jur.2d Burglary §§ 52. In Groneau [v. State, 201 So.2d 599, 602 (Fla. Dist. Ct. App. 1967)], we find:
"'Although an overt act does not establish the particular intent to commit a specific crime, yet intent, being a state of mind, or mental process, may be proved by the statement or act of the person whose act is being scrutinized and may also be inferred from the facts and circumstances as is the case in consummated crimes. 1 Wharton's Crim. Law, Attempts, §§ 234 (12th ed.). State v. Tomblin, 1942, 124 W. Va. 264, 20 Southeast 2d 122; State v. Leach, 1950, 36 Wash.2d 641, 219 P.2d 972.'"
Popwell v. State, 523 So.2d 515 (Ala. Crim. App. 1987), cert. denied.

*Granted*

1. REQUESTED JURY CHARGES 2 and 3

A person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense:
   (1) He procures, induces or causes such other person to commit the offense; or
   (2) He aids or abets such other person in committing the offense; or
   (3) Having a legal duty to prevent the commission of the offense, he fails to make an effort he is legally required to make.
   Section 13A-2-23, Code of Alabama (1975)

Given _____
Refused _____


2. The words "aid or abet" comprehend all assistance rendered by acts or words of encouragement or support or presence, actual or constructive, to render assistance should it become necessary. Gwin v. State, 456 So. 2d 845 (Ala. Crim. App. 1984)

Given _____
Refused _____

Respectfully submitted,

_____
Kyla Groff Kelim (GRO014)
Attorney for Defendant, Christopher McCullough

Alec Brown & Associates, P.C.
217 Madison Street
P.O. Box 1977
Alexander City, Alabama 35011-1977
(256) 409-9001


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have this day served counsel for the State in the foregoing matter with a true and correct copy of the foregoing document by hand delivery or by mailing a copy thereof, postage prepaid to him at his respective address on this the [ 4th ] day of November, 2003.

_____
Of counsel

2

13

3. No particular act or acts are necessary on the part of the defendant and it is sufficient to make out an offense if you the jury are convinced, beyond a reasonable doubt, that the defendant was present with a view to render aid should it become necessary.

<u>Rad Ke vs. State</u>, 292 Ala. 290, 293 So. 2d 314 (1974)

Given:_____          Refused:_____

4. REQUESTED JURY CHARGE NO.: _____

An attempt necessarily lies somewhere between mere intent, which alone is not punishable, and the completed offense. . . . Preparation consists in arranging the means or measures necessary for the commission of the offense; the attempt is the overt movement towards the commission after preparations are made. It must be in such progress that it will be consummated unless interrupted by circumstances independent of the will of the attempter.

Commentary, Section 13A-4-2, Code of Alabama (1975)
Harris v. State, 580 So. 2d 33, 35 (Ala. Crim. App 1990)

GIVEN: _____

REFUSED: _____

IN THE CIRCUIT COURT FOR CHAMBERS COUNTY
AT LAFAYETTE, ALABAMA

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case NO.:    CC 2002-318 |
| | ) | |
| CHRISTOPHER MCCULLOUGH, | ) | |
| | ) | |
| Defendant. | ) | |

### ORDER ON DEFENDANT'S REQUESTED JURY INSTRUCTIONS

THIS MATTER HAVING COME BEFORE THE COURT, and after a hearing the court being fully advised on the instructions as requested,

IT IS HEREBY ORDERED AND ADJUDGED that the Court rules as follows as to Defendant's requested instructions:

1. REQUESTED INSTRUCTION NUMBER ONE

The Court charges the jury that the following is a principle of law that applies to that, to someone who attempts a crime. A person is not liable of attempt if, under circumstances manifesting a voluntary and complete renunciation of their criminal intent, they avoid the commission of the offense by abandoning the criminal effort. And if a mere abandonment is insufficient to accomplish the avoidance, by taking further affirmative steps to prevent it. The burden of injecting the issue of abandonment of the attempt is on the Defendant, but it does not shift any burden of proof. Before the State is entitled to a conviction as to this offense, the State must prove beyond a reasonable doubt that the Defendant did not avoid the commission of that offense by abandoning his criminal effort in regard to that offense under circumstances manifesting a voluntary and complete renunciation of his criminal intent in regards to that offense.   And that same proposition applies to attempted burglary.

GIVEN_____
REFUSED___✓___   *Gave pattern Instruction, from "Use Notes" + Statute*

GIVEN_____
REFUSED_____

Such a charge is warranted where the instructions, as a whole, do not adequately cover the issue of bias on the part of the witness. See e.g. Harris v. State, 539 So.2d 1117 (Ala. Crim. App. 1988).

Respectfully submitted,

Kyla Groff Kelim (GRO014)
Attorney for Defendant, Christopher McCullough

Alec Brown & Associates, P.C.
217 Madison Street
P.O. Box 1977
Alexander City, Alabama 35011-1977
(256) 409-9001

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have this day served counsel for the State in the foregoing matter with a true and correct copy of the foregoing document by hand delivery or by mailing a copy thereof, postage prepaid to him at his respective address on this the _13th_ day of November, 2003.

Of counsel

3

IN THE CIRCUIT COURT OF CHAMBERS COUNTY, ALABAMA

| | | |
|---|---|---|
| STATE OF ALABAMA, | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | CC-___-_____ |
| | * | |
| CHRISTOPHER McCULLOUGH, | * | |
| Defendants. | * | |

## STATE'S REQUESTED JURY INSTUCTIONS

COMES NOW THE STATE OF ALABAMA, by and through the Chief Deputy District Attorney for the Fifth Judicial Circuit, and requests that the following instructions be given to the jury:

5. A person is guilty of an attempt to commit a crime if, with intent to commit a specific offense, he does any overt act towards the commission of such offense. § 13A-4-2, Code of Alabama 1975.

_____✓_____ Given *from pattern charge* _____ Denied

6. [T]he attempt is the overt movement towards the commission after preparations are made. It must be in such progress that it will be consummated unless interrupted by circumstances independent of the will of the attempter. Harris v. State, 580 So.2d 33, 35 (Ala.Crim.App.1990).

_____ Given          _____✓_____ Denied

7. One is criminally liable for attempting the commission of a crime even though his endeavor falls short of the ultimate intended objective. Commentary, § 13A-4-2, Code of Alabama 1975.

_____✓_____ Given          _____ Denied

8. An attempt to commit a crime consists of three elements: (1) an intent to commit a crime; (2) performance of some overt act toward commission of the offense; and (3) the failure to consummate its commission. Commentary, § 13A-4-2, Code of Alabama 1975.

_____✓_____ Given          _____ Denied

9. An attempt need only be some deed short of consummation. Huggins v. State, 41 Ala.App. 548, 142 So.2d 915, cert. denied, 273 Ala. 708, 145 So.2d 918 (1962).

_____ Given                    __/__ Denied


_____
Bill Lisenby, Chief Deputy District Attorney

19

Questions ① - ~~#0~~ who own the Gun
                    and were there fingerprints on them

② Was the defendant ever given the opportunity to write
~~the~~ his statement in his own words

③

You have heard all of the testimony in
this case. I cannot answer the questions
above. You must rely on each other to
consider all of the testimony presented
which may apply to either question above.

20

The State and defendant have with advice of counsel
stipulated that two pistols were
recovered from the vehicle, involved in this case, and have
agreed that those weapons do not
need to be brought into court
today.

Based on this stipulation, you,
the jury, shall consider those these
weapons as evidence just as if
they were present in court presented here open
today.

21

IN THE CIRCUIT COURT OF CHAMBERS COUNTY, ALABAMA

STATE OF ALABAMA            )
                            )
VS.                         )          CASE NO. CC-02-318
                            )
CHRISTOPHER McCULLOUGH,     )

### JURY VERDICT FORMS

We, the Jury, find the Defendant, Christopher McCullough, guilty of the offense of attempted burglary in the first degree, as charged in the indictment.

_____
Foreperson

We, the Jury, find the Defendant, Christopher McCullough, guilty of the offense of attempted burglary in the second degree – a lesser included of burglary in the first degree, as charged in the indictment.

_____
Foreperson

We, the Jury, find the Defendant, Christopher McCullough not guilty.

_____
Foreperson

11/14/03
/Date

Geryl Morgan
Printed Name of Foreperson

ACQUITTAL

FILED IN OFFICE THIS
DEC 8 2003
CHARLES W. STORY
CIRCUIT CLERK
CHAMBERS COUNTY, ALABAMA

... not charges ...

... Co-Defendant was not armed with ...
weapon.

... was not Cobb, was the ...
of the Co-Defendant ...

3. ...

CC 2002 318

29

# MOTION FOR RENDITION OF JUDGEMENT

Here comes Chris McCullough Defendant of this trial brings about unto this Honorable Court a Motion to Render Judgement of Justification pending Sentencing,

My reasons for this motion is adequate and properly brought to the honorable high Court in an appropriate manner 4 weeks before Sentencing,

The Statues I am about to state are laws of the Alabama Criminal Procedure (Annotated) (2001-2002) & (2002-2003),

FILED IN OFFICE THIS

DEC 8 2003

CHARLES W. STORY
CIRCUIT CLERK
CHAMBERS COUNTY, ALABAMA

1) If an Defendant goes to trial on certain charges, the charges that he is found guilty can not be used as prior convictions

They can be used to enhance sentence but to the Trial Judges Integrity he shall run these enhancements concurrent, if defendant has no prior show cause

2) If an ...

rule ...

to trial Failure to ...

the ... time period automation on show ...

trial Courts work out jurisdiction to hold a ...

this event ... to be disposed ...

and eliminates. If later charges ...

... time period ...

25

3) If an indictment charges an _____ _____
_____ and the evidence shows _____
_____ was committed without a weapon there is
a _____ variance.

_____ _____ at the house Mike Briggs _____ _____
_____ Thomas all testified that _____ _____
Chris McCullough nor the _____ _____ _____
_____ _____ If the Jury had _____ _____
_____ this case _____ on a _____ _____ _____
_____ _____ _____ _____ _____ _____ _____
_____ _____ staged in the _____ document _____
_____ _____
_____ _____ _____ _____ _____ by testimony _____
_____ _____ _____ _____ _____

relied on the _____ document _____
_____ _____ _____ _____ _____
_____ _____ submitted document from the Alabama
Bureau of Investigation that _____ stated _____
did not have this weapon _____ _____ _____
_____ _____ _____
_____ _____ _____

about everything that he has included me in,
Mrs. Gayle Peters _____ _____ _____ Finger print
Ident Meeting System, and his noting the _____ _____ _____
_____ _____ and my finger prints were not on any of
_____ of which _____ _____ _____ _____ _____
_____ _____ _____
_____ _____ _____ _____

_____ _____ _____ _____ _____ _____ _____

IN THE CIRCUIT COURT OF CHAMBERS COUNTY, ALABAMA

| | | |
|---|---|---|
| STATE OF ALABAMA | ) | |
| | ) | |
| vs. | ) | CASE NO. CC-02-318 |
| | ) | |
| CHRISTOPHER McCULLOUGH | ) | |

## VERDICT ORDER

On November 14, 2003, a duly empaneled jury returned the following verdict:

"We, the jury, find the Defendant, Christopher McCullough, guilty of the offense of attempted burglary in the first degree, as charged in the indictment.

Geryl Morgan<br>Foreperson"

Based upon the verdict of the jury, it is ORDERED ADJUDGED AND DECREED that the defendant is guilty of the offense of burglary in the first degree. The defendant is Ordered to appear before the Court on December 16, 2003, at 1:00 p.m. for formal sentencing hearing. The Office of Probation and Parole is instructed to prepare a pre-sentence report for said defendant.

Let a copy of this Order issue to the defendant, counsel, the District Attorneys Office, the Office of Probation and Parole, and the Chambers County Sheriffs Department.

Signed this the 11th day of December, 2003.

RAY D. MARTIN
CIRCUIT JUDGE

FILED IN OFFICE THIS

DEC 1 1 2003

CHARLES W. STORY
CIRCUIT CLERK
CHAMBERS COUNTY, ALABAMA

K. Kelim. DA. SO. Jail, Prob Dept.

IN THE CIRCUIT COURT OF CHAMBERS COUNTY, ALABAMA

STATE OF ALABAMA            )
                            )
VS.                         )        CASE NO. CC-02-318
                            )
CHRISTOPHER McCULLOUGH      )

ORDER

The hearing in the above cause shall be continued to January 15, 2004, at 9:00 a.m.

The Chambers County Sheriffs Department is Ordered to make arrangements with the Department of Corrections to transport the defendant to said hearing. Upon completion of hearing, the defendant shall be returned to the Department of Corrections.

Let a copy of this Order issue to the defendant, counsel, the District Attorneys Office, the Office of Probation and Parole, and the Chambers County Sheriffs Department.

Signed this the 16th day of December, 2003.

RAY D. MARTIN
CIRCUIT JUDGE



FILED IN OFFICE THIS

DEC 1 8 2003

CHARLES W. STORY
CIRCUIT CLERK
CHAMBERS COUNTY, ALABAMA

28

## IN THE CIRCUIT COURT OF CHAMBERS COUNTY, ALABAMA

STATE OF ALABAMA          )
                               )

VS.                         )          CASE NO. CC-02-318
                               )

CHRISTOPHER McCULLOUGH    )

### ORDER

The defendant appeared before the Court this date with counsel for Sentencing Hearing. The defendant was represented by Hon. Kyla Kelim. The District Attorneys Office was represented by Hon. Bill Lisenby.

After consideration of all submissions, it is Ordered that the defendant be sentenced to the Department of Corrections for a term of forty (40) years. The defendant is Ordered to pay all court costs. The defendant is Ordered to reimburse the State of Alabama for court appointed attorney. The defendant is Ordered to reimburse Chambers County for any medical expenses incurred on behalf of Defendant. The defendant is Ordered to pay a Victims Compensation Fund Award of $100.00.

Let a copy of this Order issue to the defendant, counsel, the District Attorneys Office, the Office of Probation and Parole, and the Chambers County Sheriffs Department.

Signed this the 15th day of January, 2004.

RAY D. MARTIN
CIRCUIT JUDGE

FILED IN OFFICE THIS

JAN 2 ... 2004

CHARLES W. STORY
CIRCUIT CLERK
CHAMBERS COUNTY, ALABAMA

K. Kelim DA SO Jail Prob Dept,

IN THE CIRCUIT COURT OF CHAMBERS COUNTY
AT LAFAYETTE, ALABAMA

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | |
| Plaintiff, | ) | |
| vs. | ) | CC 2002-318 |
| CHRISTOPHER MCCULLOUGH, | ) | |
| Defendant. | ) | |

### MOTION FOR NEW TRIAL

COMES NOW, the Defendant, Christopher McCullough, and by and through the undersigned attorney of record, respectfully requests this Honorable Court enter an Order Granting his Motion for New Trial, setting aside his conviction of November 14, 2003 and sentence entered January 15, 2004, and as grounds would show:

1. On November 14, 2003, following a jury trial in this matter, Christopher McCullough was found guilty as charged in the indictment of Attempted Burglary in the First Degree.

2. On January 15, 2003, the court sentenced Christopher McCullough to a term in prison of forty years.

3. Christopher McCullough is entitled to a new trial in this case, due to numerous errors during trial depriving him of a fair and impartial trial and the due process of law.

4. Christopher McCullough is entitled to a new trial in this case, as the verdict is contrary to the law and the weight of the evidence.

5. Christopher McCullough sets out the following as mandating a new trial in this matter, and further reserves his right to bring additional grounds once a transcript of the proceedings has been reviewed in this case.

## I.    THE STATE FAILED TO PROVE A PRIMA FACIE CASE

### A.    NO OVERT ACT PROVEN

In this case, the Defendant was indicted and tried on a charge of attempted burglary in the first degree. In order to prove burglary in the first degree, the State must prove that the defendant entered or unlawfully remained in the dwelling of another with the intent to commit a crime

while armed with a deadly weapon. Ala. Code Section 13A-7-5. In order to prove the crime of attempt, the state must prove that the defendant committed any overt act towards the commission of the offense. Ala. Code Section 13A-4-2.

During the trial of the case, the evidence showed that Ms. Pearl Trammell observed a man outside of the window of Mike Gragg's home who appeared to have a bandana over his face. She warned Mr. and Mrs. Gragg. Mrs. Gragg reported seeing two person running through the back yard away from the home seconds later. All witnesses in the home testified that no one entered the home or appeared to have attempted to enter the home. No witness in the home testified that he or she saw a weapon in any of the assailants' hands.

The police responded to a 911 call immediately made by Mr. Gragg within one minute and took up what they described as "hot pursuit" of the individuals through the yard. The defendant and co-defendant Billy Norris were stopped in an area behind the Gragg home in the defendant's automobile. After some 20 minutes of searching, the police discovered two guns in the rear trunk area of the car. The co-defendant testified that the defendant was armed when he approached the Gragg home, but both he and the defendant ran when they heard sirens.

The only evidence that supports a conviction was the testimony of the co-defendant and the unsigned statement of the defendant. The defendant testified that he was trying to stop Billy Norris from kicking in the front door of the home and committing a crime, and was approaching the home to stop Norris from committing any crime on the property. He denied being armed. He denied making a statement to police that he approached the home while armed and left when he saw people were inside the home.

Following the state's evidence, and again following the defendant's case, the defendant moved for a judgment of acquittal, based on the state's failure to prove a prima facie case. The motions were denied.

The conviction cannot stand while support only by the unsigned statement of defendant and the testimony of the co-defendant, a convicted liar who received a favorable plea bargain in exchange for his testimony, and who repeatedly made self-serving statements regarding his involvement in the offense.

The only credible evidence of an overt act is that Christopher McCullough was present on the Gragg's property while wearing a ski mask, and left the area without attempting to gain entry to the home. To sustain a conviction for attempted burglary in the first degree, justice requires more than mere presence with a ski mask.

An attempted burglary is defined in 13 Am.Jur.2d Burglary § 29 (1964) as: "an act done with the intent to effectuate a burglary, carried beyond mere preparation to commit it but falling short of its actual commission. An indictable attempt thus consists of two important elements: (1) an attempt to commit burglary, and (2) a direct ineffectual act done toward its commission."

2

In other words, an overt act is requires the direct and ineffectual act done towards its commission. The defendant in this case, according to all credible testimony and evidence, did not commit a "direct, ineffectual" act by the mere presence on the property while wearing a ski mask.

## II. INSUFFICIENT CORROBORATION OF CODEFENDANT'S TESTIMONY

In this case, the only evidence that defendant committed the crime of attempted burglary came in the form of testimony from co-defendant Billy Norris. The conviction cannot stand upon this testimony alone.

> 'The test for determining whether there is sufficient corroboration of the testimony of an accomplice consists of eliminating the testimony given by the accomplice and examining the remaining evidence to determine if there is sufficient incriminating evidence tending to connect the defendant with the commission of the offense.' Tarver v. State, 500 So.2d 1232 (Ala.Cr.App. 1986), affirmed, 500 So.2d 1256 (Ala. 1986), cert. denied, 107 S.Ct. 3197, 96 L.Ed.2d 685 (1987), citing, Miller v. State, 290 Ala. 248, 275 So.2d 675 (1973) (emphasis supplied)." Garrison v. State, 520 So.2d 219 (Ala.Cr.App. 1987)'

Patterson v. State, 538 So.2d 44 (Ala. Crim. App. 1988). See also Hardley v. State, 766 So.2d 154 (Ala. 1999), discussing Ala. Code Section 12-21-222 and reversing the conviction.

By examining the evidence in light of this test, the only facts that the state could deduce was that:

1. Christopher McCullough was on the property of Mike and Judith Gragg (only from the defendant's testimony);

2. Christopher McCullough was wearing a ski mask at the time of the offense (or, at least, during the state's case, that he was carrying a ski mask that was similar to one seen by the occupants on a person in the yard)

3. Christopher McCullough did not take any act towards gaining entry to the home or take any act at all other than walking on the property;

4. Christopher McCullough left the scene without taking property or attempting entry.

5. That after he was stopped, several guns were found in his car.

A brief examination of these facts show that no sufficient corroboration exists upon which the court can rest a verdict of guilty to the charge of attempted burglary.

3

Even if the court finds that the unsigned statement of Christopher McCullough was properly admitted and can be used in this test, it adds the following:

6. That Christopher McCullough entered the property with a gun and with the intent to enter the home of Mike and Judith Gragg to commit a theft but voluntarily left the property upon learning that the home was occupied, thus abandoning the attempt.

Under the facts as set out above, the conviction must be set aside as the unsigned statement constitutes abandonment of the offense, which is a complete defense. Without the uncorroborated testimony of Billy Norris, the state cannot refute the defense of abandonment. See Ala. Code Section 13A- Further, without the statement of the defendant and the statement of Billy Norris, only the defendant's presence suggests involvement. "[T]he accused's proximity itself, in most cases, is not enough evidence for corroboration." Scott v. State, 728 So.2d 164 (Ala. Crim. App. 1997).

Very like the *Hardley* case cited above, when the court reviews the evidence without the self serving testimony of Billy Norris, there is not corroboration to state that Defendant committed the offense, sufficient to support a conviction. The court must grant the Defendant's Motion for New Trial, and place the case back on the jury docket for the next available trial setting.

III.    TRIAL COURT ERRED IN REFUSING TO INSTRUCT THE JURY ON LESSER INCLUDED OFFENSE OF CRIMINAL TRESPASS IN THE FIRST DEGREE

The Defendant requested the court charge the jury on the lesser included charge of Criminal Trespass in the First Degree. The court refused, stating that the defendant's testimony, that he was present on the Gragg's property to prevent a crime from occurring, negated a finding of Criminal Trespass.

Whether or not a crime is a lesser included offense of a charged offense must be examined on a case by case basis. Aucoin v. State, 548 So.2d 1053, 1057 (Ala. Cr. App. 1989).Clearly, under the facts of this case, the charge of criminal trespass in the first degree is warranted. The facts showed that the defendant entered the property of Mike and Judith Gragg while wearing a ski mask but did not enter or attempt to enter the home, and instead left the property. In C.P. v. State, 597 So.2d 246 (Ala. Crim. App. 1992) this Court found that Criminal Mischief in the Third Degree was a lesser included offense of Attempted Burglary in the Third Degree where the victim stated that the defendant cut the screen to her window but then left, and later admitted to her that he had cut her screen. In this case, the Court found that the trial court property found the defendant guilty of criminal mischief in the third degree.

Similarly, in this case, the facts supported a jury finding that the defendant was on the property unlawfully, regardless of his intentions, and the trial court erred in refusing the charge

4

on the lesser included offense. Indeed, it is the intent element that distinguishes the offense of burglary from that of criminal trespass.

In Womack v. State, 462 So.2d 1020 (Ala. Crim. App. 1984), the court set out that:

It is well established under Alabama law that an individual accused of the greater offense has a right to have the court charge on the lesser offenses included in the indictment when there is a reasonable theory from the evidence to support his position. Fulghum v. State, 291 Ala. 71, 277 So.2d 886 (1973); Chavers v. State, 361 So. 2d 1106 (Ala. 1978); Staggs v. State, 51 Ala. App. 203, 283 So.2d 652 (Ala. Crim. App. 1973).

In the Womack case, the defendant was found crawling out of a window at a school where an air conditioner was discovered missing at 1:45 a.m. Although the court stated that the facts would support a finding of intent to steal, it went on to state: "since neither the missing air conditioner nor any other property from the school was ever traced to his possession, there is a lack of evidence, which is consistent with guilt only of the lesser offense." Id. The Womack court reversed the conviction for burglary and ordered a new trial.

In this case, the defendant testified that he was on the Gragg property, that he did not have permission to be there, and that he did not have an intent to go into the home or steal anything. The elements of criminal trespass encompass this set of facts, and it was clear error in refusing to instruct the jury on the lesser included offense.

Such a refusal constitutes reversible error.

## IV.     THE TRIAL COURT'S SENTENCE WAS DISPROPORTIONATE.

Defendant Christopher McCullough was sentenced to 40 years in prison following his conviction for attempted burglary in the first degree. In this case, the co-defendant pled guilty to the offense and received a twenty year sentence. Because Mr. McCullough exercised his right to a trial, in essence, his sentence was doubled. This excessive sentence the law does not allow.

Alabama courts recognize the importance of proportionality in sentencing:

Proportionality of sentence is certainly a vital constitutional guarantee. Anderson v. State, 455 So.2d 957, 958 (Ala. Crim. App. 1984)(citing Solem v. Helm). In Ex parte Maddox, 502 So.2d 786 (Ala. 1986), the Alabama Supreme Court noted that the state's appellate courts are generally prohibited from reviewing sentences that are within the limits prescribed by statute. The Court further stated:

'However, the appellate courts may review a sentence, which, although within the prescribed limitations, is so disproportionate to the offense

5

charged that it constitutes a violation of a defendant's Eighth Amendment rights. 'The United States Supreme Court in Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), recognized that reviewing courts should grant substantial deference to the authority of the legislatures in determining the kinds and limits of punishment for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals. Yet, the sentence should be proportionate to the crime." Id. at 789-90 (citation omitted).'

Wilson v. State, 830 So.2d 765 (Ala. Crim. App. 2001). Further, while not a controlling factor, "Appellate courts should 'examine the penalty imposed upon the defendant in relation to that imposed upon his accomplices, if any.' Beck v. State, 396 So. 2d 645, 664 (Ala. 1980)." Gavin v. State, CR 99-1127 (Ala. Crim. App. 9/26/2003).

The evidence showed that while the offense certainly frightened the occupants of the Gragg home, no crime involving property or person ever took place. By comparison, the defendant was sentenced following a jury trial on a charge of Burglary in the First Degree, a Class A felony, with the same criminal history, a conviction for Receiving Stolen Property in the Second Degree, a class C felony, some 10 years before, and received a sentence of fifteen years. The circumstances facing the trial judge at sentencing in this case were identical to that case, CC 02-189, other than the fact that the conviction was for a less serious offense and, in fact, for an attempt to commit a crime. The presentence investigation reveals much animus on the part of the State. In recommending the maximum sentence, life or 99 years, the probation officer cites three reasons for this sentence: 1) the prior conviction for receiving stolen property in the second degree; 2) the seriousness of the offense and 3) his bad attitude.

Sentencing should not be reduced to a popularity contest. It would be distinctly unfair, and illegal, to allow "attitude" to control the length of sentence. In this case, that is precisely the situation. The prior conviction does not warrant a forty year sentence under the habitual offender act. The conviction was for a nonviolent offense that was 10 years old. The undersigned has never in her career witnessed a forty year sentence imposed on such a basis, even in combination with a similar, serious offense. The trial court that sentenced the Defendant on the Burglary 1st charge, that arose out of conduct occurring at or near the time of the instant offense and thus not accountable under the habitual offender act, imposed a sentence that was less than that received by the co-defendant pursuant to a plea agreement. In that case, the Defendant's fifteen year sentence was considerably less than Norris' 24 year sentence. As stated above, while neither counsel nor Defendant downplays the seriousness of the Gragg's apprehension, the lack of crime against property or person would lend itself to a lesser, not greater sentence. In short, as the courts of this state mandate, the punishment must fit the crime. If the Defendant has a "bad attitude" while serving a sentence, he will end up serving a great majority of that sentence and will be denied any good time incentive for early release, and also denied parole. The state has a mechanism in place to deal with "bad attitude" and it is a dangerous precedent indeed for courts of the state to place the probation officer's perception of "attitude" in such high regard.

6

35

The sentence is grossly disproportionate to the offense that was the subject of conviction, an attempted crime. The undersigned cannot find a similar sentence anywhere in the reported history of the state for an attempted burglary under these circumstances. The trial court must find the sentence was disproportionate and set the sentence aside.

V.    VERDICT IS CONTRARY TO THE LAW AND THE WEIGHT OF THE EVIDENCE

For the reasons stated above, the verdict rendered by the jury is contrary to the law and the weight of the evidence and must be set aside.

VI.    DEFENDANT RESERVES RIGHT TO RAISE ADDITIONAL ISSUES.

The Defendant reserves the right to raise additional issues before the court once a complete record of the trial is made available to him.

Respectfully submitted this the 13th day of Feby, 2004.

_____
KYLA GROFF KELIM (GRO014)
Attorney for Defendant

Of counsel:
ALEC BROWN & ASSOCIATES, P.C.
P.O. Box 1977
Alexander City, AL 35011-1977
(256) 409-9001
(256) 409-9003 facsimile

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was delivered to counsel for the state by placing a copy of the same addressed at his office address in the United States mail, First Class, Postage Prepaid on this the 13th day of Feby, 2004.

_____
Of counsel

FILED IN OFFICE THIS

FEB 17 2004

CHARLES W. STORY
CIRCUIT CLERK
CHAMBERS COUNTY, ALABAMA

7

36

IN THE CIRCUIT COURT OF CHAMBERS COUNTY, ALABAMA

STATE OF ALABAMA          )
                          )
VS.                       )      CASE NO. CC-02-318
                          )
CHRISTOPHER McCULLOUGH    )

ORDER

After consideration, Defendant's Motion for New Trial is DENIED.

Let a copy of this Order issue to the defendant, counsel, and the District Attorneys Office.

Signed this the 10th day of March, 2004.

RAY D. MARTIN
CIRCUIT JUDGE

FILED IN OFFICE THIS

MAR 1 0 2004

CHARLES W. STORY
CIRCUIT CLERK
CHAMBERS COUNTY, ALABAMA

C. McCullough  K. Kelim  DA

31

```
ACR0370              ALABAMA JUDICIAL INFORMATION SYSTEM      CASE: CC 2002 000318.00
OPER: RHM                    CASE ACTION SUMMARY
  GE:  1                     CIRCUIT   CRIMINAL                RUN DATE: 09/05/2002
==============================================================================
 N THE CIRCUIT COURT OF  CHAMBERS                                     JUDGE: XXX

 STATE  OF  ALABAMA                 VS     MCCULLOUGH CHRISTOPHER
                                           604 S 1ST AVE
 CASE: CC 2002 000318.00
                                           LANETT, AL  36863 0000

 DOB: 11/27/1972        SEX: M  RACE: B  HT: 0 00  WT: 000   HR:      EYES:
 SSN: 912000270  ALIAS NAMES:
==============================================================================
 CHARGE01: ATTEMPT - BURGLARY 1 CODE01: BUR1A LIT: ATTEMPT - BURG TYP: F #: 001
 OFFENSE DATE:                          AGENCY/OFFICER: 0120000

 DATE WAR/CAP ISS:                      DATE ARRESTED: 08/26/2002
 DATE    INDICTED: 08/05/2002           DATE    FILED: 09/05/2002
 DATE    RELEASED:                      DATE  HEARING:
       BOND AMOUNT:      $50,000.00            SURETIES:

 DATE 1: 09/23/2002   DESC: ARRG          TIME: 0900 A
 DATE 2:              DESC:               TIME: 0000

 TRACKING NOS: GJ 2002 000270 00   /                    /

    DEF/ATY: Steve Morris        TYPE:                          TYPE:
             Nick Wooten
             Kyla Kelim   00000                    00000
 PROSECUTOR:
```

```
 TH CSE: GJ200200027000 CHK/TICKET NO:                 GRAND JURY: 270
 OURT REPORTER: _____ SID NO:     000000000
 DEF STATUS: JAIL             DEMAND:                          OPER: RHM
==============================================================================
  TRANS DATE  |  ACTIONS, JUDGEMENTS, AND NOTES                        OPE
==============================================================================
| 09/05/2002 | ASSIGNED TO: (XXX)                         (AR01)     RHM |
| 09/05/2002 | CHARGE 01: ATTEMPT - BURGLARY 1/#CNTS: 001 (AR01)     RHM |
| 09/05/2002 | BOND SET AT: $50000.00                     (AR01)     RHM |
| 09/05/2002 | DEFENDANT INDICTED ON: 08/05/2002          (AR01)     RHM |
| 09/05/2002 | SET FOR:  ARRAIGNMENT ON 09/23/2002 AT 0900A(AR01)    RHM |
| 09/05/2002 | INITIAL STATUS SET TO: "J" - JAIL          (AR01)     RHM |
| 09/05/2002 | FILED ON: 09/05/2002                       (AR01)     RHM |
| 09/05/2002 | DEFENDANT ARRESTED ON: 08/26/2002          (AR01)     RHM |
| 09/05/2002 | CASE ACTION SUMMARY PRINTED                (AR03)     RHM |
```

| | |
|---|---|
| 9/23/02 | Plea of Not Guilty + Waiver of Arrg. Plea 10/17/02. |
| 10/17/02 | T 11/4/02 |
| 11/26/03 | Cont T 12/9/02. |
| 3/13/03 | Plea Set 4/15/03. |
| 3/31/03 | Motion to W/draw Steve Morris |
| 4/1/03 | Order - Motion to W/draw S. Morris is granted. Appoints Nick Wooten |
| 4/10/03 | Order - Motion to W/draw N. Wooten grant |

38

4/15/03    T    5/5/03.

4/24/03   Request by Def for Production by State.

9/23/03   Set Plea 10/16/03.

10/16/03    T    11/3/03

10/16/03  Order - Obtain Custody of Def for Trial.

11/3/03   Motions in Limine.

11/4/03   Order - Obtain Custody of Def.

11/14/03  Jury Verdict - Guilty -
                    Sentencing 12/16/03 @ 1:00pm.

12/18/03  Order - Cont. Sent. Jan 15, 2004.
             Obtain Custody of Def. for Hearing.

1/21/04   Order - Sentencing order
                    40years.

2/17/04   Motion for New Trial.

3/10/04   Order - Motion for New
             Trial is denied.

IN THE CIRCUIT COURT OF CHAMBERS COUNTY
AT LAFAYETTE, ALABAMA

STATE OF ALABAMA,              )

    Plaintiff,                )

vs.                            )     CASE NO.: CC 02-318

CHRISTOPHER MCCULLOUGH,        )

    Defendant.                )

### NOTICE OF APPEAL

COMES NOW, the Defendant and hereby files his notice of appeal, whereby he appeals the conviction imposed upon him as a result to a jury verdict of guilty rendered on November 14, 2003, and the sentence of forty years imprisonment imposed upon him on or about January 15, 2004. The defendant filed a motion for new trial on or about February 17, 2004 and the Court denied the motion on or about March 10, 2004.

Respectfully submitted this the ___31st___ day of _March_, 2004.

                                _____
                                 KYLA GROFF KELIM (GRO014)
                                 Attorney for Defendant
                                 Christopher McCullough

Of counsel:

ALEC BROWN & ASSOCIATES, P.C.
P.O. Box 1977
Alexander City, AL 35011-1977
(256) 409-9001
(256) 409-9003 facsimile



FILED IN OFFICE THIS

APR  1 2004

CHARLES W. STORY
CIRCUIT CLERK
CHAMBERS COUNTY, ALABAMA

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have this day served counsel for the State, Bill Lisenby, in the foregoing matter with a true and correct copy of the foregoing document by hand delivery or by mailing a copy thereof, postage prepaid to him at his respective address of Post Office Box 609, Lafayette, Alabama 36862 via United State's Mail, postage prepaid to him on this the 31st day of March, 2004.

Kyla G. Kelim
Alec Brown & Associates, P.C.
217 Madison Street
P.O. Box 1977
Alexander City, Alabama 35011-1977
(256) 409-9001
(256) 409-9003 facsimile
**Attorney for Defendant**

2

| State of Alabama Unified Judicial System Form ARAP-26 (front)    8/91 | COURT OF CRIMINAL APPEALS DOCKETING STATEMENT | Criminal Appeal Number _____-_____ |
| --- | --- | --- |

**A. GENERAL INFORMATION:**

☒ CIRCUIT COURT    ☐ DISTRICT COURT    ☐ JUVENILE COURT OF *CHAMBERS COUNTY* _____ COUNTY

_CHRISTOPHER MCCULLOUGH_ , Appellant

V.    ☒ STATE OF ALABAMA    ☐ MUNICIPALITY OF _____

| Case Number CC 02-318 | Date of Complaint or Indictment 8/5/02 | Date of Judgment/Sentence/Order 11/14/03 1/15/04 1/21/04 |
| --- | --- | --- |
| Number of Days of Trial/Hearing    2 Days | Date of Notice of Appeal Oral: | Written: 4/1/04 |

Indigent Status Requested: ☒ Yes ☐ No    Indigent Status Granted: ☒ Yes ☐ No

**B. REPRESENTATION:**

Is Attorney Appointed or Retained?    ☒ Appointed    ☐ Retained.    If no attorney, will appellant represent self? ☐ Yes ☐ No

Appellant's Attorney (Appellant if pro se) *(Attach additional pages if necessary)*
_Kyla Groff Kelim_

| Telephone Number (256) 409-9001 | | |
| --- | --- | --- |
| Address P.O. Box 1977 | City Alexander City | State AL | Zip Code 35010 |

**C. CODEFENDANTS:** List each CODEFENDANT and the codefendant's case number.

| Codefendant _Billy Norris_ | Case Number CC 02-319 |
| --- | --- |
| Codefendant | Case Number |
| Codefendant | Case Number |

**D. TYPE OF APPEAL:** Please check the applicable block.

1 ☒ State Conviction
2 ☐ Post-Conviction Remedy
3 ☐ Probation Revocation
4 ☐ Pretrial Order
5 ☐ Contempt Adjudication
6 ☐ Municipal Conviction
7 ☐ Juvenile Transfer Order
8 ☐ Juvenile Delinquency
9 ☐ Habeas Corpus Petition
10 ☐ Other (Specify)
_____

**E. UNDERLYING CONVICTION/CHARGE:** Regardless of the type of appeal checked in Section D, please check the box beside each offense category for which the appellant has been convicted or charged as it relates to this appeal. Also include the applicable section of the Code of Alabama for State convictions.

1 ☐ Capital Offense - § _____
2 ☐ Homicide - § _____
3 ☐ Assault - § _____
4 ☐ Kidnapping/Unlawful Imprisonment - § _____
5 ☐ Drug Possession - § _____
6 ☐ Trafficking in Drugs - § _____
7 ☐ Theft - § _____
8 ☐ Damage or Intrusion to Property - § _____
9 ☐ Escape - § _____
10 ☐ Weapons/Firearms - § _____
11 ☐ Fraudulent Practices - § _____
12 ☐ Offense Against Family - § _____
13 ☐ Traffic - DUI - § _____
14 ☐ Traffic - Other - § _____
15 ☒ Miscellaneous (Specify): _Attempted Burglary_ - § 13A-7-5, 13A-4-2

**F. DEATH PENALTY:**

Does this appeal involve a case where the death penalty has been imposed? ☐ Yes ☒ No

**G. TRANSCRIPT:**

1. Will the record on appeal have a reporter's transcript? ☒ Yes ☐ No
2. If the answer to question "1" is "Yes," state the date the Reporter's Transcript Order was filed. 4/8/04 (Date)
3. If the answer to question "1" is "No":
   (a) Will a stipulation of facts be filed with the circuit clerk? ☐ Yes ☐ No
   (b) Will the parties stipulate that only questions of law are involved and will the trial court certify the questions? ☐ Yes ☐ No

NOTE: If the appeal is from the district or juvenile court and the answer to question "1" is "No," then a positive response is required for question 3(a) or 3(b).

Form ARAP- 26 (back)    8/91    |    COURT OF CRIMINAL APPEALS DOCKETING STATEMENT

**H. POST-JUDGMENT MOTIONS:** List all post-judgment motions by date of filing, type, and date of disposition (whether by trial court order or by the provisions of Rules 20.3 and 24.4 (ARCrP)):

| DATE OF FILING | | | TYPE OF POST-JUDGMENT MOTION | DATE OF DISPOSITION | | |
|-------|-----|------|---|-------|-----|------|
| Month | Day | Year | | Month | Day | Year |
| 2 | 17 | 2004 | Motion for New Trial | 3 | 10 | 2004 |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**I. NATURE OF THE CASE:** Without argument, briefly summarize the facts of the case.

On 3/19/2002, Appellant and co-defendant were arrested in proximity to the land of the victims. Occupants in victims home alleged two black males wearing ski masks were seen in area of the home.

**J. ISSUE(S) ON APPEAL:** Briefly state the anticipated issues that will be presented on appeal. (Attach additional pages if necessary.)

I.  NO overt act proven sufficient to prove Attempted Burglary.

II.  No Independent Corroboration of Co-defendant's testimony.

III.  Court erred in failing to instruct jury on lesser included offense of Criminal Trespass in the Third Degree.

IV.  Appellant's sentence disproportionate and excessive.

V.  Verdict was contrary to the law + the evidence.

VI.  All other issues of record reserved.

**K. SIGNATURE:**

Date  4/8/04

Signature of Attorney/ Party Filing this Form

| State of Alabama Unified Judicial System | REPORTER'S TRANSCRIPT ORDER -- CRIMINAL | Criminal Appeal Number |
|---|---|---|
| Form ARAP-1C    8/91 | See Rules 10(c) and 11(b) of the Alabama Rules of Appellate Procedure (A.R. App.P.) | |

TO BE COMPLETED BY COUNSEL FOR THE APPELLANT OR BY THE APPELLANT IF NOT REPRESENTED AND FILED WITH THE WRITTEN NOTICE OF APPEAL OR FILED WITHIN 7 DAYS AFTER ORAL NOTICE OF APPEAL IS GIVEN.

☒ CIRCUIT COURT · ☐ DISTRICT COURT ☐ JUVENILE COURT OF _CHAMBERS COUNTY_ COUNT

_CHRISTOPHER MC CULLOUGH_, Appellant

V. ☒ STATE OF ALABAMA    ☐ MUNICIPALITY OF _____

| Case Number CC 02-318 | Date of Judgment/Sentence/Order |
|---|---|
| Date of Notice of Appeal Oral:    Written: 4/1/04 | Indigent Status Granted: ☒ Yes  ☐ No |

**PART 1. TO BE SIGNED IF THE APPEAL WILL NOT HAVE A COURT REPORTER'S TRANSCRIPT:**

I CERTIFY THAT NO REPORTER'S TRANSCRIPT IS EXPECTED AND THAT THE RECORD ON APPEAL SHALL CONSIST OF THE CLERK'S RECORD ONLY. IF THE APPEAL IS FROM DISTRICT COURT OR JUVENILE COURT, I ALSO CERTIFY (1) THAT A STIPULATION OF FACTS WILL BE INCLUDED IN THE CLERK'S RECORD AND THAT THE APPELLANT WAIVES HIS RIGHT TO A JURY TRIAL IF SO ENTITLED; OR (2) THAT THE PARTIES HAV STIPULATED THAT ONLY QUESTIONS OF LAW ARE INVOLVED AND THAT THE QUESTIONS WILL BE CERTIFIED BY THE JUVENILE/DISTRIC COURT FOR INCLUSION IN THE CLERK'S RECORD (SEE RULE 28(A)(1), ALABAMA RULES OF JUVENILE PROCEDURE, AND §12-12-72, CODE O ALABAMA 1975).

_____     _____     _____
Signature              Date                Print or Type Name

**PART 2. DESIGNATION OF PROCEEDINGS TO BE TRANSCRIBED.** Request is hereby made to the court reporter(s) indicated below for a transcript of the following proceedings in the above referenced case (see Rule 10(c)(2), Alabama Rules of Appellate Procedure (A.R.App.P.)):

MARK PROCEEDINGS REQUESTED:                                          COURT REPORTER(S)

A. ☒ TRIAL PROCEEDINGS - Although this designation will include the judgment and sentence proceedings, a transcript of the organization of the jury and arguments of counsel must be designated separately.

_FRANCES ROARK_
_P.O. BOX 763_
_Wedowee, AL 36278_

B. ☐ ORGANIZATION OF THE JURY - This designation will include voir dire examination and challenges for cause. Note that in noncapital cases the voir dire of the jury will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

C. ☐ ARGUMENTS OF COUNSEL - Note that in noncapital cases the arguments of counsel will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)

IN ADDITION TO ANY PROCEEDINGS DESIGNATED ABOVE, SPECIAL REQUEST IS HEREBY MADE TO INCLUDE THE FOLLOWING PROCEEDINGS IN THE REPORTER'S TRANSCRIPT PORTION OF THE RECORD ON APPEAL. (ATTACH ADDITIONAL PAGES IF NECESSARY.)

| ADDITIONAL PROCEEDINGS REQUESTED | DATE | COURT REPORTER(S) |
|---|---|---|
| D. | | |
| E. | | |
| F. | | |
| G. | | |

IMPORTANT NOTICE: The court reporter who reported the proceedings for which a transcript is requested must be identified on this form to L effective. Additionally, it is important to note that the appellant may not be permitted to raise any issue on appeal relating to any proceedings the case that are not specifically designated on this form for inclusion in the reporter's transcript. A general designation such as "all proceedings" not sufficient. (See Rule 10(c)(2), A.R.App.P.)

**PART 3. MUST BE SIGNED IF THE APPEAL WILL HAVE A COURT REPORTER'S TRANSCRIPT:**

I CERTIFY THAT I HAVE DISTRIBUTED THIS FORM AS SET OUT BELOW. I ALSO CERTIFY (1) THAT I HAVE MADE SATISFACTORY FINANCI ARRANGEMENTS WITH EACH COURT REPORTER LISTED ABOVE FOR PREPARING HIS OR HER PORTION OF THE REPORTER'S TRANSCR HEREIN REQUESTED; OR (2) THAT THE APPELLANT PROCEEDED AT TRIAL AS AN INDIGENT AND THAT STATUS HAS NOT BE REVOKED; OR, (3) THAT THE APPELLANT HAS BEEN GIVEN PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS.

_____     4/8/04     _KYLA GROFF ICEUM_
Signature              Date        Print or Type Name

DISTRIBUTION: Original filed with Clerk of Trial Court and copies mailed to:  (1) Clerk of the Court of Criminal Appeals.  (2) the District Attorne (3) the Attorney General or the municipal prosecutor in lieu of the District Attorney and the Attorney General if the appeal is from municipal conviction, and (4) to each Court Reporter who reported proceedings designated for inclusion in the reporter's transcrip

45

| State of Alabama<br>Unified Judicial System<br><br>m ARAP-14         Rev. 11/91 | CERTIFICATE OF COMPLETION AND<br>TRANSMITTAL OF RECORD ON<br>APPEAL BY TRIAL CLERK | Appellate Case Number<br><br>_____ |
|---|---|---|

| TO: THE CLERK OF<br>THE COURT OF CRIMINAL APPEALS OF ALABAMA | DATE OF<br>NOTICE OF APPEAL:  *April 1 2004* |
|---|---|

APPELLANT

*Christopher McCullough.*

v.    STATE OF ALABAMA

---

I certify that I have this date completed and transmitted herewith to the appellate court the record on appeal by assembling in (a single volume of _____ pages) (____1____ volumes of 200 pages each and one volume of *109* pages) the clerk's record and the reporter's transcript and that one copy each of the record on appeal has been served on the defendant and the Attorney General of the State of Alabama for the preparation of briefs.

I certify that a copy of this certificate has this date been served on counsel for each party to the appeal.

DATED this _____*1*_____ day of _____*June*_____, *2004*.


_____
Circuit Clerk

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE FIFTH JUDICIAL CIRCUIT

IN AND FOR CHAMBERS COUNTY

LAFAYETTE, ALABAMA


STATE OF ALABAMA

VS                                    CC 02-318

CHRISTOPHER MCCULLOUGH

　　　　Defendant                    COPY


BEFORE:    Judge Howard Ray D. Martin and jury
           November 13 & 14, 2003, 9:00 a.m.



                    APPEARANCES

        FOR THE STATE:

            Mr. Bill Lisenby

            Ms. Amy Newsome

        FOR THE DEFENDANT:

            Ms. Kyla Kelium







    Frances P. Looney, CSR, RPR

    Official Court Reporter

```
 1              I N D E X   O F   W I T N E S S E S

 2     FOR THE STATE:            D         X          RD        RX

 3     (Suppression)

 4     BLACKSTONE, Jeff          54        59         64

 5     CARTER, Richard           64        69 .       74

 6     (Trial)

 7     TRAMMELL, Ola Mae         79        84

 8     GRAGG, Judith             86        93

 9     GRAGG, Charles M.         96        103

10     BETTIS, Robbie            106       113

11     WHALEY, Lincoln           115       123

12     NORRIS, Billy             124       135

13     BLACKSTONE, Jeff          145       151

14     CARTER, Richard           154       167

15     FOR THE DEFENDANT:

16     MCCULLOUGH, Chris         176       183

17

18

19

20

21

22

23

24

25
```

```
 1                I N D E X   O F   E X H I B I T S

 2     FOR THE STATE:                    Page

 3     1 (form)                           56

 4     2 (statement)                      67

 5     3 (statement)                      75

 6     4 (mask)                          144

 7     5 (envelope)                      157

 8     6 (tape)                          161

 9     7 (plea)                          125

10     FOR THE DEFENDANT:

11     1 (form)                           61

12     2 (statement)                      63

13

14     MOTIONS:  172, 199

15     JURY CHARGE:  221

16     VERDICT:  244

17

18

19

20

21

22

23

24

25
```

1        THE COURT:  Calling for trial the case of

2    State of Alabama versus Christopher McCullough,

3    case number CC O2-318.  What says the State?

4        MR. LISENBY:  State is ready, Your Honor.

5        THE COURT:  What says the defense?

6        MS. KELIUM:  Defense is ready, Your Honor.

7        THE COURT:  Ladies and gentlemen, I'll need

8    for all of you to stand where you are and raise

9    your right hands.

10                    (JURY SWORN)

11        THE COURT:  This case is brought by way of

12    indictment.  And as I have told all of you before

13    the indictment in this case is not evidence.  It

14    is the formal means by which a case is brought

15    before you for trial.  It is the formal procedure

16    by which a defendant is charged with a crime and

17    brought before you as I said for trial.  The

18    indictment reads as follows:  The grand jury of

19    said county charge that before the finding of this

20    indictment Christopher McCullough did with the

21    intent to commit the crime of burglary first

22    degree Section 13A-7-5 of the Code of Alabama

23    attempt to commit said offense by attempting to

24    knowingly and unlawfully enter or remain

25    unlawfully in a dwelling of another, that being,

1    Mike Gragg with intent to commit a therein, to

2    wit:  theft and while effecting entry or while in

3    the dwelling or immediate flight therefrom the

4    said Christopher McCullough was armed with an

5    explosive or a deadly weapon that being a pistol a

6    further description of which is otherwise unknown

7    to the grand jury in violation of Section 13A-4-2

8    of the Code of Alabama against the peace and

9    dignity of the State of Alabama, signed Rea S.

10   Clark, District Attorney.

11        As I said before the indictment in this case

12   is not evidence, but it is the formal method of

13   charging a defendant with a crime and bringing

14   that person before you for trial.

15        Now, first I'm going to ask for the State to

16   identify those persons that will be acting on the

17   State's behalf in prosecution of this cause.

18        MR. LISENBY:  Thank you, Your Honor.  Good

19   morning.  My name is Bill Lisenby.  I'm the Chief

20   Assistant District Attorney here for the Fifth

21   Circuit along with Amy Newsome who is the

22   Assistant District Attorney here in Chamber County

23   will be prosecuting this case.  Mr. Mike Gragg is

24   the alleged victim in this case.  And his wife

25   Judith Gragg is back here.  If you want me to,

1    Your Honor, I'll just go ahead and introduce the

2    potential witnesses?

3        THE COURT:  Please do.

4        MR. LISENBY:  Other potential witnesses in

5    this case are Ola Peril Trammell.  Stand for me,

6    please.  Bobby Bettis, Lincoln Whaley, Rick Brown,

7    Richard Carter also with the Lanett Police

8    Department.  I think he stepped out of the

9    courtroom right now.  Individual by the name of

10   Billy Norris also potentially will testify.  Our

11   investigator will be in and out is Jeff Chandler

12   whose office is actually over in Alexander City.

13   But he works all four counties in the circuit.

14       THE COURT:  And the same for defense.

15       MS. KELIUM:  My name is Kyla Kelium.  I know

16   you have got to see me the last week or so.  I

17   practice in Alexander City with Alec Brown.  He

18   couldn't be here today.  He's sorry.  With me is

19   Chris McCullough of Lanett.  Thank you.

20       THE COURT:  Ladies and gentlemen, are any of

21   you related by blood or marriage to the defendant,

22   his attorney, to any of the prosecutors, or to the

23   persons identified by the prosecution as working

24   with the state in the prosecution of this case?

25   Are any of you related by blood or marriage to any

1      of those persons that have been identified?

2          I think Investigator Carter if you would

3      stand, please, sir.  Investigator Carter will also

4      be involved in the prosecution of this case.  Are

5      any of y'all related by blood or marriage to any

6      of these identified individuals?

7          MR. LISENBY:  Judge, I'm sorry.  There's one

8      other individual that came in, too, Investigator

9      Jeff Blackstone with the sheriff's department.

10         THE COURT:  Anyone related by blood or

11     marriage to any of these folks?  Have each of you

12     been a resident householder of Chambers County for

13     the last six months?

14         Have any of you been indicted within the last

15     12 months for the felony offense for attempted

16     burglary first degree or for any similar offense

17     as that with which this defendant is charged?

18         Do any of you have an interest in the

19     conviction or acquittal of the defendant, or have

20     you made any promise or given any assurance that

21     you will either convict or acquit this defendant?

22         Do any of you have a fixed opinion as to the

23     guilt or innocence of the defendant which would

24     bias your verdict one way or the other?

25         Now, I expect that the State's allegations

1   brought in this indictment alleged that this

2   offense occurred on or about March 19th year 2002

3   at a residence on Country Club Road that being

4   3622 Country Club Road in Lanett, Chambers County,

5   Alabama.

6           Are any of you a witness or a potential

7   witness in this case?

8           The indictment itself was returned by the

9   grand jury of Chambers County for the fall term

10   year 2002.  Were any of you a member of the

11   Chambers County grand jury for the fall term year

12   2002?

13           Do any of you have a fixed opinion against

14   imprisonment in the penitentiary?

15           Would each of you convict on circumstantial

16   evidence?

17           Do any of you know anything about the facts

18   of this case which would influence your verdict

19   one way or the other?

20           Do any of you know of any reason why you if

21   selected as a juror in this case could not give

22   both the state and the defendant a fair and

23   impartial trial?

24           Ladies and gentlemen, the attorneys for both

25   State and defense will have certain questions for

1    you now.  At the conclusion of all questions by

2    counsel if there's something that you think might

3    affect your ability to serve as a fair and

4    impartial juror in this case, I'll give you an

5    opportunity to come up here and tell me about that

6    in private.  Any questions from the State?

7         MR. LISENBY:  Yes, Your Honor, thank you.

8         Good morning.  I want to do the same thing

9    that you did last Monday because I was in here and

10    have not had an opportunity to do that.  As I said

11    my name is Bill Lisenby.  I'm the Chief Assistant

12    District Attorney here in the Fifth Circuit.  My

13    wife's name is Carol.  She is formally Carol

14    Bishop from Five Points.  She's a housewife.  We

15    have one adult daughter who's 19.  Her name is

16    Samantha.  She works down in the 911 dispatch

17    center.  You know a little bit about me.  We know

18    a little bit about you.  Ms. Newsome has taken

19    some very good notes.  So I have only a few

20    questions I need to ask.  But if you do have a

21    response we need you to stand for us for the court

22    reporter to get your name first and your response.

23         Is there any member of the panel that knows

24    the defendant in this case Chris McCullough?

25    Anyone know Mr. McCullough?  Several hands.  I

1    don't see any on the first two rows.  On the third

2    row.  Yes, ma'am, your name, please?

3         JUROR:  My name is Janice Jackson.  I know

4    Christopher's mom.  Their family stay sort of in

5    the neighborhood.  Normally I used to see him

6    walking the streets.

7         MR. LISENBY:  When you say you know his

8    mother are the two of you friends?

9         JUROR:  No.

10        MR. LISENBY:  Know her from the neighborhood

11   also?

12        JUROR:  Right.

13        MR. LISENBY:  Follow-up question for you in

14   just a moment.  Your name?

15        JUROR:  Denise Ray.  I know Christopher going

16   to school.  He a couple of grades ahead of me in

17   school.

18        MR. LISENBY:  Ms. Ray.  Would you consider

19   yourself a friend of Mr. McCullough's?

20        JUROR:  No.

21        MR. LISENBY:  Just an acquaintance through

22   school?

23        JUROR:  Yes.

24        MR. LISENBY:  Have you seen him since then?

25        JUROR:  Not really.

1          MR. LISENBY:  Anyone else on that same row?

2     Next row?  Yes, sir.

3          JUROR:  Me and Christopher went to school

4     together.

5          MR. LISENBY:  Your name, please.

6          JUROR:  Timothy Farmer.

7          MR. LISENBY:  Were you in the same grade?

8          JUROR:  Might be.  I can't remember.

9          MR. LISENBY:  Would you consider him a friend

10    of yours?

11         JUROR:  Not really.

12         MR. LISENBY:  Just an acquaintance.  Have you

13    seen him since then?

14         JUROR:  No.

15         MR. LISENBY:  Anyone else on the same row

16    with Mr. Farmer?  Next row?  Another hand?  Yes,

17    ma'am, your name, please?

18         JUROR:  Williams.

19         MR. LISENBY:  How is it that you know Mr.

20    McCullough?

21         JUROR:  I grew up with him, been knowing him

22    since childhood.

23         MR. LISENBY:  Do you still have some contact

24    with him?

25         JUROR:  No.

1       MR. LISENBY:  Would you consider him a

2    friend of yours?

3       JUROR:  No.

4       MR. LISENBY:  How long ago would you say the

5    last time you had seen him, your best judgment?

6       JUROR:  Probably about a year and a half ago.

7       MR. LISENBY:  Thank you, ma'am.  Anyone else

8    that knows Mr. McCullough?  I'll go ahead and

9    expand that.  Already had one response about

10   knowing his family.  Any of you know Mr.

11   McCullough's family members?  Ms. Williams,

12   again.  Okay.  Ms. Jackson, you knew his mother;

13   is that right?

14      JUROR:  Yes.

15      MR. LISENBY:  Do you recall her name by any

16   chance?

17      JUROR:  Yes, it's Bobbie McCullough.

18      MR. LISENBY:  Thank you.  Anyone happen to

19   know Bobbie McCullough, sound familiar to you?

20   Ms. Williams.  Anyone else?  See no other

21   response.  Go ahead and ask those four people Mr.

22   Farmer, Ms. Jackson, Ms. Williams, and Ms. Ray,

23   would the fact that you know Mr. McCullough or a

24   family member of his family or had some

25   acquaintance with him would that cause you any

problem sitting on a jury and trying to decide
whether he were guilty or not guilty of this
crime? Ms. Williams, no. Mr. Farmer is shaking
his head no. Ms. Jackson?

JUROR: No.

THE COURT: And I saw a hand was that a yes
or no?

JUROR: No.

MR. LISENBY: Thank you, Ms. Ray. I have
mentioned the name, the individual is not here.
His name is Billy Norris who may testify during
the course of this trial. Any member of the panel
that knows Billy Norris or any of his family
members? Ms. Williams. Okay. Tell me about that
Ms. Williams.

JUROR: My dad married his mom.

MR. LISENBY: Are they still together?

JUROR: Yes.

MR. LISENBY: Anyone else know Mr. Norris or
any of his family members? Ms. Williams, let me
ask you this, would the fact that Mr. Norris may
be a witness in this case, would that cause you
any problems sitting on a jury?

JUROR: No.

MR. LISENBY: You have been introduced to Ms.

1    Keli◯  she is a defense attorney here.  She works

2    with Alec Brown over in Alexander City.  But she

3    and Mr. Brown come over here to Chambers County

4    and other places.  So I have a question is there

5    any member of the panel that knows Ms. Kelium or

6    Mr. Brown on a personal level, went to the same

7    school together, children in school together,

8    clubs, church, anything of that nature?  Anyone

9    know Ms. Kelium or Mr. Brown?  No response to

10   that.

11       Is there any member of the panel or a family

12   member to your knowledge that's ever had any legal

13   work done for you by Ms. Kelium or Mr. Brown?  No

14   response to that.

15       Now, I identified several individuals who are

16   seated over here.  A couple of them have police

17   officer uniforms on.  They're members or former

18   members of the Lanett Police Department.  I have a

19   broad question.  Then I'll narrow it down a little

20   bit.  Is there any member of the panel that's ever

21   had a problem with any member of the Lanett Police

22   Department?  That could be something involving a

23   case that came up or you got stopped for speeding,

24   you didn't like the way the police officer treated

25   you or maybe even something that was private in

1    nature, some kind of contract that maybe didn't go

2    well, you had some animosity somewhere?  Any

3    member had any problems with the Lanett Police

4    Department?  I see no response to that.

5         I want to be specific and ask you again

6    whether it be on a level involving police officers

7    or private in nature such as a contract dispute,

8    children got into a fight at school, anything of

9    that nature?  Anyone have any problems or a family

10   member ever had any problems with Lincoln Whaley

11   or Richard Carter, Robbie Bettis, Rick Brown,

12   Steven Wood, those are all the Lanett Police

13   Department, and expand it to Jeff Blackstone who

14   works with the Chambers County sheriff's

15   department?  Any problems with any of those

16   individuals?  No response to that.

17        If you do have a response to these questions

18   and you don't want to just say it out loud, it's

19   quite all right.  At the very end of my questions

20   and Ms. Kelium questions for you to come up and

21   approach the judge if there's something you think

22   about and don't want to respond out in public we

23   all understand that.  I'm not trying to embarrass

24   anyone, trying to get some information.  If you

25   think about something just let us know.  Let me

1  ask a broad question again.  I think there have

2  been some responses to this in the past and

3  because this record in this case is coming up, I

4  need to get those responses.

5      Is there any member of the panel that's had a

6  problem with any law enforcement officer that's

7  left kind of a bad taste in your mouth or that

8  you've had some concern about that?  Tell me your

9  name.

10     JUROR:  Priscilla Buzbee.

11     JUROR:  Russell Ennis.

12     MR. LISENBY:  Anyone else that had a response

13 to that?  Judge, do you need those individuals to

14 come up front?

15     THE COURT:  Yes.

16     MR. LISENBY:  Want them to do that now?

17     THE COURT:  Yes.

18     MR. LISENBY:  Ms. Buzbee and Mr. Ennis come

19 up individually.

20     THE COURT:  Go ahead.

21         (The following occurred at the bench

22         outside the hearing of the jury.)

23     MR. LISENBY:  Ms. Buzbee, I know that you

24 have responded to this earlier in this term.  But

25 for this record could you explain again what your

1  prob[ ]m was?

2  JUROR:  Yes, sir.  My brother was hit by a

3  hit and run driver.  And he nearly died from the

4  accident.  And during the course of the time that

5  he was in the hospital, he was in the hospital for

6  two months in intensive care, and from there to

7  Warm Springs two months.  He had to have some

8  therapy done in Columbus.  The police never did

9  solve the case.  A name was turned in, but they

10  never done anything about it.

11  MR. LISENBY:  Which department was that?

12  JUROR:  Valley.

13  MR. LISENBY:  Valley Police Department.

14  JUROR:  Yes, sir.  During the time each time

15  we tried to find out information we would have to

16  go ourselves.  They never called us to give us any

17  information, so the case was left unsolved.

18  MR. LISENBY:  How long ago was that?

19  JUROR:  It was two years ago.

20  MR. LISENBY:  Two years.

21  JUROR:  Yes, sir.  It left my brother with a

22  limp.  He almost died from the accident.

23  MR. LISENBY:  Is he doing better now?

24  JUROR:  Yes, sir, doing better.

25  MR. LISENBY:  If you were to sit as a juror

in this case and listen to law enforcement officers, these officers are not from the Valley Police Department, but they're from the Lanett Police Department and the sheriff's office, would that cause you some problems in listening to their testimony and making a determination --

JUROR:  I don't think so.

MR. LISENBY:  You think you would be okay listening to them?

JUROR:  Yes, sir.

MR. LISENBY:  Mr. Ennis, you had I believe previously answered this question earlier on another case; but for this record, can you tell the Court again what your problem was with law enforcement?

JUROR:  The policeman that arrested me was dishonest, and I feel like a policeman ought to be honest.

MR. LISENBY:  Which officer was that?

JUROR:  Jerome Bailey.

MR. LISENBY:  Was he with the sheriff's office at that time or with the Valley Police Department?

JUROR:  Valley.

MR. LISENBY:  About how long ago would that

1    have been?

2        JUROR:  Probably been at least six years.

3        MR. LISENBY:  There's going to be testimony

4    from law enforcement officers in this case.  Do

5    you have a general dislike for law enforcement

6    officers, or do you think that would be limited to

7    just Officer Bailey?

8        JUROR:  I wouldn't say all police, no.  I

9    would hope that some of them are honest.  I mean

10   if they ain't we're in trouble.

11       MR. LISENBY:  Let me ask you this.  If you

12   were to serve as a juror on this case and you had

13   to make determinations about things that law

14   enforcement officers said which obviously you

15   would listening to testimony, do you think that

16   you would be able to put out of your mind your

17   problem with Officer Bailey, or would that cause

18   you to lien one way or another?

19       JUROR:  It could tend to make you lien to be

20   honest with you.

21       MR. LISENBY:  That's all we want.  I

22   appreciate that.  That's exactly what we want is

23   you to be honest with us.  Let's say, for example,

24   a law enforcement witness were to come in and

25   testify that the light was red and a non-law

1    enforcement witness were to come in and testify

2    that the light was green and you had to make a

3    determination about who was being truthful, would

4    you be -- because of your past problems with law

5    enforcement -- more inclined to believe the other

6    individual or less inclined to believe the police

7    officer because of that?

8        JUROR:  Very possible.

9        MR. LISENBY:  Again that's all we want is you

10   to be honest with us?

11       THE COURT:  Thank you, sir.  Any questions?

12       MS. KELIUM:  No.

13       MR. LISENBY:  Challenges now?

14       THE COURT:  Go ahead.

15       MR. LISENBY:  I'll go ahead and challenge Mr.

16   Ennis for cause based on his responses.

17       MS. KELIUM:  He said he couldn't be fair?

18       THE COURT:  Challenge granted.

19       MS. KELIUM:  Also if you want to take it up

20   now there was a lady who said she was related by

21   marriage to one of the witnesses.

22       THE COURT:  Who is that?

23       MS. KELIUM:  Ms. Williams, her dad was

24   married to a witness' mother, still married now.

25       THE COURT:  That's close enough.  What's the

1    name.  That will be granted relative of that

2    witness.  Priscilla Eubanks.

3         MR. LISENBY:  I'm going to go ahead and

4    challenge Ms. Buzbee for cause also.  She was the

5    first lady that came up.

6         MS. KELIUM:  She said she could be fair.

7         THE COURT:  Denied.

8              (JURY PRESENT)

9         MR. LISENBY:  Is there anyone else that has a

10   response to that question?  Yes, ma'am.

11        JUROR:  Anywhere we have a problem with law

12   enforcement?

13        MR. LISENBY:  Yes, ma'am.  You want to come

14   on up, please, ma'am?

15        THE COURT:  Your name?

16              (The following occurred at the bench

17               outside the hearing of the jury.)

18        JUROR:  Amy Stanford.  And I'm paying a fine

19   now due to when a law officer told me in South

20   Cobb I was driving on a suspended tag.  It was my

21   brother's car.  And he asked me for some

22   information concerning my brother, and he would

23   give me a warning and let me go.  But I found out

24   that I missed a court date.  He actually wrote out

25   a ticket.

22

1    THE COURT:  Would that have an effect on your

2    ability to sit on this jury which you will hear

3    testimony from law enforcement officers.  Would

4    that affect your ability to serve?

5         JUROR:  No, because the law officers here

6    treated me okay even with the FTA when I was

7    arrested.  I got an apology from a law officer in

8    Lanett.

9         THE COURT:  Any questions?

10        MR. LISENBY:  No.

11        MS. KELIUM:  No.

12        THE COURT:  Thank you.

13             (Jury present)

14        MR. LISENBY:  Is there anyone else that had

15   a response to that question?  No other responses.

16        Now, a person that has already identified

17   Billy Norris was also an individual charged in

18   this particular case who may testify during the

19   course of the trial.  And he would be called a

20   co-defendant, an individual who was charged

21   jointly with Mr. McCullough.  Mr. Norris has

22   already entered a guilty plea with regard to this

23   case and agreed to testify.  My question to you is

24   there any member of the panel as you sit there

25   now -- of course, you don't know what the judge is

1  going to instruct you and that type of thing --

2  but just as you sit there now is there any member

3  of the panel that thinks it's inappropriate for

4  the State to make agreements with co-defendants to

5  testify in a trial?  Okay.  One response.  Anyone

6  else?  Sir, could you come up, please, sir?

7           (The following occurred at the bench

8           outside the hearing of the jury.)

9       THE COURT:  Your name for the record?

10      JUROR:  Joey Finley.

11      MR. LISENBY:  Mr. Finley, of course, you

12  don't know anything about what the agreement was

13  or anything of that nature.  But you indicated

14  that you had a problem with the State making

15  agreements with co-defendants to testify.  Can you

16  tell us what your problem is with that, what your

17  feeling is about that?

18      JUROR:  I sort of kind of feel like if they

19  were both were involved in it, then it's not right

20  for the other one to turn around and point the

21  finger and say, well, he was doing this or he did

22  that in compliance with the Court to get a lesser

23  plea.  You're an adult.  You know what you did.

24  You should go ahead and take what you did on your

25  part because he didn't make him do it.

1  MR. LISENBY:  If Mr. Norris the co-defendant

2  in this case were to testify, would you be less

3  inclined to believe him because he had entered

4  into an agreement with the State to testify?

5  JUROR:  No.

6  MR. LISENBY:  Even though your feelings are

7  against that policy if he were to testify about

8  the case you're telling us you would be able to

9  evaluate his testimony along with all of the other

10  evidence?

11  JUROR:  Yes, sir.

12  MR. LISENBY:  And make a determination.  If

13  it came to a point of where Mr. Norris testified

14  that the light was red and another witness were to

15  testify that the light was green, would you simply

16  because of your feelings about the fact that he

17  had an agreement with the State, would you be more

18  inclined to believe that other witness that

19  testified the light was green?

20  JUROR:  No.

21  MR. LISENBY:  So you would be fair and

22  impartial?

23  JUROR:  Yes.

24  THE COURT:  Any questions?

25  MS. KELIUM:  No.

(Jury Present)

MR. LISENBY:  Is there anyone else that had a response to that particular question now that you have had a chance to sit and think about it for a little bit?  Any problems with it in your mind as you sit there now the fact that the state has made an agreement with an individual to testify in this case?  No response to that.

Let me just ask it in kind of another way. Is there anyone that thinks because of that agreement, simply because of that, you would be less inclined to believe that individual than another person who testified?  If you could come up front, please.  And if there's anyone else that has a response to that, if you could just come on up front and line up.

(The following occurred at the bench outside the hearing of the jury.)

JUROR:  James Wright.

MR. LISENBY:  Okay, thank you, Mr. Wright. Mr. Wright, can you tell me what your feelings are about that?

JUROR:  Well, if I got picked I didn't want to wait till then.  I don't know.  I just have a problem believing that they were conspirators.  I

would have a problem believing what he said.

MR. LISENBY:  Just because he was involved?

JUROR:  Yes.

MR. LISENBY:  If the judge were to give you instructions about how to evaluate not only that witness, but all witnesses and there was information about how to evaluate a co-defendant's testimony, would you be able to follow the law, or do you think that because of your own feelings you would have to disregard any of it?

JUROR:  I would have no problem with the law.

MR. LISENBY:  I don't want to get into what the judge is going to instruct, okay.  I'm just going to do it in kind of a general term.  But if the law were to instruct you that you were to evaluate all the witnesses' testimony and consider it along with all of the other evidence in the case and determine what weight, if any, and what credibility to give, if any, to someone you would be able to do that?

JUROR:  I would be able to follow instructions, yes.

MR. LISENBY:  That would be despite your feelings that initially you said you didn't think you would be able to believe him because he was a

conspirator?

JUROR:  If I had certain instructions on the

situation.

MR. LISENBY:  You feel like you could do

that?

JUROR:  Yes.

(Jury Present)

MR. LISENBY:  Is there anyone else that after

they thought about it has a response to that

question?  See no other responses to that.

The judge asked you a question about if

anyone knew about the facts of the case to the

extent that it would influence your verdict one

way or the other.  I would like to know if there's

any member of the panel either at work or at

church or reading about it in the paper anything

on the radio anyone that knows anything about the

facts of the case at all?  Anyone remember it?  No

response to that.

Thank you very much.  I believe that's all

the questions I have.  Thank you, Your Honor.

THE COURT:  Ms. Kelium.

MS. KELIUM:  Good morning.  Let me tell you a

little bit about myself.  I guess you know I'm a

lawyer.  And I practice in Alexander City.  My

1    husband's name is Patrick Kelium.  And he's a

2    marine technician at Kowaliga We have a two year

3    old son Paton and will have a little brother or

4    sister.  I'm here today representing my client

5    Christopher McCullough.  As you have heard already

6    he has a mother named Bobbie McCullough, two

7    brothers Marcus and Edmond McCullough.  They're

8    all from the Valley area.  Chris attended Valley

9    High School.  Does anyone here know any of

10   Christopher's relatives?  Already heard from Ms.

11   Jackson.  The gentleman right there on the fourth

12   row.

13       JUROR:  I went to high school with Edmond and

14   Marcus McCullough.  Danny Smith.

15       MS. KELIUM:  Anyone else responded?  I have

16   you already, Ms. Ray.  What's your name?

17       JUROR:  Whitlow.  I went to school with his

18   brother.

19       MS. KELIUM:  Anybody else that I hadn't

20   already talked to.  Ms. Whitlow and Mr. Smith, due

21   to your knowing Mr. McCullough's brothers would

22   you have any problem being fair and impartial in

23   this case involving Christopher?

24       JUROR:  No.

25       MS. KELIUM:  You have been asked if you're

1    related by brood or marriage to any of the law

2    enforcement officers that you were introduced to

3    over here, Mr. Ennis, Mr. Bettis, Investigator

4    Carter, Whaley, and Jeff Blackstone.  Does anybody

5    know any of these officers?  All right, Mr.

6    Finley.

7         JUROR:  Yes.

8         MS. KELIUM:  Who do you know?

9         JUROR:  Officer Blackstone.

10        MS. KELIUM:  How do you know him?

11        JUROR:  From a case that my brother is

12   involved in.

13        MS. KELIUM:  Yes, sir.

14        JUROR:  I know Maye through some detective

15   work.

16        MS. KELIUM:  What's your name?

17        JUROR:  Michael Cotney.

18        JUROR:  Patrol the streets, go up and down

19   the streets.  I know most all of them.

20        MS. KELIUM:  What's your name, sir?

21        JUROR:  Lonnie Morgan.

22        MS. KELIUM:  One other response.

23        JUROR:  I know Richard Carter and Blackstone,

24   too.

25        MS. KELIUM:  What's your name?

1    JUROR:  Phil Slay.

2    MS. KELIUM:  How do know him?

3    JUROR:  Richard and I went to high school

4    together.  He was about two years younger than I

5    was.  Played football together.  I know Blackstone

6    as a deputy.

7    MS. KELIUM:  Mr. Slay, in your relationship

8    with Ms. Blackstone and Mr. Carter would you have

9    any problem being fair and impartial to Mr.

10   McCullough, or would you be more likely to believe

11   something that Mr. Carter and Blackstone might

12   say?

13   JUROR:  It would not influence me either way.

14   Assume everything is right I will do what's right.

15   It don't matter if I have been knowing him a long

16   time.

17   MS. KELIUM:  Due to your relationship with

18   either Mr. Blackstone or Mr. Carter would you be

19   more inclined to believe what they say if they

20   were to testify in this case?

21   JUROR:  If I could see the evidence and

22   everything else like that.

23   MS. KELIUM:  What I'm asking you is if they

24   got up and said light is green, somebody else says

25   the light is red, would you be more inclined to

1    believe them?

2        JUROR:  That they said it was green, yes, I

3    guess.

4        MS. KELIUM:  That's all I'm going to ask.

5    Mr. Cotney, same question to you.  Would you be

6    more likely to believe the officers that you know?

7        JUROR:  No, ma'am.

8        MS. KELIUM:  Anyone else respond to that

9    question?

10        JUROR:  I know Rick Brown from work related.

11    My name is Martha Milner.

12        MS. KELIUM:  If Mr. Brown were to testify in

13    this case would you be more likely to believe him

14    because of your relationship with him than any

15    other witness?

16        JUROR:  No.

17        MS. KELIUM:  Fairly evaluate what he says?

18        JUROR:  Yes.

19        MS. KELIUM:  You don't think if he said the

20    light was green and somebody else said it was red,

21    you wouldn't be more inclined to believe Mr.

22    Brown?

23        JUROR:  No.

24        MS. KELIUM:  Anyone else?

25        JUROR:  Morgan.

1       MS. KELIUM:  Would you be more inclined to

2   believe any of the officers that you know from

3   patrolling if you heard from them on the stand?

4       JUROR:  Really I'd listen to the facts.

5       MS. KELIUM:  You believe you can be fair to

6   both sides?

7       JUROR:  Fair to both.

8       MS. KELIUM:  I don't have too many questions

9   for you today because I know you have been here a

10   very long time with all of us asking questions.  I

11   have tried my hardest to be here every time you

12   have been here to go through this.  I apologize I

13   was not here Friday.  I don't know whether you

14   have been asked this before.  Has anybody here

15   been the victim of a burglary, car, homes, or

16   office or anything like that?  Yes, ma'am, Ms.

17   Buzbee.

18       JUROR:  Yes.

19       MR. KELIUM:  When did this happened?

20       JUROR:  About three years ago.

21       MS. KELIUM:  What happened?

22       JUROR:  Someone broke into my van on my

23   driveway.  We didn't find out until the next

24   morning.

25       MS. KELIUM:  Something taken out of it?

33

1      JUROR:  No.  I guess -- I don't know what

2  they were looking for.  But they told me the

3  pocket, inside the glove compartment, the

4  dashboard.

5      MS. KELIUM:  So you had to get that repaired?

6      JUROR:  Yes.

7      MS. KELIUM:  Is that the only problem you

8  have ever had?  Any problems being burglarized?

9      JUROR:  Someone came into our house when we

10 was at work.  They didn't really take anything.

11     MS. KELIUM:  When did that happen?

12     JUROR:  About seven years ago.

13     MR. KELIUM:  Somebody else raised their hand.

14 Mr. Cotney.

15     JUROR:  My house was broke into probably a

16 year ago.

17     MS. KELIUM:  Was something taken?

18     JUROR:  No, ma'am, pretty much they was

19 attempting to, one of my friends.

20     MS. KELIUM:  Somebody you knew?

21     JUROR:  My friend knew them.  I didn't know

22 them on a personal level.

23     MS. KELIUM:  Who else responded?  Let's see.

24 On the fifth row, gray shirt.

25     JUROR:  Yes, my house was under construction.

1  It was broken into.

2       MS. KELIUM:  Anything taken?

3       JUROR:  Some tools.

4       MS. KELIUM:  What was your name, sir?

5       JUROR:  Andrew Mask.

6       MS. KELIUM:  How long ago was that?

7       JUROR:  Early '90s.

8       MS. KELIUM:  That the only problem you have

9  had with anybody breaking in?

10      JUROR:  Yes.

11      MS. KELIUM:  Gentleman?

12      JUROR:  Leon Weathers, vehicle.

13      MS. KELIUM:  Was something taken out of your

14  vehicle?

15      JUROR:  Both times.

16      MS. KELIUM:  How long ago?

17      JUROR:  15 or 20 years ago.

18      MS. KELIUM:  Mr. Slay.

19      JUROR:  I had a barn broke in one time and

20  stole some heaters and others things.

21      MS. KELIUM:  How long ago was that?

22      JUROR:  About eight years ago.

23      MS. KELIUM:  I think back row, start over

24  there.

25      JUROR:  Ed McLaughlin, stolen car.

1    MS. KELIUM:  Sure.

2    JUROR:  Yes.

3    MS. KELIUM:  Pretty good, how long ago was

4    that?

5    JUROR:  Late '70s.

6    MS. KELIUM:  Ever find your car?

7    JUROR:  Yes.

8    MS. KELIUM:  Was it worth driving after that?

9    JUROR:  Yes.

10    MS. KELIUM:  Lady right there in the red

11    shirt.

12    JUROR:  My flower shop was broken into, but I

13    think I left the door open.  I think I invited

14    them in, took the cash register.

15    MS. KELIUM:  Wow.

16    JUROR:  Maybe a $100 in change and money.

17    MS. KELIUM:  When did that happen?

18    JUROR:  Probably 12 years ago.

19    MS. KELIUM:  You double check now, right?

20    JUROR:  I got rid of the flower shop.

21    MS. KELIUM:  What was your name again?

22    JUROR:  Sylvia Fullerton.

23    MS. KELIUM:  Mr. Finley.

24    JUROR:  My house was burglarized.  That's

25    been about three years ago.

1    MS. KELIUM:  Did they take something?

2    JUROR:  Yes.

3    MS. KELIUM:  Lady back there.

4    JUROR:  Peggy Combs.  This was early '70s,

5    burglarized several times before we realized it.

6    MS. KELIUM:  They had taken things out that

7    you just didn't know?

8    JUROR:  Small items, charm bracelet was

9    realized then.

10    MS. KELIUM:  Somebody you knew coming in

11    there?

12    JUROR:  Employee of my husband's.  He would

13    stay after work.  I was at work.  So he knew where

14    all of us were.

15    MS. KELIUM:  Early '70s?

16    JUROR:  Yes.

17    MS. KELIUM:  My question for each of you who

18    responded, this case obviously you have heard the

19    charges of attempted burglary.  Each of you that

20    have had these problems in the past, could you sit

21    on this jury and hear the facts of this case and

22    be fair.  Ms. Buzbee?

23    JUROR:  Yes, ma'am.

24    MS. KELIUM:  Ms. Slay, could you be fair?

25    JUROR:  Yes, ma'am.

1     MS. KELIUM: Mr. Finley?

2     JUROR: I'd rather not.

3     MS. KELIUM: Ms. Combs?

4     JUROR: Yes.

5     MS. KELIUM: Would you be able to be fair

6  given the fact that somebody was coming in your

7  house?

8     JUROR: Yes.

9     MS. KELIUM: Mr. Cotney?

10     JUROR: Yes, ma'am.

11     MS. KELIUM: Mr. McLaughlin?

12     JUROR: Yes.

13     MS. KELIUM: I think Mr. Withers, was it?

14     JUROR: Yes.

15     MS. KELIUM: You could be fair?

16     JUROR: Yes.

17     MS. KELIUM: Who else did I miss? Ms.

18  Fullerton?

19     JUROR: Yes.

20     MS. KELIUM: That is all the questions I have

21  today. Thank you very much.

22     THE COURT: Counsel.

23        (The following occurred at the bench

24        outside the hearing of the jury.)

25     THE COURT: That will be enough time. We'll

1    take the motions up after we get the jury back

2    here.  What motions do you have?

3        MS. KELIUM:  I had filed some motions in

4    limini.

5        THE COURT:  That's it.

6        MR. LISENBY:  Some of them are in the form

7    of motion to suppress.

8        THE COURT:  There's a big difference in that.

9        MS. KELIUM:  All in the form of motions to

10   suppress, they're stuff I don't want to come in.

11       THE COURT:  Is it a motion in limini or a

12   motion to suppress?

13       MS. KELIUM:  We want to suppress any evidence

14   of the other burglaries that he was involved in,

15   allegedly involved in at the same time.

16       THE COURT:  That's a motion in limini.

17       MS. KELIUM:  One he had been convicted from.

18   We want to suppress his statement that was taken

19   without his signature.  There's about seven of

20   them I filed.

21       THE COURT:  If it goes to the nature of

22   derogation of a constitutional right, then you're

23   looking at a motion to suppress.  If you're

24   looking at an evidentiary question as to

25   admissibility under the rules, then you're going

1    under a motion in limini.  The statement would be

2    suppress.  The burglary in limini.  I have not

3    seen what you actually filed.

4         MS. KELIUM:  In this case we sort of

5    compressed.

6         THE COURT:  What I'll do is during the trial

7    before the State can admit the statement, of

8    course, they can do it out of the presence of the

9    jury.  If they can prove it's voluntary, then it

10   will come in.

11        MR. LISENBY:  My preference will be to do

12   that before opening statements if we're going to

13   have to do something along those lines.

14        THE COURT:  Let's get the jury struck.  Can

15   y'all have it ready by 10:30, or do I need to

16   limit the number of jurors?

17        MR. LISENBY:  I think we can do it by 10:30.

18             (Jury Present)

19        THE COURT:  Ladies and gentlemen, at this

20   time we're ready for the attorneys and Mr. Story

21   to go through the selection process.  I'll need

22   you back in here at 10:30.  Be back in here at

23   10:30 and we'll call the jury up to the box.

24   Thank you.  Everyone remain in while the jury

25   exits.  One alternate.

1    (Jury not present)

2        MS. KELIUM:  Challenge for cause on Finley?

3        THE COURT:  Bill, I want to make sure you

4    know I'm going to grant the challenge for cause on

5    Finley.

6        MR. LISENBY:  Okay.

7        MS. KELIUM:  Bill, I have one more.  Mr.

8    Slay answered that he would give the police

9    officer's testimony more weight.

10        THE COURT:  He did.  Granted.

11    (JURY OF 12 STRUCK PLUS TWO ALTERNATES)

12        THE COURT:  Please come forward and have a

13    seat in the jury box as your name is called.

14        (Jury of 14 placed in box)

15        THE COURT:  Ladies and gentlemen on the

16    jury, I'll need for all of you to stand where you

17    are in the jury box and raise your right hands.

18        (JURY SWORN)

19        THE COURT:  The main instruction that I'm

20    going to give you at this time is for you to have

21    no conversation with anyone about this case.  Do

22    not discuss this case with anyone not even amongst

23    yourselves.  Don't allow anyone to engage you in

24    conversation about this case.  You cannot even

25    discuss the case amongst yourselves as jurors

1    until all evidence has been presented and until I

2    charge you with the law that applies to this

3    case.  After I charge you on the law at the

4    conclusion of the trial I'll send you back to the

5    jury room and that is when you will be free, of

6    course, to discuss the case and deliberate and

7    reach your verdict.

8         Now, with that I've got some matters to take

9    up both with the jury venire and with the

10   attorneys.  If it goes very long I will have Mr.

11   Story notify you and allow y'all to be more at

12   liberty at a brief break or recess.  Until then if

13   you would just wait in the jury room.  And I'll be

14   with you in a few minutes.

15                  (JURY NOT PRESENT)

16        THE COURT:  Ms. Kelium, you have a motion to

17   suppress the defendant's statement?

18        MS. KELIUM:  I do.

19        THE COURT:  Let's go ahead and deal with that

20   now.

21        MR. LISENBY:  Actually she's got seven

22   motions.  I didn't know if you wanted to discuss

23   each of those.

24        MS. KELIUM:  Take up the statement first?

25        THE COURT:  First, tell me the motions you

1    have got.

2        MS. KELIUM:   Copies should be in the court

3    file, but this is an extra copy.

4        THE COURT:  Motion in limini.

5        MS. KELIUM:   First one is for an order

6    suppressing any mentioning of his pending charges.

7    As I indicated to the court he had a total of five

8    cases simultaneously charged for different dates,

9    all of which were in March of 2002.  He has been

10    convicted of one of those charges of burglary.  I

11    believe just burglary, or was it burglary and

12    theft?

13        MR. LISENBY:   Burglary and theft.

14        MS. KELIUM:   That was last November.  What

15    the first motion requests is to suppress any

16    mention of any of those other cases because they

17    have nothing to do with this.  All it will serve

18    to do is prejudice the jury.  It's not proper

19    under 404B case law and argument if the State is

20    planning on bringing that up.  At the time we

21    discussed it some of these we may be able to agree

22    on because the State was unclear about what they

23    were going to try to bring in.

24        THE COURT:  What's the State's position?

25        MR. LISENBY:  We're not going to bring them

1    in in the case in chief.  We do reserve the right

2    at the time it may be proper for impeachment

3    purposes or maybe even rebuttal with regard to

4    that.  Some of it may depend on the court's ruling

5    in regard to the statement.

6        MS. KELIUM:  I don't want to sit through this

7    trial with my hands tied, not be able to cross

8    examine any witness about anything without fear of

9    bringing these in.  That's why I wanted a ruling

10   these were not proper 404B.

11       THE COURT:  I'm going to grant the motion in

12   limini, but that will be subject to change

13   according to what progresses at trial.  Number

14   two, prior convictions.

15       MS. KELIUM:  Prior convictions, he has a

16   prior conviction in 1993 for receiving stolen

17   property.  And he has a prior conviction,

18   obviously the one we're most concerned about is

19   the prior conviction for burglary and theft

20   arising out of the same series of events he's

21   under trial for now.

22       THE COURT:  State's position?

23       MR. LISENBY:  Again I think that those would

24   be permissible and admissible for impeachment

25   purposes if the defendant were to testify.  We

1    don't intend to get into it in the case in chief

2    unless something happens.  We would initially

3    approach the Court.

4         THE COURT:  There again it's going to be

5    granted, but subject to what may transpire at

6    trial.  Number three?

7         Statement, we'll come back to that.  Four.

8         MS. KELIUM:  The defendant is accused in this

9    case of attempting to break into Mike and Judith

10   Gragg's home.  I expect the evidence would show

11   Mike and Judith Gragg were at home, the maid sees

12   two men outside, both with their face covered,

13   alerts the homeowner.  He called 911 or she calls

14   911, one of them does.  Two people leave.  Shortly

15   thereafter the defendant and co-defendant were

16   stopped in the defendant's vehicle on city

17   property in Hillview Cemetery area.  The testimony

18   that would come from that stop was I believe at

19   gun point.  He made a felony -- what he termed a

20   felony traffic stop, had the defendant and the

21   co-defendant forced out of the car at gun point,

22   put on their stomachs on the ground where they lay

23   there about 40 minutes while they searched the car

24   and while other officers came on the scene.  We

25   don't want any mention of that felony traffic stop

1    and the fact that they had their guns out and made

2    them get on the ground.

3        THE COURT:  How long did this happen after

4    the 911 call?

5        MR. LISENBY:  Minutes.

6        THE COURT:  Minutes?

7        MS. KELIUM:  Within minutes.  The problems is

8    it's prejudicial and doesn't prove any of the

9    elements the State is required to prove.  And it's

10    extremely prejudicial because it gives the jury

11    the impression before they hear the other evidence

12    about the elements that they need to prove is that

13    the defendant and co-defendant weren't violent.

14        THE COURT:  How far was it from the house

15    that was the subject of this charge?

16        MS. KELIUM:  We'll stipulate that he was

17    stopped near the scene.

18        MR. LISENBY:  As the crow flies we can get --

19        MS. KELIUM:  Said somewhere around 2 to 300

20    yards.

21        THE COURT:  I mean a few miles or 50 miles?

22        MR. LISENBY:  I'm going to say much less

23    than a mile and probably less than a quarter of a

24    mile.

25        MS. KELIUM:  We will stipulate that he was

1    stopped near the scene.  I just think it's a bit

2    extreme for them to be hearing stuff about felony

3    traffic stops, guns drawn, pulled out of the car,

4    put in handcuffs.

5         MS. NEWSOME:  300 to 400 yards.

6         THE COURT:  I'll grant as to use of the term

7    felony traffic stop, think about that for a

8    second, but not as to the factual things that

9    happened.  What's the State's position on that?

10        MR. LISENBY:  I think all of that is

11   admissible as the fact that the officers were

12   responding and this is the way they do this

13   particular thing because they had the nature of

14   call a felony involved.

15        THE COURT:  Denied.

16        MS. KELIUM:  This motion went a little bit

17   further.  At the time we filed Bill was unsure

18   about whether or not they were going to use any of

19   videotapes.  There were two videotapes showing the

20   stop and the search of the car.  The only part of

21   the stop it shows is the police actually getting

22   out of the car and approaching the vehicle with

23   gun drawn taking my client and the co-defendant

24   out and placing them on the ground and putting

25   them in handcuffs and other police showing up and

1  searching the car.  You have 40 minutes of this

2  videotape with my client laying on the ground in

3  handcuffs.  And there's several places in the

4  videotape you can tell that they're having words,

5  if you turn the audio on you can tell what those

6  words are.  Specifically, a police officer telling

7  my client to, quote, shut the fuck up and,

8  otherwise, being treated very badly.  The jury

9  doesn't need to see that.  It's not an element.

10  The elements of this case are did he attempt to

11  break and enter into the home of Mike and Judith

12  Gragg with any intent to commit a felony therein.

13  The fact that he's laying on the ground in

14  handcuffs is highly prejudicial.  And I've got

15  case law.

16      THE COURT:  Motion denied.  Put it on the

17  record.

18      MS. KELIUM:  The Eleventh Circuit has stated

19  in Gates v Vann.  This is 880 F.2nd 293, a 1989

20  case.  That it's okay for the jury to see

21  incidental glimpses of the defendant in handcuffs,

22  was not necessarily prejudicial.  Clearly the

23  Eleventh Circuit you go beyond that.  That's too

24  much.  In this case the State would request the

25  jury see and hear 40 minutes of my client laying

1    on his stomach.

2          THE COURT:  I don't know that that could very

3    well be used against the State by defense.

4          MS. KELIUM:  How is that going to help?

5          THE COURT:  The fact you just said the way he

6    was treated.

7          MS. KELIUM:  Well, he wasn't treated --

8    basically he's being treated like a criminal.  The

9    prejudice the jury is going to get out of it is

10   far more prejudicial that probative.  It proves

11   nothing.

12         THE COURT:  You're talking about something

13   that actually occurred within minutes of this

14   attempted burglary within a few hundred yards of

15   the house in question.  There's going to be

16   testimony --

17         MS. KELIUM:  I haven't tried the case where

18   the facts of the arrest have come in before the

19   jury.

20         THE COURT:  Then what you want to do is just

21   say that these guys popped up in custody of the

22   police?

23         MS. KELIUM:  We'll stipulate that he was

24   arrested.

25         THE COURT:  Tell me what kind of stipulation

1    you would enter.

2        MS. KELIUM:  We would stipulate that he was

3    within 3 or 400 yards of that home in the car with

4    Bill Norris at the time he was stopped by the

5    police.  I don't want the jury to see and hear

6    about 40 minutes of them having him on the ground

7    in handcuffs.

8        THE COURT:  There will be I assume testimony

9    of him being on the ground 40 minutes in

10   handcuffs.

11       MS. KELIUM:  And what does that prove?

12       THE COURT:  It's at the time this happened.

13   I see no need to sanitize the actual occurrences.

14       MS. KELIUM:  Forty minutes in handcuffs has

15   nothing to do with an attempt to break in a home.

16   Also it prejudices defendant and making it seem

17   like the police got their guy; and he's guilty,

18   guilty, guilty, or else we wouldn't be hearing

19   about all this.

20       THE COURT:  I think it's admissible under the

21   evidence.  Motion denied.  Next stolen weapons

22   found in the automobile.

23       MS. KELIUM:  When we were talking, Bill and

24   I, prior to the trial he was unsure about whether

25   he would try to introduce the fact that one of the

1  guns was stolen I believe from the crime that he

2  was convicted for last November.

3      MR. LISENBY:  That's right.  Mr. Burton's

4  residence.

5      MS. KELIUM:  One of the elements they have to

6  prove is that they had a gun.  I don't think a

7  stolen gun does anything but prejudice them more.

8  They're not being charged with that.

9      MS. LISENBY:  Let me respond to that in this

10 way, Judge.  There's a videotape of the search of

11 the vehicle which the guns are recovered and are

12 shown.  Once they were recovered they were

13 returned to the victim, so we don't have the guns

14 physically here.

15     MS. KELIUM:  We'll stipulate that there were

16 guns found in that trunk area behind the speaker

17 in the car during that search.  I just think it's

18 really prejudicial for them to be seen in

19 videotapes, then they hear about it was stolen and

20 returned.  That's why they don't have them.  He

21 will enter into a stipulation saying, yes, they

22 were in the car.

23     MR. LISENBY:  The only thing is I would like

24 something either from the Court or in a

25 stipulation or something that indicates why the

1    weapons aren't physically present. I don't want

2    the jury to get back there and go, oh, gee, we

3    don't have a gun.

4        MS. KELIUM:  We waive that.

5        MR. LISENBY:  I understand you waive that.

6        THE COURT:  You can tell them that, but it

7    matters to them.  The State has got a right to

8    have some explanation of where the gun is if it's

9    not introduced.

10        MR. LISENBY:  I don't mind if the Court

11   states that, subject to figuring out how to word

12   it, that there's been a stipulation.  We intend to

13   show the videotape where the guns were recovered.

14   The guns were recovered in that area.  They have

15   subsequently been returned to the proper owner or

16   something like that.  So that they're not --

17        THE COURT:  Stipulation that will be fine.

18        MS. KELIUM:  I'll work on it during lunch.

19        THE COURT:  What actually happened.

20        MS. KELIUM:  If that's okay.

21        MR. LISENBY:  As I said once we show the

22   videotape and they see that we recovered guns I

23   just don't want the jury go back in the jury room

24   and say where are the guns.

25        MS. KELIUM:  There's no audio on the

1    videotape you're going to show?

2         MR. LISENBY:  We don't play the audio.

3         THE COURT:  If y'all can do the stipulation

4    on number five that will be fine.  Number six.

5         MS. KELIUM:  How much of this videotape are

6    you going to show?  Is it 40 minutes?  Are you

7    going to show the whole thing?

8         MR. LISENBY:  No.

9         MS. KELIUM:  Are you going to cut right to

10   it?

11        MR. LISENBY:  What I always do.

12        THE COURT:  Number six, criminal history.

13        MS. KELIUM:  Only thing on criminal history I

14   know Chris.  I have been knowing him for years

15   because I have been assisting him since he was 12,

16   that kind of thing.

17        THE COURT:  That's general.  That's granted.

18   There's got to be some reason something like that

19   could be admissible.

20        MR. LISENBY:  I do want to make a note in

21   that motion in limini she has said that the State

22   has given no notice of its intent to rely on prior

23   bad acts and inadmissible purpose.  I just wanted

24   the Court to be aware that there was no request

25   for 404B evidence in that motion.  We have

1    discussed because she is obviously aware of a

2    number of the things.

3        THE COURT:  That will be noted in number six.

4    Motion in limini number seven.  Granted.

5        MS. KELIUM:  We've already had one incident

6    before the jury even left the jury room for their

7    first break the officer took my client back in the

8    back.  The jury wasn't out of the room.  Half of

9    them were in here chatting with each other on the

10   way out at the door.  We're doing what we can.  I

11   understand there's some logistical problems.  But

12   they can at least wait until the jury is gone.

13       THE COURT:  That's the kind of thing that can

14   actually be overplayed.  I have been here the

15   whole time.  There's not been any action --

16       MS. KELIUM:  You were already in your office.

17       THE COURT:  That I have seen.  It's a dual

18   thing.  He is incarcerated.  That officer is under

19   a duty to see that he remains incarcerated.  But

20   at the same time we want to take whatever is

21   necessary to keep that from being conveyed to the

22   jury.  So that's granted.

23       All right.  Statement number three, that's

24   going to be in the nature of a motion to suppress.

25   Does the State need to call a witness?

1      MR. LISENBY:  Of course, for the record

2  we're just going to object for the lateness of the

3  filing for that motion to suppress.

4      THE COURT:  Noted.

5      MR. LISENBY:  Let me just note for the

6  record, Your Honor, let me note for the record

7  that I intend to sanitize this with the use of

8  your word with regard to presentation before the

9  jury.  Just so the Court will understand the

10  circumstances I'm going to go through the process

11  of what occurred here.

12              MOTION TO SUPPRESS

13              JEFF BLACKSTONE

14  called as a witness by the State, having been

15  first duly sworn, was examined and testified as

16  follows:

17              DIRECT EXAMINATION

18  BY MR. LISENBY:

19  Q    Tell us your name, please.

20  A    Jeff Blackstone.

21  Q    Where are you employed?

22  A    Chambers County sheriff's office.

23  Q    What is your current position there?

24  A    Chief investigator.

25  Q    How long have you been with the sheriff's

```
 1                department?

 2    A    Approximately 10 years.

 3    Q    How long have you been involved in investigations?

 4    A    Approximately five years.

 5    Q    Investigator Blackstone, I want to direct your

 6         attention back to March the 19th of 2002 in

 7         connection with events involving Chris McCullough.

 8         Did you have an occasion to see Mr. McCullough

 9         that day?

10    A    Yes, I did.

11    Q    Where did you see him at?

12    A    Lanett PD.

13    Q    For what purpose did you see Mr. McCullough?

14    A    Case I was working in Lafayette was a burglary.

15    Q    So you were actually there to interview Mr.

16         McCullough yourself?

17    A    Yes, I was.

18    Q    Were there other officers also there?

19    A    Yes, there was.

20    Q    Just in general can you tell us what agencies were

21         involved?

22    A    It was Lafayette PD, Lanett PD, Chambers County

23         sheriff's department.

24    Q    Prior to your speaking with Mr. McCullough did you

25         advise him of some constitutional rights?
```

| | | |
|---|---|---|
| 1 | A | Yes, I did. |
| 2 | Q | How did you do that? |
| 3 | A | We have a waiver of rights that I have written, |
| 4 | | constitutional rights. |
| 5 | Q | When you did that, did you also fill in some |
| 6 | | blanks that were on that form? |
| 7 | A | Yes, I did. |
| 8 | Q | Can you tell us about that? |
| 9 | A | I took the waiver, and I read it to Mr. McCullough |
| 10 | | and filled in place Lanett PD, date 3/19/02, time |
| 11 | | 14:47. |
| 12 | Q | Is that central time or eastern time? |
| 13 | A | I usually do everything on central time.  That |
| 14 | | should be central time. |
| 15 | Q | That's because of what? |
| 16 | A | I work on central time. |
| 17 | | (State's Exhibit 1, rights form, marked |
| 18 | | for identification.) |
| 19 | Q | Show you what is marked as State's Exhibit Number |
| 20 | | 1.  Take a moment and see if your recognize that. |
| 21 | A | Yes, I do. |
| 22 | Q | What is that? |
| 23 | A | A copy of the rights form I read to Chris |
| 24 | | McCullough. |
| 25 | Q | Is that an accurate copy of your original that you |

1       have in your file?

2    A   Yes, it is.

3        MR. LISENBY:  Ms. Kelium, you can see the

4        original if you'd like to.

5    Q   If you would, would you tell the court what you

6        advised Mr. McCullough of?

7    A   I advised Mr. McCullough I said before I ask you

8        any questions I'm I going to read you your rights.

9        Advised him you have got the right to remain

10       silent.  Anything you say can and will be used

11       against you in a court of law.  You have a right

12       to a lawyer and to have him present with you when

13       you're being questioned.  If you cannot afford to

14       hire a lawyer one will be appointed to represent

15       you before any questions if you wish if you decide

16       at any time to exercise these rights not to answer

17       any questions.

18       Also went further and then read him his

19       waiver of rights.  I have read this statement of

20       my rights or have been read to me.  I understand

21       my rights.  I want to waive these rights and make

22       a statement.  No promises or threats have been

23       made to me and no coercion of any kind was used

24       against me.

25       I had Mr. McCullough go back and initial

1       everything after I read it to him.

2   Q   Tell me what you mean by that.

3   A   We have one through five on the rights form that

4       he read it hisself.  And as he read it I had him

5       to put his initial beside where he read.

6   Q   So he acknowledged some way he had read and

7       understood that right?

8   A   Yes, he did.

9   Q   Is there a form on there for a signature?

10  A   Yes, it is.

11  Q   Tell me about that.

12  A   At the bottom after he was through I had him sign

13      the rights form which he agreed to give a

14      statement, and he signed Chris McCullough.

15  Q   And that was in your presence?

16  A   That was in my presence.

17  Q   Were there other officers also present at that

18      time?

19  A   Yes, there was.

20  Q   Who would that be?

21  A   Kenny Vines, Steve Smith, Mike Looser, also

22      Lincoln Whaley was in there at the time.

23  Q   Tell me what agencies those officers belong to.

24  A   Kenny Vines and Steve Smith are Lafayette PD.

25      Mike Looser and myself are Chambers County

1    sheriff's department.  And Lincoln Whaley is

2    Lanett PD.  He was an investigator at the time.

3  Q    After you advised Mr. McCullough of his rights and

4    before anyone spoke to him did you or anyone in

5    your presence threaten him?

6  A    No, sir.

7  Q    Did you or anyone in your presence promise him

8    anything or offer him any hope of reward?

9  A    No, sir.

10 Q    Did you or anyone in your presence tell him it

11    would be better for him to make a statement than

12    to not to make a statement?

13 A    No, sir.

14        MR. LISENBY:  We would offer State's Exhibit

15    Number 1 for the purpose of this hearing.

16        THE COURT:  Admitted.

17            (State's Exhibit 1 admitted.)

18 Q    Investigator Blackstone, in connection with the

19    burglary at Mike Gragg's residence, did you have

20    any conversation with Mr. McCullough?

21 A    Not in reference to that burglary.

22        MR. LISENBY:  Ms. Kelium may have some

23    questions.

24            CROSS EXAMINATION

25  BY MS. KELIUM:

```
 1   Q    Were you in the room when there were conversations

 2        going on about that burglary?

 3   A    I wasn't there about that.  I don't remember

 4        whether there was anything going about that one or

 5        not.

 6   Q    Refer to you what the State has just admitted to

 7        this hearing as Exhibit 1.  What's the time on

 8        that form?

 9   A    2:47 central.

10   Q    Is that what time he signed that form?

11   A    Yes.

12   Q    Did you remain in the room for the entire

13        statement after this?

14   A    No.  I only took my statement.  Kenny Vines and

15        Steve Smith took their statement.  I had already

16        left.

17   Q    So you don't know what went on as far as this

18        statement for this case?

19   A    No.

20   Q    Don't know what was told to him?  You don't know

21        if there were any promises made to him after he

22        signed this form?  Don't know of any of the

23        conversation that went on?

24   A    No.

25   Q    Were you involved in questioning Mr. Norris?
```

1    A    I questioned Mr. Norris.

2    Q    I'm going to show you what I'm going to mark as

3    Defendant's Exhibit 1 for purpose of this hearing.

4    Can you take a look at that.  Do you recognize

5    that document?

6    A    Yes, I do.

7    Q    What is it?

8    A    It's a rights form that Richard Carter read and

9    Billy Norris and I witnessed.

10    Q    So that is your signature at the bottom?

11    A    Yes, it is.

12    Q    What time is that rights form signed?

13    A    He's got 11:55.

14    Q    So that's somewhere close to three hours before

15    you had Mr. McCullough read his rights form?

16    A    Approximately.

17         MS. KELIUM:  Admit this for purpose of this

18    hearing.

19         THE COURT:  Admitted.

20              (Defendant's Exhibit 1 admitted.)

21    Q    Were you in the room with Billy Norris the entire

22    time he was being questioned before he went in

23    with Mr. McCullough?

24    A    I really can't remember.  I really can't remember.

25    Q    You can't remember?

1    A    If it was Richard that questioned Billy.

2    Q    Do you remember whether Mr. McCullough was being

3          questioned at the same time as Mr. Norris?

4    A    No, he wasn't.

5    Q    Who else was in the room with Billy Norris?

6    A    I don't remember.

7    Q    You do see on State's Exhibit 1 where it has who

8          was present?

9    A    I wrote that.

10   Q    You wrote this.  Do you know if any of these

11        gentleman were in on Billy Norris?

12   A    I don't remember.

13   Q    Was it more than just you and Lieutenant Carter?

14   A    When Lieutenant Carter read him his rights I

15        remember I was in there then and signed as a

16        witness.  Other than that I don't remember

17        anything on Billy Norris.

18   Q    In fact, this happened -- the date on both of

19        those forms is March 19th.  It's been a year and a

20        half, right?

21   A    Right.

22   Q    You've been involved in lots of other cases?

23   A    That's right.

24   Q    Fair to say you don't have a whole lot of memory

25        of the events that went on in this except for

1           what's written down?

2      A      Except what's written down and what's in my cases.

3                   (Defendant's Exhibit 2, statement,

4                   marked for identification.)

5      Q      Let me show you what's marked as Defendant's

6      Exhibit Number 2.  Do you recognize that document?

7      A      It's a Lanett Police Department statement.

8      Q      Does anything in that statement contain

9      information that you elicited from Billy Norris?

10     A      I don't see anything.

11     Q      Do you know the time that's on this statement?

12     A      14:40.

13     Q      That is?

14     A      Eastern standard time.

15     Q      What time?

16     A      2:40.

17     Q      Eastern standard time.  You would agree that that

18     time is about seven minutes before Mr. McCullough

19     signed this one?

20     A      Central time, hour and seven minutes between those

21     two.

22     Q      One of these is an eastern?

23     A      One on central.

24     Q      How do you know which one is eastern?

25     A      We do everything on central time.  Lanett does it

on eastern time?

THE COURT: East is east, west is west.

MS. KELIUM: I know. I don't have any other questions.

REDIRECT EXAMINATION

BY MR. LISENBY:

Q    Just so the record can be clear, Investigator, can you explain what the central and eastern time situation is in Chambers County, Alabama?

A    The time zone splits our county. Half our county works off central time which is an hour behind eastern time. That part of the county Lanett and Valley all of that is eastern time. And all this part of the county is central time.

Q    Your main office is where?

A    Central time.

Q    Here in the City of Lafayette?

A    It is confusing.

MR. LISENBY: That's all I have.

THE COURT: Anything else? Call your next witness.

RICHARD CARTER

called as a witness by the State, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. LISENBY:

Q   Tell us your name, please, sir.

A   Richard Carter.

Q   Where are you employed?

A   Lanett Police Department.

Q   What is your present position with the Lanett
Police Department?

A   Lieutenant in charge of investigations.

Q   How long have you been employed by the Lanett
Police Department?

A   Twelve years and about four months.

Q   How long have you been involved in investigations?

A   Seven years and again four months.

Q   Let me direct your attention back to March the
19th of 2002 and in regard to an alleged break-in
or attempted break-in at Mike Gragg's residence.
Were you involved in that?

A   Yes, I was.

Q   Briefly for the purpose of this hearing, what was
your initial involvement?

A   Called to assist Lieutenant Bettis at the scene.
He conducted the traffic stop.  And then from that
point assisted Lieutenant Whaley on the
investigation and subsequent interviews of the

1    suspect.

2    Q    During the course of this investigation did you

3    have occasion to see the defendant in this case

4    Chris McCullough?

5    A    Yes, I did.

6    Q    Where did you see him initially?

7    A    In the Hillcrest Cemetery.

8    Q    That would be the place of the traffic stop?

9    A    Yes.

10   Q    Later on did you see him at the Lanett Police

11   Department?

12   A    Yes, sir.

13   Q    Did you have the occasion to speak to him at the

14   Lanett Police Department?

15   A    Yes.

16   Q    When you spoke to him were you alone, or were

17   other officers present?

18   A    Lieutenant Whaley was present.  At the time he was

19   Detective Whaley.

20   Q    He's changed jobs since then; is that right?

21   A    Yes.

22   Q    When you spoke to Mr. McCullough did you or anyone

23   in your presence threaten him?

24   A    No.

25   Q    Did you or anyone in your presence promise him

1    anything or offer him any hope of reward?

2  A    No.

3  Q    Did you or anyone in your presence tell him it

4    would be better for him to make a statement than

5    to not to make a statement?

6  A    No.

7  Q    Did he then make a statement to you concerning

8    Mike Gragg's residence?

9  A    Yes, he did.

10              (State's Exhibit 2, statement, marked

11              for identification.)

12  Q    I'm about to show you a document that I have

13    marked as State's Exhibit Number 2.  Take a look

14    at that for a moment and see if you recognize the

15    contents of that particular document?

16  A    Yes, I do.

17  Q    Now, State's Exhibit Number 2, kind of speed it

18    along, State's Exhibit Number 2 is a statement in

19    reference to Mike Gragg's burglary; is that

20    correct?

21  A    Yes, sir.

22  Q    You spoke to Mr. McCullough.  Did you take

23    information with regard to another burglary also?

24  A    Yes, I did.

25  Q    That is not contained on what is now marked

1    State's Exhibit Number 2; is that correct?

2    A    That's correct.

3    Q    Other than that information about these other

4    burglaries that would not be involved in this

5    case, does this State's Exhibit Number 2 conform

6    to your original with regard to Mike Gragg's

7    burglary?

8    A    Yes, it does.

9    Q    If you would tell us -- there's some blanks on

10    there that I believe were filled in -- tell us

11    about this statement.  See what I'm talking about,

12    date, time, place, statement of, address and phone

13    number.

14    A    Statement of Chris McCullough, address he give us

15    there, phone number he give us, the date March

16    19th, '02.  The time of the statement began 16:53

17    military time.  Shows one page, first page of one

18    page.

19    Q    16:53 is that central or eastern time?

20    A    Eastern time.

21    Q    Because you work for the City of Lanett?

22    A    Yes.

23    Q    If you would go ahead and read that statement for

24    us, please.

25    A    Today I picked him up at my house.  I had been to

1    Lafayette at the Food Stamp Office.  I was headed

2    back to Lafayette when we saw the house.  We

3    stopped and parked down at the cemetery.  When we

4    got out I had a mask and a 9 mm.  Billy had a

5    bandanna and gloves.  He left the duck tape in the

6    car.  We went through the woods to the house.

7    When we got to the house Billy saw a lady inside

8    folding clothes.  He told me.  And I said let's

9    go.  He said you got a gun.  You might as well go

10   on and do it.  I told him no.  Then we was walking

11   back towards the woods when we heard the police

12   car coming up.  Then we ran through the woods to

13   the car.

14       Mr. McCullough read this statement, advised

15   that it was true and correct and would not sign

16   it.  Then I signed it.

17   Q   Again State's Exhibit Number 2 with regard to Mike

18       Gragg's burglary is a copy of your original; is

19       that correct?

20   A   That's correct.

21       MR. LISENBY:  We would offer Number 2.

22       THE COURT:  Admitted.

23           (State's Exhibit 2, statement,

24           admitted.)

25       MR. LISENBY:  Ms. Kelium may have some

70

```
 1           questions for you.
 2                        CROSS EXAMINATION
 3      BY MS. KELIUM:
 4      Q    Could you take a look at State's Exhibit 2 for
 5           me.  On the top line of the statement who is him?
 6      A    Billy Ralph Norris.
 7      Q    Is that who he's referring to as him?
 8      A    Yes, ma'am.
 9      Q    Is it typical when you're writing out statements
10           like that to leave -- I apologize it's been a long
11           time since I studied grammar -- to leave a
12           preposition of that nature without further
13           identifying?
14      A    I agree.  I probably should have written the
15           subject's name is parenthesis.
16      Q    You knew that the eastern time here is almost 5:00
17           eastern time?
18      A    Yes, ma'am.
19      Q    Let me show you what's been mark as State's
20           Exhibit 1.  Does that also have eastern time noted
21           on it?
22      A    It's got military time, and I would assume since
23           the sheriff's department investigator filled this
24           out that they work on central time.
25      Q    So that time is actually 2:47 central time; is
```

```
 1              that right?

 2     A    Yes, ma'am.

 3     Q    So it was at least an hour and probably a little

 4          more between this time and the time that Exhibit 2

 5          was taken down?

 6     A    Yes, ma'am.

 7     Q    What was going on in that hour?

 8     A    The initial interview question/answer session.  We

 9          didn't initially jump in and start writing a

10          written statement.

11     Q    But you don't have any written record of what went

12          on during this question and answer session or this

13          initial interview?

14     A    That's correct.  I do not.

15     Q    Is it fair to say that you had already

16          participated in the questioning of Billy Norris?

17     A    Yes, ma'am.

18     Q    Is it fair to say with regard to this statement

19          since he's prominently mentioned as him in the

20          first few words that the majority of what you and

21          Chris McCullough talked about was what Billy

22          Norris said?

23     A    I wouldn't say the majority of it.  I would say

24          some of it, yes.

25     Q    But you told Mr. McCullough this is what Billy
```

1          Norris said happened?

2     A    At times I'm sure I would.

3     Q    Are you familiar with Defendant's Exhibit 2?  I'll

4          show you.

5     A    Yes, ma'am.

6     Q    And did you participate in that statement?

7     A    Yes, I did.

8     Q    Would you agree that there are a lot of portions

9          of Billy Norris' statement and Chris McCullough's

10         statement that are corresponding.  And take your

11         time to review.

12    A    If you'd reask the question.

13    Q    My question was would you agree that there are

14         several things in there where the statements

15         correspond to each other?

16    A    Yes, ma'am.

17    Q    You have already stated, of course, the time shows

18         Billy Norris' statement taken first?

19    A    That's correct.

20    Q    Chris McCullough was not being questioned during

21         the time Billy Norris was being questioned about

22         this event?

23    A    About this event, correct.

24    Q    I'm going to refer to State's Exhibit 2 again.

25         Could you read what is next to the star asterisk

73

| | | |
|---|---|---|
| 1 | | on the last two lines of the statement, please? |
| 2 | A | Mr. McCullough read the statement and advised that |
| 3 | | it was true and correct and would not sign it. |
| 4 | Q | If he advised it was true and correct, why |
| 5 | | wouldn't he sign? |
| 6 | A | He just refused to sign it. |
| 7 | Q | Did he say I advise that that is true and correct? |
| 8 | A | No.  I said is the statement correct?  Is this |
| 9 | | what you told me?  He said it was. |
| 10 | Q | What did he say? |
| 11 | A | He said yes. |
| 12 | Q | He said yes, but I'm not going to sign it? |
| 13 | A | Yes. |
| 14 | Q | Have you had -- referring to State's Exhibit 1 |
| 15 | | again -- have you had suspects who reviewed this |
| 16 | | waiver of rights form, signed it, and then didn't |
| 17 | | give you a statement? |
| 18 | A | Yes, ma'am. |
| 19 | Q | So just because they sign the waiver of rights |
| 20 | | contained in State's Exhibit 1 doesn't mean they |
| 21 | | actually will go ahead and give you a statement |
| 22 | | afterwards; is that right? |
| 23 | A | That's correct. |
| 24 | Q | So this doesn't necessarily give any evidence of |
| 25 | | someone giving a voluntary statement? |

```
 1    A    It just tells us and the courts that they agreed

 2         to answer questions that we asked.

 3    Q    There's sometimes people sign this and don't

 4         answer any questions that you ask them, right?

 5    A    Sure.

 6              MS. KELIUM:  I don't have any other

 7         questions.  I just move to admit for the purposes

 8         this hearing Defendant's Exhibit 1 and 2.

 9              THE COURT:  Admitted.

10              (Defendant's Exhibit 2 admitted.)

11                   REDIRECT EXAMINATION

12    BY MR. LISENBY:

13    Q    I want to show you what I have now marked as

14         State's Exhibit Number 3, Lieutenant Carter, and

15         take a moment and see if you recognize what that

16         is.

17    A    Yes.

18    Q    What is that?

19    A    This is the complete statement that I took from

20         Mr. McCullough on that day.

21    Q    And when you say the complete statement, this

22         refers to the other burglary that you were

23         questioning him about; is that correct?

24    A    Yes.

25    Q    Ms. Kelium was asking you questions about the
```

1           first line of the Gragg statement that said the

2           day I picked him up at my house, and there wasn't

3           a reference to who him was; is that correct?

4       A   Yes, sir.

5       Q   What about the first paragraph?

6       A   He's named in the paragraph by his first name.

7               MR. LISENBY:  For purposes of this hearing,

8           Your Honor, I would offer State's Exhibit Number

9           3.  And the reason for that is that if, in fact,

10          Ms. Kelium asks a question as she did in front of

11          the jury about who is him, I would like to be able

12          to get into the entire statement that way.

13              THE COURT:  Admitted.

14                  (State's Exhibit 3, statement,

15                  admitted.)

16              MR. LISENBY:  That's all with regard to the

17          statement.

18              THE COURT:  Anything from the defense?  You

19          may step down.

20              MS. KELIUM:  Your Honor, just Lieutenant

21          Carter acknowledges that even though he signed a

22          waiver of rights form that's no evidence that the

23          statement was voluntary.  It obviously wasn't

24          voluntary because after he reviewed it he refused

25          to sign it.  Now the State would use that against

1  him in court and say, well, he said all this.  He

2  said all this voluntary, this is knowing.

3  Obviously it wasn't knowing and voluntary because

4  once he reviewed the statement he said, no, I'm

5  not signing that.

6      THE COURT:  Motion to suppress denied.  I

7  will give the proper jury charge on defendant's

8  statement that covers all of the type of objection

9  that you raise.  And it's up to the jury to

10 determine what weight to give the statement.  I

11 find that it is voluntarily, knowingly, and

12 intelligently made as far as the statement.  But

13 I'll give the correct jury charge as to weight

14 that they can attach to the evidence.  Are we

15 ready?

16          (JURY PRESENT)

17     THE COURT:  Ladies and gentlemen, let me tell

18 you the procedure that we'll be following

19 throughout the course of this trial.  How many of

20 you have served on the jury in the past two

21 weeks?  Okay.  Thank you.

22     As I have said before you'll have to listen

23 to this again.  The first order of business will

24 be that the attorneys for both State and defense

25 present to you their opening statements.  Now,

what the attorneys say is not evidence.  However, they can tell you what they expect the evidence to be.  They can tell you what they expect to be proven or what they expect not to be proven in the case.  They can in short use their opening statements as sort of a road map to tell you where this case is going.

I'll remind you again that what the attorneys say is not evidence.  And the evidence will come to you in the form of sworn testimony from this witness stand and from any items or exhibits that I admit as evidence for your consideration.

After opening statements the State will be given an opportunity to present their case to you.  Then defense will be given an opportunity to present their case to you.  After all evidence has been presented, the attorneys will again address you in what's called closing arguments.  At that time counsel for both State and defense can tell you what they think the evidence has shown.  They can tell you what they think has been proven or not proven.  They can ask for you to draw reasonable inferences from the testimony and evidence presented.  Again what they say is not testimony.  You will be the ultimate judges of the

1    facts of this case.  I will be the judge of the

2    law.  And after closing arguments of counsel I

3    will charge you on the law that applies to this

4    case.  You cannot substitute that with what you

5    think the law is or what you think the law ought

6    to be.

7        After I have charged you on the law I will

8    send you back to the jury room to deliberate and

9    reach your verdict.  You will choose a foreperson

10   to act on your behalf and to moderate your

11   deliberations.  You may choose your foreperson by

12   whatever method you think is correct and proper.

13   Your foreperson will be the one that actually has

14   to sign the verdict form.  I will prepare verdict

15   forms for you.  But your foreperson must sign the

16   verdict form that actually conforms with your

17   actual vote.

18       Your vote and your verdict must be unanimous.

19   That is, all twelve jurors must concur in whatever

20   verdict you reach.  Anything requested further by

21   State at this time?

22       MR. LISENBY:  Not at this time, Your Honor.

23       THE COURT:  By defense?

24       MS. KELIUM:  Not at this time.

25       THE COURT:  You may state your case to the

1 jury.

2    (MR. LISENBY AND MS. KELIUM MADE OPENING

3  STATEMENTS WITH NO OBJECTION)

4   THE COURT:  Call your first witness.

5   MS. NEWSOME:  State calls Ola Pearl Trammell.

6     OLA PEARL TRAMMELL

7 called as a witness by the State, having been

8 first duly sworn, was examined and testified as

9 follows:

10     DIRECT EXAMINATION

11 BY MS. NEWSOME:

12 Q Ms. Trammell, please state your full name.

13 A Ola Pearl Trammell.

14 Q Where do you live, Ms. Trammell?

15 A I live at 950 Whitten Road in West Point, Georgia

16 in Harris County.

17 Q How are you currently employed?

18 A Well, I'm not employed right now.  Of course, I

19 was working, but my husband is debilitated.  So I

20 had to quit.  And the people I iron for, they

21 still bring their clothes and pick them up and I

22 still iron for them.

23 Q Was there some time when you worked for Mike and

24 Judith Gragg?

25 A Yes, and I still do.

1   Q   During your employment did you ever go to their

2       residence to perform your work there?

3   A   Yes, I did.

4   Q   I'd like to direct your attention to March the

5       19th of last year.  Do you recall that particular

6       day?

7   A   Yes, I do.

8   Q   Were you at the Gragg residence on that day?

9   A   Yes, I was.

10   Q   Do you recall what you were doing that morning?

11   A   I was ironing.

12   Q   While you were ironing did you notice anything

13       unusual outside?

14   A   Yes.  I happened to glance out the window.  And I

15       saw a man with a ski mask running around the house

16       toward the front of the house.  And I got up close

17       and looked out.  And I saw another man crouching

18       down with a blue bandanna on his face.

19   Q   Could you tell if these individuals were white or

20       black?

21   A   They were black.  I could see.  Their faces were

22       covered, but their arms weren't.

23   Q   Did they both appear to be black males?

24   A   Yes.

25   Q   Ms. Trammell, do you remember what color the ski

1         mask was?

2    A    Yes, it was a dark blue or black.

3    Q    Do you recall what color the bandanna was?

4    A    Yes, it was blue and white.

5    Q    And did you say that bandanna was covering one

6         individual's face?

7    A    Yes.  He had it around his face this way.

8    Q    So it covered just the lower part of his face

9         below his nose?

10   A    Yes.

11   Q    What did you do after you saw these two people?

12   A    Mr. Gragg had just stepped out the door to smoke a

13        cigarette.  And I called him in.  I said, Mr.

14        Gragg, come on back in.  I just saw two men with

15        masks on their face go around the house.

16   Q    Were you concerned about what you had just seen?

17   A    Of course I was.

18   Q    Were you concerned for Mr. Gragg's safety?

19   A    Yes.

20   Q    Is that why you called him back into the

21        residence?

22   A    Yes, also because if they got him out there they

23        could have forced him inside and hurt all of us.

24   Q    What did Mr. Gragg do after you conveyed this

25        information to him?

```
 1    A    He came back inside.  And he got his gun out of

 2         the closet.  And he told me, Miss Pearl, go on

 3         down there where Judy is, his wife.  Then he got

 4         on the telephone, and he called the police.

 5    Q    Did you hear what he said on the telephone?

 6    A    No, because I was gone down there to where Ms.

 7         Gragg was.  She was upstairs, and she came down.

 8         She heard us talking.  And then we went on down to

 9         her bedroom.  And we could see out the window.

10         And we looked to see if we saw those men.  We know

11         they went around the front.  She said, look, Miss

12         Pearl, there they go.  They're going down toward

13         the barn.

14    Q    You were able to see this from the upstairs

15         bedroom?

16    A    Not upstairs.  She had come downstairs.  And we

17         could see it from her bedroom from the window of

18         her bedroom.

19    Q    You were able to locate Ms. Gragg and you went to

20         the downstairs bedroom with her?

21    A    Yes.

22    Q    Tell me again.  What did you see from the bedroom

23         window?

24    A    We saw these two men running down passed the barn

25         which it goes toward a cemetery out there.  And
```

```
 1          they were running toward that cemetery passed the

 2          barn.

 3     Q    Do you remember if they were still wearing the

 4          clothing items you had seen on them earlier?

 5     A    Yes.  They had on what they had on the first time

 6          I saw them.

 7     Q    You told me you had noticed a ski mask and

 8          bandanna.  Did you notice anything else about

 9          their clothes, their shirts, or pants?

10     A    Not anything particular.

11     Q    Did you notice when the police arrived?

12     A    Yes, it wasn't very long.  They were there within

13          a very short time.

14     Q    Were you able to see any of the police officers at

15          the residence while you were in the bedroom?

16     A    Yes.  I saw some of them go over toward the

17          cemetery.

18     Q    Were they headed in the same direction you had

19          seen the two blacks males run?

20     A    Yes, yes.

21               MS. NEWSOME:  Thank you, Ms. Trammell.

22          That's all the questions I have.

23                    (The following occurred at the bench

24                    outside the hearing of the jury.)

25               MS. KELIUM:  May I approach, Your Honor?  I
```

1    begged and begged before trial to get witness

2    statements, and I was denied.  I told them it's

3    going to take us forever to get through.  But I

4    want to review this statement before cross

5    examination.  My client has that right.

6         MR. LISENBY:  My understanding the Court has

7    the ability to review the statements in camera to

8    determine if there's anything that would be

9    exculpatory.

10        THE COURT:  Let me see the statement.  Really

11   nothing exculpatory at all.

12        MS. KELIUM:  Okay.

13        THE COURT:  Cross examination.

14                   CROSS EXAMINATION

15   BY MS. KELIUM:

16   Q   Ms. Trammell, I'm Kyla Kelium.  And I represent

17       Chris McCullough in this case.  I just have a few

18       questions for you, okay.  You said that you were

19       still in the bedroom, Ms. Gragg's bedroom, when

20       you saw the police go by; is that right?

21   A   Yes.  Yes, I did say that.

22   Q   How long were you in that bedroom?  Were you there

23       very long?

24   A   We weren't there very long, maybe about 10/15

25       minutes.

85

```
 1   Q    So you think it was 10/15 minutes before you saw

 2        the police go back?

 3   A    No.  We were in the bedroom 10 or 15 minutes.  I

 4        said the police were there very soon after Mr.

 5        Gragg called.

 6   Q    You think they were there in much less than 10

 7        minutes?

 8   A    Yes, of course.

 9   Q    You said that you could tell that these gentlemen

10        were black from their arms; is that right?

11   A    I'm black.  I know black when I see black, yes.

12   Q    So is it fair to say that they were wearing

13        clothes, and you could see their skin?

14   A    Yes, yes.

15   Q    Did you see either of these gentlemen with a gun?

16   A    No, I didn't see a gun.

17   Q    You didn't see a gun on either one of them, did

18        you?

19   A    No.

20   Q    They weren't wearing big bulky jackets or anything

21        like that?

22   A    No.  I didn't see a gun.  I don't know whether

23        they had them or not.  But I didn't see one.

24        MS. KELIUM:  That's all the questions I have.

25        Thank you.
```

```
 1              THE COURT:  Anything else.  Thank you, ma'am.

 2        You're free to go.  Call your next witness.

 3              MS. NEWSOME:  State calls Judith Gragg.

 4                    JUDITH BRANDON GRAGG

 5        called as a witness by the State, having been

 6        first duly sworn, was examined and testified as

 7        follows:

 8                    DIRECT EXAMINATION

 9        BY MS. NEWSOME:

10        Q    Ms. Gragg, please state your full name.

11        A    Judith Brandon Gragg.

12        Q    Where do you reside?

13        A    3622 Country Club Road.

14        Q    How long have you lived at that residence?

15        A    About eight years, almost eight years.

16        Q    I'd like to direct your attention to the day of

17             March the 19th of 2002 and ask do you recall that

18             particular day?

19        A    Oh, yes, ma'am.

20        Q    Do you recall what you were doing that morning?

21        A    I do.

22        Q    If you would please tell us what you were doing on

23             the morning of March the 19th, 2002.

24        A    We were preparing to leave for a trip.  The

25             following day Miss Ola Pearl had come that morning
```

1      to iron.  And we had two young men to come to do

2      yard work.  We were waiting for them to come to

3      give them instructions.  Once we did that our day

4      would really get started.  I had gone upstairs to

5      put some things in the closet and took some things

6      out and put some things back.  I was up there a

7      few minutes.  I heard a lot of noise downstairs.

8      I could tell my husband Mike and Miss Ola Pearl

9      were talking.  So I kind of listened because it

10     wasn't like they were just talking loud or joking

11     or anything like that.  I could tell something was

12     wrong.

13  Q   Were you able to understand any of that

14     conversation?

15  A   At first I wasn't.  And then I heard Mike tell

16     Miss Pearl, find Judy.  So I stopped what I was

17     doing and listened for a second trying to, you

18     know, decide what was going on.  I could tell

19     something was wrong.  I heard Mike say, Miss

20     Pearl, find Judy again.  And then he said, Miss

21     Pearl said I think she's upstairs.  He said, find

22     her and y'all get away from the windows.

23  Q   You said you could tell that something was wrong.

24     What made you think that something was wrong?

25  A   The fact that they were speaking loudly and just

```
 1                   tone of voice.

 2    Q     What happened next?

 3    A     Mike told Miss Pearl -- I heard him say, find

 4          Judy.  Miss Pearl started up the steps.  At that

 5          time I had come out of the bedroom onto the

 6          balcony.  And I met Miss Pearl.  I was on the

 7          balcony.  She was probably two steps from the top.

 8          I said, Miss Pearl, what's wrong.  And she said,

 9          there are two men outside with masks and bandannas

10          I think is what her word -- anyway I got the

11          impression they were not the kind of people that

12          you expect to see outside.  So she said Mr. Gragg

13          said for us to come downstairs and get away from

14          the windows.  So we turned around and went down

15          the stairs.  I met Mike at the bottom of the

16          stairs.  And he said y'all get away from the

17          windows.  We don't know how many people are out.

18               MS. KELIUM:  Your Honor, I'm going to object,

19          have a continuing objection to whatever they said.

20               THE WITNESS:  I'm sorry.

21               THE COURT:  Overruled.

22    A     We went down the hallway to my bedroom that's at

23          the end of the hall.  That room was closed off

24          because I just hadn't cleaned up back there that

25          morning after we had gotten up.
```

1   Q    Were you and Ms. Trammell the only two individuals

2        that went to the bedroom?

3   A    Yes, ma'am.

4   Q    Where was your husband?

5   A    He was in the foyer area, our house we have a

6        foyer and there's a hallway.  Then it opens up.

7        It's all real open.  It opens up into our den.  He

8        was standing right there kind of at the end of the

9        foyer and the hallway where he could see the front

10       door and the door that comes, two doors that come

11       in from the back of our house.

12  Q    Did you see him pick up the telephone or make a

13       telephone call?

14  A    No, I did not see that.  I think he had done that

15       before I got down there.

16  Q    What did you and Miss Pearl do after you got into

17       the bedroom?

18  A    We went in the bedroom.  We were both real scared,

19       of course.  I tried to get Miss Pearl to sit down.

20       And I walked around -- the end of our house we

21       have two windows.  And they just happened to be

22       one on either side of the bed.  So I walked around

23       to the window on the left which is on the back

24       corner of my house.  I don't know.  I just looked

25       out.  When I did I saw three -- I believe it was

1      three policemen out there, two were in uniform and

2      one I believe just had a sports shirt on. And, I

3      said, Miss Pearl, the police are already here. So

4      she came to look out. I think I made mention then

5      that I saw at least two of the policemen had guns

6      drawn I believe at that point. She came to look

7      out that window. I walked around the bed to the

8      other window and looked out the window. When I

9      did I saw this person running.

10   Q   Saw one person running?

11   A   I saw one person running down toward our barn

12      right at the edge of the woods. It's real grown

13      up. So it's almost like a wall of woods, like a

14      line of woods. That's where I saw this person.

15      They were running like along the edge of that

16      wooded area.

17   Q   Do you remember what that person was wearing?

18   A   A white T-shirt and dark pants. I believe it was

19      jeans the best I could see. But I'm sure of the

20      white shirt and dark pants.

21   Q   When you saw this person did he have anything on

22      his head or face?

23   A   I didn't -- I couldn't see that or I didn't notice

24      that from where I was.

25   Q   Did you convey any of this information to your

1      husband?

2  A    I started screaming.  I was saying, Miss Pearl,

3      tell Mike they're going the wrong way because when

4      I looked out the window I could see the three

5      policemen.  Just as I got over to the other window

6      and I saw the person running down the hill, they

7      had -- all three were not at the same time or they

8      weren't rushing, but they were moving back toward

9      the front of my house just in that direction, not

10     rushing or anything.  But they were moving in the

11     direction.  And I was trying to get Mike's

12     attention that they were going the wrong way, that

13     I could see someone down by the barn.

14  Q    Did it appear to you that the police were

15     moving around toward the front of the house and

16     away from the person that was running?

17  A    Right.  They were going this way.  And the person

18     that was running was like directly in front of me

19     down by the barn.

20  Q    Were you able to tell your husband about that?

21  A    Well, Miss Pearl stepped out into the hallway to

22     tell him.  I was yelling, but I don't think he

23     heard us say that.  I think he heard us say that

24     the police were there.  But I don't know that he

25     heard us say -- I think he heard us say that the

1    person was down by the barn.  I don't think he

2    knew at that point that the police were there.  He

3    didn't know the police were there.  He did hear us

4    say that there was a person down by the barn.

5    Q    Anything happen after you saw that person running

6    down by the tree line?

7    A    Well, I had stepped away from the window screaming

8    to Mike, trying to make him hear.  So by the time

9    I got back over to the window I didn't see anyone.

10   Q    That person was gone when you got back to the

11   window?

12   A    Then I went back out into the hallway.  Then I

13   never looked out again.

14        MS. NEWSOME:  Thank you, Ms. Gragg.  That's

15   all the questions I have.  Ms. Kelium may have

16   some.

17        MS. KELIUM:  May I approach, Your Honor?

18        THE COURT:  Yes.

19             (The following occurred at the bench

20             outside the hearing of the jury.)

21        MS. KELIUM:  I don't want to beat a dead

22   horse, but I did ask way ahead of time.

23        MR. LISENBY:  They're not discoverable.

24   That's why we didn't give them.

25        MS. KELIUM:  After this witness I want to

1   invoke the rule.  I neglected to do that earlier.

2        MR. LISENBY:  I would have given this to you

3   if they had anything exculpatory.  Do you want us

4   to ask the officer to leave now?

5        MS. KELIUM:  No.

6        THE COURT:  All right.  Go ahead.  Cross

7   examination.

8                    (Jury Present)

9                 CROSS EXAMINATION

10  BY MS. KELIUM:

11  Q    Ms. Gragg, I just have a couple of questions for

12       you.  You stated that the only person you saw was

13       one person in the white pants -- I'm sorry,

14       T-shirt and jeans?

15  A    Uh-huh.

16  Q    You would agree with me that the police were there

17       very quickly?

18  A    Extremely quickly.

19  Q    You went to look, there's a guy running over here,

20       there's the police over here?  Is that about

21       right?

22  A    Yes, ma'am.  They were right outside our bedroom

23       on the end of the bedroom, not directly out the

24       window, not as far as from here to that wall where

25       we were.

1   Q   You could see the man and you could see the

2      police?

3   A   Uh-huh.

4   Q   Within the same several seconds; is that correct?

5   A   Yes, ma'am.

6   Q   Did that man have a gun?

7   A   The man that was running?

8   Q   Did he have a gun?

9   A   I don't know.

10   Q   You didn't see one, did you?

11   A   I didn't see one.

12   Q   They did not get in your house; is that correct?

13   A   I'm sorry?

14   Q   No one got into your house that day?

15   A   No.

16   Q   So no one took anything from you?

17   A   No, ma'am.

18   Q   The only person you saw was the one person?

19   A   I saw one person.

20      MS. KELIUM:  Those are all the questions I

21   have.

22      THE COURT:  All right.  You may step down.

23      Ladies and gentlemen, at this time we're

24   going to be in recess and take a break until

25   1:00.  I expect we'll commence again the trial and

95

1    testimony at 1:00.  Follow the instructions that I

2    have already given you and follow these as well.

3    Do not discuss this case with anyone not even

4    amongst yourselves.  Do not allow anyone to try to

5    engage you in conversation about this case.  Don't

6    try to find out anything about this case.

7    Everything that you can know about this case will

8    come to you from this witness stand and from the

9    evidence admitted during the trial.  Should anyone

10   try to contact you about this case tell them

11   you're under a court order not to discuss it.  If

12   they persist, then let Mr. Story, any of his

13   deputies, or any of the court officials know.  If

14   there's a problem they'll get that to me and we'll

15   take care of it.  Don't put yourself in an over

16   hearing parties, witnesses, or attorneys that

17   might be discussing this case at any time we're in

18   recess today.  So if you're here in the courthouse

19   coming and going from the jury room, simply

20   isolate and insulate yourself from any contact

21   with anyone that might be discussing this case in

22   any regard.

23        With that everyone remain in here.  Jury

24   you're excused.  Come directly back to the jury

25   room and be in here at 1:00, and we'll start

1       again.  Thank you.

2                       (LUNCH BREAK)

3                       (JURY PRESENT)

4               THE COURT:  The record will reflect all

5       jurors present, parties present, counsel present.

6       Call your next witness.

7               MS. NEWSOME:  Your Honor, the State calls

8       Charles Michael Gragg.

9                    CHARLES MICHAEL GRAGG

10      called as a witness by the State, having been

11      first duly sworn, was examined and testified as

12      follows:

13                     DIRECT EXAMINATION

14      BY MS. NEWSOME:

15      Q    Mr. Gragg, please state your full name.

16      A    Charles Michael Gragg.

17      Q    Where do you reside?

18      A    3622 Country Club Road in Lanett.

19      Q    Is your home located in Chambers County, Alabama?

20      A    Yes, ma'am.

21      Q    Like to direct your attention to March the 19th of

22           2002 and ask if you recall that particular day?

23      A    Yes, ma'am.

24      Q    Do you recall what you were doing that morning?

25      A    Yes, ma'am.  I was preparing to go to a board

```
 1              meeting at Lanier Hospital.  And we were going to

 2              have to get ready to go on a trip.  We were

 3              leaving the next morning to go on a trip to meet

 4              my wife's brother and his family.  I was also

 5              waiting for two young men who had been doing some

 6              work on my farm for months.  They were supposed to

 7              have shown up early.  It was a little before 10.

 8              And they hadn't shown up yet.

 9        Q     Sometimes that morning did you have the occasion

10              to go to the utility room in your home and have a

11              conversation with your housekeeper Ms. Trammell?

12        A     Yes, ma'am.

13        Q     Did she at any time indicate to you that she had

14              noticed something unusual outside?

15        A     Yes, ma'am.

16        Q     What did she say to you?

17        A     Well, I had actually opened the door that goes

18              from the utility room out onto the deck.  Whenever

19              I passed Miss Pearl in the utility room -- I had

20              already been outside several times that morning.

21              I'm always joking with her.  We'll talk back and

22              forth.  I opened the door.  I had stepped out onto

23              the deck.  I still had the door knob in my hand.

24              Miss Pearl yelled out, Mr. Gragg, she said there's

25              a man out here with a mask on.  And I heard what
```

1         she said.  I heard every word.  But I was having a

2         hard time registering because it was 10:00 on a

3         beautiful spring morning.  About that time she

4         said there's another man out here with a mask on.

5    Q    Did you notice anything about her tone of her

6         voice?

7    A    She was -- you could tell she was pretty upset.

8    Q    After you had an opportunity to digest this

9         information, what did you do?

10   A    Well, it didn't take long to digest it.  I slammed

11        the door and locked it.  I told Miss Pearl as I

12        was grabbing for the telephone -- there's a

13        telephone right beside where she stands and irons

14        with her back to the window -- I told Miss Pearl

15        go find Judy -- that's my wife -- and for them to

16        get in the bedroom and stay away from the windows.

17        As I dialed 911 I reached in the closet, got my

18        shotgun.  And I chambered three Magnum double

19        ought buckshot shells.

20   Q    Had you seen any individual outside at the time

21        you loaded your weapon?

22   A    No, ma'am.

23   Q    Had Miss Pearl left the utility room by the time

24        you got your weapon?

25   A    Just as I was getting the weapon out and was

1       talking -- the 911 dispatcher had answered -- Miss

2       Pearl was out of the utility room at that time

3       headed toward our master bedroom which is on the

4       lower level of the house.

5  Q    You said you got your shotgun and loaded it?

6  A    Yes, ma'am.

7  Q    What were you planning on doing with the shotgun?

8  A    Well, I went and stood by our fireplace which is

9       between our foyer and our family room where I

10      could see the front door and the French doors

11      coming in off the deck.  I could see the French

12      doors coming in off my study.  And I could see the

13      utility room.  I couldn't see the door.  I was

14      standing there.  My intention was I was convinced

15      they were going to kick the door in.  And I was

16      going to shoot whoever came through the door.

17  Q    And you were prepared to do that as soon as

18      someone entered your residence?

19  A    Yes, ma'am.

20  Q    Had you given anybody permission to enter your

21      residence or attempt to enter your residence that

22      particular morning?

23  A    Other than Miss Pearl, no.

24  Q    Besides the individuals who were already in the

25      house, did anyone else have permission?

```
 1    A    No, ma'am.

 2    Q    Did you have any conversation with your wife after

 3         Miss Pearl left the utility room?

 4    A    Well, I was -- I still at this point didn't know

 5         my wife was upstairs.  When I was standing by the

 6         fireplace with my shotgun Miss Pearl came from up

 7         the hall from the master bedroom.  And she said I

 8         can't find Miss Judy.  I thought Judy had gone

 9         outside.  About that time I heard my wife.  She

10         spoke from upstairs.  And she said what's wrong.

11         So I knew that she was upstairs, and she was in

12         the house.  Miss Pearl began describing to her,

13         she said there are two black men outside with

14         masks on.  That's the first time that I had heard

15         the word "black" used.  So I called -- I grabbed

16         the phone.  I called 911 again and advised them

17         that the subjects were black.

18    Q    As you got additional information you called back

19         to the 911 center and relayed the information as

20         you were getting it?

21    A    Yes, ma'am.

22    Q    Did you make any other calls?

23    A    No, ma'am.

24    Q    After that second call?

25    A    No, ma'am.
```

```
 1    Q    Do you recall your wife trying to convey to you
 2         that the police were going in the wrong direction?
 3    A    Well, I heard my wife yell they're going the wrong
 4         way, they're running down by the barn.  I had no
 5         idea what they're going the wrong way meant.
 6    Q    You didn't know who that referred to?
 7    A    No, ma'am.  But I understood it to mean when she
 8         said they're running down by the barn that she was
 9         talking about the people who were outside with
10         masks on.
11    Q    Did you relay that information to anyone outside?
12    A    In a very dangerous way.  I did not know the
13         police had gotten there yet.  And I went to the
14         front door with my shotgun pointed up in the air,
15         opened the double front doors, and started to step
16         out with my shotgun and was greeted by a Lanett
17         police officer with a automatic weapon pointed
18         just about right here.
19    Q    Did you tell him what your wife had told you about
20         this individual running down by the barn?
21    A    No, not at that point.  I said I did not know you
22         were here yet.  It was quite frightening.  Then I
23         just stepped inside and shut the door.
24    Q    Did you ever see either of the individuals that
25         were at your residence?
```

1    A    No, ma'am.

2    Q    How long did it take for the police to arrive?

3    A    Well, at the time it seemed like an eternity.  But

4         in reality it was no time at all.  It was a matter

5         of two/three minutes I would guess.  It was just

6         minutes.

7    Q    Where is Hillcrest Cemetery in relation to your

8         house?

9    A    Our house sits about 600 feet off Country Club

10        Road.  And we have 94 acres.  And the city

11        property, city cemetery property, borders our side

12        on the west side of our property.

13   Q    Is the cemetery to the west of your house then?

14   A    Yes, ma'am.  To the east, I'm sorry.  To the east.

15   Q    To the east of your house?

16   A    Yes.

17   Q    Can you estimate the distance from your residence

18        to the cemetery?

19   A    Well, to the property line itself it's probably

20        300 yards, maybe 1000 feet.  But to the cemetery

21        itself it's a lot further because there's no

22        direct path.  This was in the spring of the year.

23        And the woods are just thick, thick.  Literally

24        there are places you would literally have to get

25        on your hands and knees and crawl through to get

1  through these woods, there are vines.  They're not

2  just trees.

3  Q  But it's your estimation that from your house to

4  the property line of the cemetery would be

5  approximately 300 yards to 1000 feet?

6  A  Yes, ma'am.

7  Q  I have already asked you if you had given anyone

8  permission to attempt to enter your house that

9  day.  But did you specifically give Billy Norris

10  or Christopher McCullough permission to enter or

11  to attempt to enter your residence on that day?

12  A  No, ma'am, I did not know either one of the two.

13  Q  They did not have permission to be on your

14  property or to attempt to enter your residence; is

15  that right?

16  A  No, ma'am, and my property is posted.

17         MS. NEWSOME:  Thank you, Mr. Gragg.  That's

18  all the questions I have.

19         THE COURT:  Cross examination.

20                CROSS EXAMINATION

21  BY MS. KELIUM:

22  Q  Afternoon, Mr. Gragg.  I just have a few questions

23  for you.

24  A  Okay.

25  Q  You said the police got there in no time at all?

1   A   Yes, ma'am.

2   Q   Matter of minutes or less?

3   A   Yes, ma'am.

4   Q   So your property is posted.  Posted against

5       trespassing?

6   A   Yes, ma'am.

7   Q   Is that what it says, no trespassing?

8   A   Posted, no trespassing.  There are a few signs

9       that say posted, no hunting or trespassing.

10   Q   So anyone on your property that day without

11       permission would be trespassing?

12   A   Yes, ma'am.

13   Q   You said you were stationed in such a point in

14       your house that you were able to observe all the

15       of the entrances with exception of the utility

16       room where you could not quite see the door?

17   A   No.  There are actually another set of French

18       doors off of our master bedroom right off of the

19       deck.  I could not see those.  But I could see all

20       of the doors except the utility room.  I could see

21       into the utility room.

22   Q   You said you never saw any of these gentlemen?

23   A   No, ma'am.

24   Q   That were outside.  So they never entered any of

25       the entrances you were watching?

1   A   No, ma'am.

2   Q   To your knowledge did they enter any entrance to

3       your house?

4   A   No, ma'am.

5   Q   To your knowledge did they get in your house in

6       any way?

7   A   No, ma'am.

8   Q   To your knowledge did they attempt to get in your

9       house?

10  A   I'm convinced that was their intention.

11  Q   To your knowledge, do you have any personal

12      knowledge that they actually attempted to get in?

13  A   No, ma'am.

14  Q   Didn't kick the door in?  Didn't try to kick the

15      door in?

16  A   No, ma'am.

17  Q   You didn't see anybody and you didn't see anybody

18      with a gun; is that right?

19  A   No, ma'am.

20          MS. KELIUM:  That's all the questions I have.

21          THE COURT:  Anything further from this

22  witness?  You may step down.  Thank you, sir.  And

23  call your next witness.

24          MR. LISENBY:  State calls Robbie Bettis.

25                  ROBBIE BETTIS

1    called as a witness by the State, having been

2    first duly sworn, was examined and testified as

3    follows:

DIRECT EXAMINATION

5    BY MR. LISENBY:

6    Q    Would you tell me your name, please, sir?

7    A    Robbie Bettis.

8    Q    Where are you employed?

9    A    CSX Railroad.

10   Q    I believe that's a new job?

11   A    Yes, sir.

12   Q    Prior to that where were you employed?

13   A    Lanett Police Department.

14   Q    How long had you been with the Lanett Police

15        Department?

16   A    Thirteen years.

17   Q    What was your position with the Lanett Police

18        Department?

19   A    Lieutenant.

20   Q    How long had you been a lieutenant?

21   A    Right at 10 years.

22   Q    Mr. Bettis, I want to direct your attention back

23        to March the 19th of 2002 and in regard to this

24        particular case ask if you were on duty that day?

25   A    Yes, sir.

1   Q   What were your duties during that day March the

2       19th?

3   A   I was shift supervisor.  We had received a call.

4       And there was a possible break-in on Country Club

5       Road, so instructed some of the guys to go on

6       toward the house.  We was going to try to set up a

7       perimeter.

8   Q   Let me ask you, as a shift supervisor what does

9       that entail?  Tell me what you did as a shift

10      supervisor.

11   A   The shift supervisor is pretty much responsible

12      for the officers on that shift and as far as also

13      I patrol and write tickets just as any other

14      officer does.

15   Q   But you indicated in regard to this case when you

16      received some type of call out to a residence on

17      Country Club Road you also gave some additional

18      instructions; is that correct?

19   A   Yes, sir.  Anything serious, bank robbery or any

20      type crime in progress all the available people,

21      in fact, even the detectives I ask for their help.

22      That's the reason a lot of times plain clothes get

23      calls of that nature.

24   Q   Did you also respond to this call yourself?

25   A   Yes, sir, I did.

1   Q   Do you recall about what time of the day it was?

2   A   Roughly around 10:00 that morning.

3   Q   Your best judgment after you received the call how

4       long was it before you, yourself, were in the area

5       of the residence?

6   A   Pretty lucky.  We were all on Cherry Drive.  We

7       just had left the station.  So it was about three

8       units.  We were probably there within three or

9       four minutes, maybe even a little sooner.  I

10      didn't look at the log.

11   Q   Cherry Drive is the road that runs into Country

12      Club?

13   A   Actually turns into Country Club Road, yes, sir.

14   Q   You were actually on the road closest to the city

15      I guess?

16   A   Yes, sir.

17   Q   When you responded did you go to the residence?

18   A   No, because a couple of units ahead of me were

19      already at Mr. Gragg's -- arrived at the house.

20      So I turned into the cemetery right before the

21      house.

22   Q   Were you familiar with where this location was

23      that you were going to?  You called it Mr. Gragg's

24      residence?

25   A   Yes.

1    Q    You say you turned into the cemetery?

2    A    Hillcrest.

3    Q    Hillcrest Cemetery.  Describe for the members of

4         the jury as best you can how Hillcrest Cemetery

5         looks as far as drives and things of that nature

6         when you go into it.

7    A    You turn in off of Country Club Road.  The

8         cemetery is the road that runs directly down the

9         middle.  It branches off.  Wood line is around the

10        entire cemetery.  And it's a couple of dirt roads

11        that some of the city workers uses to dump debris.

12        We're familiar because we've caught a lot of

13        people especially at night parking back there and

14        doing drugs and other things.  So we watch that

15        area pretty -- especially on night shift.  So

16        we're all familiar with some of the drives.

17   Q    You say you were familiar with Mr. Gragg's

18        residence.  Did you know if it had any connection

19        in and around that area?

20   A    We have answered alarm calls.  We're familiar with

21        that area pretty well.

22   Q    Tell me when you responded to that area what you

23        did and what you observed.

24   A    When I turned down into the cemetery, like I said,

25        mainly I was going down there to set up a

```
 1          perimeter in case they did run out of the woods.

 2          The last I heard they were in the woods.  When I

 3          got toward the -- entered the back of the cemetery

 4          I noticed something shining through the woods.  I

 5          seen the vehicle coming out.  I looked in it.  It

 6          was two black males in the vehicle.  So I

 7          activated my lights.  I didn't know if they would

 8          stop or not because it was obvious they was

 9          involved.  They did stop.  That's when I conducted

10          the felony stop.

11    Q     When you were responding what information do you

12          recall being given?

13    A     It was two black males.  As far as the masks, I

14          knew one mask.  I wasn't sure about the bandanna.

15          I just knew they was supposed to have a mask and

16          possibly armed.  That's about all the information

17          I got at the time.

18    Q     You mentioned something about someone going toward

19          the wood line area?

20    A     Yes, they were going towards the woods.  That's

21          the reason I wanted to set up a perimeter in case

22          they did come out and I could see because the wood

23          line around the cemetery I could see a good ways.

24    Q     After you said you activated your lights and the

25          vehicle did stop?
```

1    A    Yes, sir.

2    Q    Did you subsequently get the people out of the

3          vehicle?

4    A    I called for backup as soon as I noticed them.  I

5          really couldn't believe they was coming out like

6          that.  I expected them to flee from the car.

7             MS. KELIUM:  Objection, Your Honor, could he

8          answer the question he asked him.

9             THE COURT:  Sustained.  Go ahead next

10         question.

11    Q    Did you subsequently get the people out of the

12         vehicle?

13    A    I did.

14    Q    You said you had called for backup.  Did other

15         officers arrive?

16    A    Yes, they did.

17    Q    Do you recall what officers?

18    A    First one was Sergeant Brown, Rick Brown.

19    Q    Did other officers arrive after that?

20    A    Yes, sir.

21    Q    Do you recall how many officers responded to where

22         you were at?

23    A    Lieutenant Carter, Lieutenant Whaley.  There was a

24         couple of others.  They were still in the woods

25         right then.  But they were coming out.  I think it

1    was Officer Wood, a couple more.

2  Q You indicated when you saw this vehicle that you

3    observed two black males in the vehicle?

4  A Yes, sir.

5  Q Is that how many people were actually in the car

6    once you got it stopped?

7  A Yes, sir.

8  Q With regard to that are either one of those

9    individuals in court today?

10 A Yes, sir.

11 Q Who is that, please?

12 A Christopher McCullough.  He was the driver.

13 Q Can you just for the record indicate where you're

14   looking at to see Mr. McCullough?

15 A Right there.

16    MR. LISENBY:  The record would reflect that

17   the witness has pointed at the defendant

18   Christopher McCullough.

19 Q And you indicated Mr. McCullough was the driver;

20   is that correct?

21 A Yes, sir.

22 Q Just in my mind I want to see if I can get clear

23   about this area where you actually observed the

24   car.  You went to the cemetery area where you

25   observed the car.  Were there cemetery plots?

A    No, sir.  The car was in the wooded area in the

line.  As soon as you go to the very back of the

cemetery it's a little trail the city trucks use

to dump debris back there.  It's not even a dirt

road, like a little logging road.

Q    Do you have a judgment -- if you don't that's

okay -- do you have a judgment as to the distance

it would have been from where you first observed

the car to Mr. Gragg's house?

A    It's not as long as a football field probably.

Probably about a football field length, probably

to the back to his property line through the woods

it's about that far if that far.

        MR. LISENBY:  Thank you, sir.  Ms. Kelium may

have some questions for you.

        THE COURT:  Cross examination.

                CROSS EXAMINATION

BY MS. KELIUM:

Q    I just have a few questions for you, Mr. Bettis.

You said you responded within three or four

minutes of getting a call; is that correct?

A    Somewhere.

Q    There were several units you said were there

already at the residence?

A    They were a little piece in front of me, yes,

ma'am.

Q    In less than three minutes the police had

responded to a call there?

A    Yes, between three and four minutes.

Q    When you went back to the cemetery you saw this

car right away; is that right?

A    Pretty much.  I hadn't stopped rolling.

Q    When you were making the stop and you say you

called for backup you said there were several

officers already coming through the woods; is that

correct?

A    I don't know how far.  They knew where I was at.

I called for backup and told them I think I got

the suspects.

Q    Do you have any judgment about how long it took

them to get there?

A    Well, Sergeant Brown had already turned around

because there was another unit in the area.  He

was on me pretty much as I was getting them out of

the car.

Q    He was there almost when you were?

A    Pretty much, 30 or 45 seconds.

Q    You made the statement that you were told that

these people were possibly armed; is that right?

A    I was told that they had been possibly armed.

1  Q    You heard none of the homeowners or the occupants

2       of the house had seen a gun?  Would that surprise

3       you?

4  A    No, ma'am.  As far as the gun all I know that's

5       how it's dispatched to us, possibly armed.

6  Q    So you don't know who gives you that information?

7  A    When people are scared you don't know.  You've

8       just got to take it from all the information.

9  Q    You assume?

10 A    Yes, ma'am, assume it.

11 Q    That was just an assumption?

12 A    Pretty much they said, possibly armed.

13          MS. KELIUM:  That's all the questions I have.

14          THE COURT:  Anything further from this

15     witness?

16          MR. LISENBY:  No, sir.

17          THE COURT:  Call your next witness.

18          MR. LISENBY:  Lincoln Whaley.

19                    LINCOLN WHALEY

20     called as a witness by the State, having been

21     first duly sworn, was examined and testified as

22     follows:

23                  DIRECT EXAMINATION

24 BY MR. LISENBY:

25 Q    Would you tell us your name, please, sir?

| | | |
|---|---|---|
| 1 | A | Lincoln Whaley. |
| 2 | Q | Where are you employed? |
| 3 | A | Lanett Police Department. |
| 4 | Q | What is your position with the Lanett Police |
| 5 | | Department? |
| 6 | A | Lieutenant. |
| 7 | Q | How long have you been employed with the Lanett |
| 8 | | Police Department? |
| 9 | A | Almost eight years. |
| 10 | Q | You indicated now you are a lieutenant, and you're |
| 11 | | wearing a uniform.  Are you in the patrol division |
| 12 | | now? |
| 13 | A | I'm a patrol supervisor. |
| 14 | Q | Prior to your becoming patrol supervisor were you |
| 15 | | in some other capacity with the Lanett Police |
| 16 | | Department? |
| 17 | A | Yes, sir, I was a detective. |
| 18 | Q | If you would remember to keep your voice up. |
| 19 | A | I have a real bad cold. |
| 20 | Q | I want to direct your attention back to March the |
| 21 | | 19th of 2002 and ask if you were working that |
| 22 | | particular day? |
| 23 | A | Yes, sir, I was. |
| 24 | Q | What position did you hold on that day? |
| 25 | A | I was a detective. |

1   Q   Sometime that morning around 10:00 or so did you

2       become aware of some call out to Mike Gragg's

3       residence?

4   A   Yes, sir, I was standing out there under the Sally

5       port with Officer Steven Wood.  He actually got

6       the call, and the called sounded pretty bad.  So I

7       jumped in the car.

8         MS. KELIUM:  Objection, Your Honor, nature of

9       the call.

10        THE COURT:  Overruled.  Go ahead.

11   Q   You were with Officer Wood?

12   A   We were standing under the Sally port talking.  I

13       heard the call go out.  Normally I wouldn't jump

14       in the car with him.  But it sounded bad, so I

15       dove in the car with him.  And we headed towards

16       the Gragg residence.

17   Q   You and Officer Wood went in one vehicle?

18   A   Yes, sir.

19   Q   What kind of vehicle was that?  I mean was it a

20       patrol or plain car?

21   A   It was a marked police car.

22   Q   Tell me what happened as you went to that area.

23   A   Drove up, turned until we found the residence.

24       Didn't know whose residence it was at the time.

25       We go by numbers and addresses.  We turned in the

1    driveway, fairly long driveway.  It's curvy.  We

2    accelerated because it's a long way.  We were

3    trying to get there.  Up the driveway, got out of

4    the car.  I covered the yard.  And Officer Wood

5    went toward the front door.

6  Q  Tell me what you mean by covered the yard.

7  A  I drew my weapon, and I began to cover behind us

8    watching for him and myself as he approached the

9    residence.

10  Q  Do you recall what information you were given as

11    to looking out for any individual or individuals?

12      MS. KELIUM:  Objection, Your Honor.  That's

13    all hearsay as what was told to him.

14      MR. LISENBY:  First of all, I simply asked

15    did he recall.

16      THE COURT:  Overruled.

17  Q  Do you recall being given information about

18    looking out for an individual or individuals?

19  A  The dispatch advised there were two guys --

20      MS. KELIUM:  Objection, Your Honor.  His

21    response is hearsay.  And it's nonresponsive to

22    the question.  As far as I know the dispatcher is

23    not here.

24      THE COURT:  Overruled.

25  Q  You may go ahead and answer.

1   A   Dispatch advising that there was two guys crouched

2       down under the window with a mask on.

3   Q   The air conditioner has come on, Lincoln.

4   A   I'll do my best.  I'm pretty sick.

5   Q   You had information to be on the lookout for two

6       people?

7   A   Yes, sir.

8   Q   Did other officers other than you and Officer Wood

9       respond?

10  A   Yes, sir.  While we were there at the residence

11      Mr. Gragg came out and gave us the direction the

12      guys ran.  Officer Ben Brown drove up.  And we

13      headed towards the barn.  And he was backing up,

14      Officer Wood and I.

15  Q   Do you know if other officers were responding in

16      the area around the Gragg residence?

17  A   Yes, sir.  Every officer that was on duty was en

18      route there.  We were just the first ones to get

19      there.

20  Q   Do you have a judgment as to about how long it was

21      before you arrived at Mr. Gragg's residence?

22  A   Say a minute, travel time from the PD roughly a

23      mile and a half maybe to his residence.

24  Q   Now, when you said after arrival you received some

25      more information about where to look for an

|    |   |                                                          |
|----|---|----------------------------------------------------------|
| 1  |   | individual; is that correct?                             |
| 2  | A | Yes, sir.                                                |
| 3  | Q | Did you go out to that area?                             |
| 4  | A | When we drove up Mr. Gragg came out of the               |
| 5  |   | residence and said they ran towards the barn.            |
| 6  |   | Officer Wood and I headed towards the barn.  As we       |
| 7  |   | were going down we were told by dispatch that they       |
| 8  |   | were headed towards the wood line.  We turned to         |
| 9  |   | go towards the wood line.  Officer Brown, Ben            |
| 10 |   | Brown, went towards the barn.                            |
| 11 | Q | While you were out there in and around Mr. Gragg's       |
| 12 |   | residence did you see any other individuals?             |
| 13 | A | No, sir.                                                 |
| 14 | Q | Other than police officers and Mr. Gragg?                |
| 15 | A | No, sir.                                                 |
| 16 | Q | Subsequent to that did you become aware of a             |
| 17 |   | vehicle being stopped somewhere near the area?           |
| 18 | A | As we got to the wood line -- we never like to           |
| 19 |   | walk into a wood line anyway.  As we got closer we       |
| 20 |   | slowed down and began to look.  We heard on the          |
| 21 |   | radio transmitter that Lieutenant Bettis had a           |
| 22 |   | vehicle stopped in the cemetery.  At that point we       |
| 23 |   | ran back to our unit, up the hill, and through the       |
| 24 |   | pasture, jumped in our car and headed to the             |
| 25 |   | cemetery.                                                |

1    Q    What did you see when you got there?

2    A    Lieutenant Bettis and Sergeant Brown was there and

3         they had two black males out of the car.

4    Q    Are any of those individuals present in court

5         today?

6    A    Yes, sir.

7    Q    Where?

8    A    Mr. McCullough.

9    Q    The defendant in this case?

10   A    Yes, sir.

11   Q    You said he was on the ground when you initially

12        saw him?

13   A    Yes, sir.

14   Q    Did you observe something on or about him that you

15        subsequently retrieved?

16   A    He had a ski mask in his back pocket.

17   Q    Let me show you what's been marked as State's

18        Exhibit Number 4.  And take a look at the envelope

19        initially and then when you're through with that

20        open it up and look into the contents for me.

21   A    That's the mask that we recovered.

22   Q    Let me first ask you about the envelope.  Do you

23        recognize the envelope?

24   A    Yes, sir.

25   Q    How do you recognize that?

1    A    My writing, I filled it out.

2    Q    The contents of number 4 you pulled out, do you

3         recognize that?

4    A    Yes, sir.

5    Q    What is that?

6    A    It's a blue ski mask.

7    Q    Where was that recovered?

8    A    From the back pocket of Mr. McCullough.

9    Q    On his person?

10   A    On his person.

11             MR. LISENBY:  We would offer Exhibit Number

12        4, Your Honor.

13             THE COURT:  Admitted.

14                  (State's Exhibit 4, mask, admitted.)

15             MR. LISENBY:  May we show this to the jury?

16   Q    Did other officers and other detectives also

17        arrive at the scene?

18   A    Yes, sir.

19   Q    Were you present during a subsequent search of the

20        vehicle?

21   A    I was present, but I was on the phone with Mr.

22        Clark the entire time.  After that point I had

23        stepped away and getting information and advice

24        from him.

25             MR. LISENBY:  Thank you, sir.  Ms. Kelium may

1    have some questions.

2                    CROSS EXAMINATION

3    BY MS. KELIUM:

4    Q    I just have a couple, Officer Whaley.  You got

5         there within a minute is basically what you said?

6    A    Roughly.

7    Q    A mile and a half down there.  So about a minute.

8         Y'all responding, got the call, you got there in a

9         minute.  You said you received directions about

10        where these individuals or individual went.

11        Direction towards the wood line?

12   A    Yes, ma'am.

13   Q    You were fairly close behind them at that point;

14        is that right?

15   A    We never saw anyone.  This is a pretty large

16        residence.  And the driveway comes up to the front

17        door.  We walked to the door.  As I was turned

18        around backwards to the cover the area of the

19        yard.  I heard Officer Wood get startled.  I

20        turned around and saw Mr. Gragg and the shotgun

21        coming out the door.

22   Q    This is all happening within a matter of a minute

23        of arriving, right?

24   A    Yes, ma'am.

25   Q    This didn't happened over 20 minutes?

1    A    No.

2    Q    You get up the wood line and you hear a car has

3         been pulled over?

4    A    Yes, ma'am.

5    Q    You never saw Mr. McCullough or anybody else until

6         you got down to the car; is that right?

7    A    That's correct.

8    Q    You never saw any individuals in that yard at all

9         on Mr. Gragg's property other than Mr. Gragg and

10        the other officers?

11   A    Right.

12        MS. KELIUM:  I don't have any further

13   questions.

14        THE COURT:  You may step down.

15        MR. LISENBY:  State calls Billy Norris.

16        BILLY RALPH NORRIS, JR.

17   called as a witness by the State, having been

18   first duly sworn, was examined and testified as

19   follows:

20              DIRECT EXAMINATION

21   BY MR. LISENBY:

22   Q    Mr. Norris, this is kind of a big room and the air

23        conditioner has started running on us.  You'll

24        have to speak up loud for me, okay?

25   A    Yes.

1    Q    Can you tell me your name, please?

2    A    Billy Ralph Norris.

3    Q    Where are you presently living?

4    A    Living at Draper Institution.

5    Q    Last part?

6    A    Draper Correctional Center.

7    Q    You're in prison; is that correct?

8    A    Yes, sir.

9    Q    And in regard to this particular case, Mr. Norris,

10    you entered a guilty plea back on October the 17th

11    and received a 20 year sentence with this; is that

12    correct?

13    A    24.

14    Q    I think on this particular case it was 20.

15    A    Twenty on this one.

16    Q    Is this your signature there on this document?

17    A    Yes, sir.

18        MR. LISENBY:  We would offer Number 7, Your

19    Honor.

20        THE COURT:  Admitted.

21            (State's Exhibit 7, plea, admitted.)

22        MR. LISENBY:  Show this to the jury?

23        THE COURT:  Yes.

24    Q    Mr. Norris, do you know the defendant in this case

25    Chris McCullough?

| | | |
|---|---|---|
| 1 | A | Yes, sir. |
| 2 | Q | How long prior to the incident that we're about to |
| 3 | | talk about would you say you knew Mr. McCullough? |
| 4 | A | Since I moved to -- I'm 28 now.  Since I was like |
| 5 | | 14. |
| 6 | Q | I'm having a hard time hearing you.  Probably not |
| 7 | | doing a lot of talking. |
| 8 | A | 14 years. |
| 9 | Q | You have known him for 14 years? |
| 10 | A | Yes. |
| 11 | Q | With regard to this case I want to direct you back |
| 12 | | to March the 19th of 2002 and ask if that morning |
| 13 | | you had the occasion to see Mr. McCullough |
| 14 | | somewhere? |
| 15 | A | Yes, sir, I seen him that morning.  He came to |
| 16 | | pick me up at the Kroger's store down in Lanett, |
| 17 | | Alabama.  I seen him that morning. |
| 18 | Q | You said he came to pick you up; is that correct? |
| 19 | A | Yes. |
| 20 | Q | Do you recall what kind of vehicle he was in? |
| 21 | A | Gray, Mustang GT. |
| 22 | Q | Did you and he go someplace? |
| 23 | A | Yes, sir. |
| 24 | Q | Where did you go to? |
| 25 | A | Out on Country Club Road out on -- I don't know |

1    exact address, Mr. Gragg's.

2  Q  Did you know Mr. Gragg at that time?

3  A  No.  I didn't know him.  I just know the name on

4    the document out Country Club Road out passed the

5    housing project.

6  Q  I know they're having a hard time hearing.  Mr.

7    Norris, I'm sorry.  If you'd remember to keep your

8    voice up, okay?

9  A  Yes, sir.

10  Q  Let me ask you that last question again.  You said

11    you went out to an area of Mr. Gragg's residence.

12    Did you know him prior to that day?

13  A  No, I didn't know him prior to that day.  Like I

14    said, I just see his name -- it was Gragg I seen

15    on the paper they served me with.  I didn't know

16    him prior to that day.

17  Q  Now, when Mr. McCullough picked you up at Kroger

18    did you and he have any conversation about what

19    you were going to do?

20  A  We had a conversation.  Said he had just come back

21    from the food stamp office up here in Lafayette

22    from taking his girlfriend.  He had seen a house

23    out on Country Club Road that we should check

24    out.  He asked me to get in the car.  I got in the

25    car with him.

Q    What happened then?

A    I seen some like duct tape in the car.  And I

asked him what it was far.  He said we probably

need this.

Q    What happened then?

A    Rode out there.  He said the house kind of far

from the road, off in the woods behind some pine

trees.  You see a bunch of pine trees.  Can't see

the house.  He said we needed somewhere to put the

car at.  He drove up the road.  There's a cemetery

up the road down in like a ditch like in a hole

like the cemetery down there.  We drove down

there, and the back of the cemetery -- back of the

cemetery like a dirty area like people might ride

four wheelers or something out there.  We parked

the car behind some brush.

Q    Who was driving the car at this time?

A    Oh, he was driving.

Q    Mr. McCullough was driving the car?

A    Yes, sir.

Q    And y'all went up into the cemetery?

A    Yes, sir.

Q    You said something about the area was dirty or

looked like where four-wheelers had been?

A    Yes, the cemetery goes in like a horseshoe shape.

1      Down below the cemetery is a area back there like

2      people drive off into the woods like four-wheelers

3      or motorcycles or whatever.  If you go down in

4      there we parked the car behind some brush where

5      couldn't nobody see us if they come down into the

6      cemetery.

7    Q    What happened then?

8    A    He asked me if I had anything in my pocket, empty

9         my pockets where I wouldn't have anything in my

10        pockets or anything.  I had a blue bandanna and

11        some gloves.  He got out of the car.  He had a ski

12        mask.

13   Q    Did you see where he got the ski mask from?

14   A    It was in the car.

15   Q    You said you had a blue bandanna with you?

16   A    Yes, sir, I had a blue bandanna.

17   Q    And some gloves?

18   A    Some gloves.

19   Q    What kind of gloves are you talking about?

20   A    They weren't leather gloves, just like blue

21        fiber-like gloves.

22   Q    What I might describe them as work gloves?  Is

23        that what you're talking about?

24   A    They wasn't necessarily work gloves.  Just some

25        gloves I had on, blue gloves I had on my hands.  I

|   |   |   |
|---|---|---|
| 1 | | had a blue bandanna.  He had a ski mask.  I seen |
| 2 | | him.  He got out the car and he put a pistol into |
| 3 | | his pants. |
| 4 | Q | Could you tell us what the pistol looked like that |
| 5 | | you saw? |
| 6 | A | It was a chrome Beretta 9 mm. |
| 7 | Q | Did you see where he got that from? |
| 8 | A | Out of the car.  It was in the car. |
| 9 | Q | What happened then? |
| 10 | A | I had went off ahead of him.  He was coming behind |
| 11 | | me.  We got on into the woods.  We crossed the |
| 12 | | stream like, I guess a little stream.  And we went |
| 13 | | running through the woods.  We jumped the stream |
| 14 | | and went on where the house -- side of the house |
| 15 | | barb wire fence. |
| 16 | Q | Let me ask you this.  When you were either while |
| 17 | | y'all were in the car or when you were going |
| 18 | | toward the house, for what purpose were you going |
| 19 | | to this house? |
| 20 | A | Like I say, I didn't know if anyone was at the |
| 21 | | house or anything.  Really the purpose was he just |
| 22 | | said he had picked me up -- I wanted to know was |
| 23 | | anything at the house.  He said didn't look like |
| 24 | | no one was at the house. |
| 25 | Q | If no one was at the house, what were you going to |

1       do?

2   A   The intention was probably to burglarize the

3       house.

4   Q   Y'all were going to try to take something?

5   A   Right.

6   Q   Y'all were approaching the house.  And what did

7       you do with your bandanna while you were

8       approaching the house?

9   A   I had my bandanna already tied around my face

10      except my eyes.

11  Q   What about Mr. McCullough?  Did he have anything

12      on his face?

13  A   Mr. McCullough got in the yard, he put his ski

14      mask on.

15  Q   You mentioned something earlier about duct tape?

16  A   Yes, sir.  I didn't have the duck tape.  I didn't

17      see him get the duck tape.  I really don't know if

18      the duck tape was there.  I know it was in the car

19      when I got in the car because I asked him what was

20      it for.

21  Q   You had originally seen it in the car?

22  A   I had seen it at Kroger in the car.  That's when I

23      asked him what it was for by the passenger seat.

24      I asked him what it was for.  He said we'd

25      probably need that.  But when I got out of the car

1    I said all I need was my bandanna.  I took

2    everything out my pockets but my gloves.  And I

3    got out ahead of him.  But I seen him get out of

4    the car.  I seen his ski mask.  He went into the

5    trunk behind the seat.  There was a speaker box,

6    went behind the speaker box and got a pistol from

7    back there.  Like I say, I didn't see any duct

8    tape.  I don't know if he left it in the car,

9    forgot it, or whatever.  We went up to the house.

10  Q   Tell me what happened when you got up to the

11    house.

12  A   Got up to the house I went to one side of the

13    house, and he went to one side of the house.  We

14    decided we'd look in the window and see if we see

15    anybody.

16  Q   Did you see anybody when you looked in?

17  A   The side of the house I was on I didn't see

18    anyone.  I didn't see anyone on the side of the

19    house I was on.

20  Q   What happened then?

21  A   I went to the front, and I met him.  On the side

22    of the house he had said he had checked the window

23    and wasn't nobody in the house.  But it was a

24    window on the back side of the house that was kind

25    of high.  He couldn't see in it.  The height I am

1    I'm taller than him.  I looked into it.

2  Q   Did you seen anything in it?

3  A   When I looked into it I seen a black woman with

4    her back turned to me with a yellow blouse and

5    folding clothes.  Naturally I thought she probably

6    worked there or lived there or whatever.  But I

7    knew someone was in the house.

8  Q   What happened then?

9  A   After then I told him, I said, man, somebody was

10   in the house.  We need to leave, get out of here.

11   He was like, well, this house right here is too

12   good.  We need to get this because, you know, he

13   had a pistol and this and that.  So really I

14   didn't really --

15       MS. KELIUM:  Is this responsive to any

16   questions, Your Honor?

17       THE COURT:  Is that an objection?

18       MS. KELIUM:  That's an objection.

19       THE COURT:  Sustained.

20  Q   So when you looked in and saw a person, you had a

21   conversation then with Mr. McCullough.  What's the

22   next thing that happened?

23  A   I had the conversation with him that we should

24   leave here.  He said the house was too good.  We

25   need to get this and that.  I didn't really want

1    to go in the house.  We were like getting into a

2    conversation then out there.

3  Q    Y'all were talking back and forth to each other?

4  A    Talking back and forth.  Then I said I think I

5    heard somebody say they seen somebody.

6  Q    What did you do?

7  A    Then I went in front of the house.  I hear like

8    motors revved up coming through the driveway

9    because it's a long driveway from the road.  I

10    thought it was the police.

11  Q    What happened then?

12  A    I took off running.  He took off behind me.

13  Q    What happened to Mr. McCullough?

14  A    He was behind me.  I jumped the barb wire fence

15    there.  When I jumped over the fence he came over

16    the fence, and he tripped.  And the pistol fell.

17    And I picked the pistol up.  And he got up and

18    came behind me.  When we got to the car, both of

19    us got in the car, everything was in the car.  He

20    crunk up and was leaving out.

21  Q    When you got into the car who was driving?

22  A    He was driving.  I wasn't driving.

23  Q    Where were you at?

24  A    I was on the passenger side.

25  Q    What happened then?

A    We left out.  We was leaving out fixing to get
     back into the cemetery.  And the police came down
     in the cemetery.  Police did that and arrested us.

Q    Was that a patrol car?

A    Patrol car.

Q    Did they get you out of the vehicle?

A    Yes, he said to put our hands out the window.  I
     did.  We got out of the vehicle.  And I laid on
     the ground.  Both of us got out of the vehicle.
     He got us out of the vehicle.  He called back-up.
     More police came.  I was face down on the ground
     and handcuffed and everything.  We sat out there
     for like -- I really don't know how many hours it
     was.  They searched the car and found the pistol
     and everything in there.  After that we stayed --

          MS. KELIUM:  Objection again as responsive to
     any questions that have been asked.

          THE COURT:  Sustained.

Q    They take you to the police department?

A    Yes.  We stayed there a while.

          MR. LISENBY:  Ms. Kelium may have some
     questions.

                    CROSS EXAMINATION

BY MS. KELIUM:

Q    I have just a few.  So you were wearing a bandanna

```
 1                    on your face, right?

 2   A    Yes, ma'am.

 3   Q    Why were you wearing a bandanna on your face?  Is

 4        it because so no one could identify you; is that

 5        right?

 6   A    Yes, ma'am.

 7   Q    You're saying Chris McCullough had a gun?

 8   A    Yes.

 9   Q    9 mm?

10   A    Yes.

11   Q    Pretty big gun?

12   A    Yes.

13   Q    Had it in his pocket?

14   A    No, front of his pants.

15   Q    In the front of his pants?

16   A    Yes.

17   Q    Sticking out?

18   A    I didn't never say it was in his pocket.  In his

19        pants with his shirt over it.

20   Q    Sticking out of the front of his pants?

21   A    With his shirt over it.

22   Q    And he had duct tape; is that right?

23   A    It was in the car when he picked me up.

24   Q    In the car.  So you say you see somebody in the

25        house; is that right?
```

1     A     Yes.

2     Q     You said Mr. McCullough was shorter than you, so

3           he couldn't see in that window?

4     A     No, he couldn't.

5     Q     You see somebody in there.  You didn't run off

6           though, did you?

7     A     No, I told him that I had seen someone.

8     Q     If you were worried about somebody seeing you, why

9           didn't you just run off then?

10    A     I was going to tell him.  I was with him.

11    Q     Y'all had this conversation.  How long did that

12          last?

13    A     It really didn't last long, I don't know or what.

14          But the police came not too long after that.

15    Q     So you took off running?

16    A     Yeah, I hear the motor running.  I took off

17          running with him behind me.

18    Q     You say he ran after you?

19    A     Yes.

20    Q     Even though you have a mask covering your face and

21          nobody can recognize you, you're going to

22          voluntarily take off, right?

23    A     Yes.

24    Q     Because you don't want to get caught by the

25          police; is that right?

| | | |
|---|---|---|
| 1 | A | Well, someone was in the house, and I told him. |
| 2 | Q | You didn't take off when you saw somebody. You |
| 3 | | said that? |
| 4 | A | I told him first because I was with him. I just |
| 5 | | didn't take slap off after I seen them. I told |
| 6 | | him that I had seen someone. Someone was in |
| 7 | | there. I heard -- said I heard someone say I |
| 8 | | think I seen somebody. Right after that the |
| 9 | | police -- the car was revving up the driveway. I |
| 10 | | took off running. I was really going to take off |
| 11 | | running when I said I seen somebody. But I heard |
| 12 | | a car. So I was going to run automatically |
| 13 | | anyway. |
| 14 | Q | You plead guilty to this charge, is that right, |
| 15 | | attempted burglary first degree? |
| 16 | A | Yes, I did. |
| 17 | Q | Got 20 years? |
| 18 | A | Yes. |
| 19 | Q | Not your first felony, right? You're the same |
| 20 | | Billy Ralph Norris that was convicted of |
| 21 | | aggravated assault in 2001, right? |
| 22 | A | Yes, in Georgia. |
| 23 | Q | With felony offense of aggravated assault? |
| 24 | A | My wife. |
| 25 | Q | Is that a yes? You are the same person that was |

1     convicted of the felony offense of aggravated

2     assault?

3  A   Yes.

4  Q   You were also convicted on the same day on April

5     4th, 2001, of giving a false name to a police

6     officer, right?

7  A   Giving what?

8  Q   I can show it to you if you forget.

9         MR. LISENBY:  Ask the question.

10        THE COURT:  I don't think he understood your

11    question.  Ask the question again.

12  Q   Are you the same Billy Ralph Norris, Jr. who was

13    convicted on April 4th, 2001, of giving a false

14    name to a law enforcement officer?

15  A   Which state?

16  Q   That was in Georgia.  Would you like me to show it

17    to you?

18  A   Yes.

19        MR. LISENBY:  Approach just a moment, Your

20    Honor.

21          (The following occurred at the bench

22          outside the hearing of the jury.)

23        MR. LISENBY:  According to this record he was

24    given first offender treatment in Georgia.  That's

25    not a felony conviction.

1    MS. KELIUM:  Says felony conviction.

2    MR. LISENBY:  Once you receive first offender

3    it's not a felony conviction.  Believe me, I have

4    dealt with that on several occasions.  It's not a

5    conviction.

6    MS. KELIUM:  Not same as you have.

7    MR. LISENBY:  Right, it's different.  It can

8    be discharged completely.

9    MS. KELIUM:  Could be, but was it?

10   MR. LISENBY:  We don't know that.

11   THE COURT:  This is equivalent of youthful

12   offender, is it not?

13   MR. LISENBY:  No, sir.  It's actually more

14   expansive than youthful offender.

15   MS. KELIUM:  That is generous.  In some

16   respects it is different.  The fact that they can

17   expunge it.  It's not sealed.  It is a felony

18   conviction.

19   MR. LISENBY:  That's not completely true.  I

20   had to write a brief on this for a case involving

21   an individual here.  It's an offense that can be

22   given to any individual regardless of age.  And

23   when given first offender treatment it's something

24   that they do not impose the sentence at all until

25   after a period of time takes place which they go

back in and determine whether or not the person

should or should not be found guilty of the

offense.

MS. KELIUM:  Been found guilty --

THE COURT:  Do you have any case law from

Georgia as to how it's classified.

MR. LISENBY:  I do have some.  It would take

me a little bit of time to dig it up.  Like I

said, I had to write a brief on a fellow that was

convicted over here on manslaughter.  I can do

that.  I guess the concern I have is at this

point it's already out there in front of the jury.

MS. KELIUM:  Saying you want a mistrial?

MR. LISENBY:  Well, no.

MS. KELIUM:  Otherwise, it's out there.

MR. LISENBY:  I like this jury.  And I like

the way the evidence is going.  I don't want to do

that.  If we can get the Court or however the

Court wants to do it in some way indicate that

these convictions are under Georgia's first

offender law.

MS. KELIUM:  He's got a felony since then. So

what's the effect of that?

MR. LISENBY:  Until they do something,

nothing.

THE COURT:  I'll have to give an instruction.

MS. KELIUM:  I have got another one that's here.

THE COURT:  Move on.

(Jury Present)

BY MS. KELIUM:

Q    Are you the same Billy Ralph Norris, Jr. that was convicted on March 14th, 2001, for giving a false name to a law enforcement officer here in this county?

A    Officer who?

Q    Huh?

A    Officer who?

Q    Giving a false name to a law enforcement officer is what you were convicted of on March 14th, 2001, true, in Chambers County, Alabama?

A    Yes, I am.

Q    So you have lied to the police before?  Yes?

A    If that's yes, I was convicted.

Q    You gave the police a statement this time, didn't you?

A    Yes, I did.

Q    You told them what you have been telling us today, right?

A    Yes.

| | | |
|---|---|---|
| 1 | Q | Chris took you out to this house? |
| 2 | A | Yes. |
| 3 | Q | Chris had a gun? |
| 4 | A | Yes. |
| 5 | Q | Chris had a mask? |
| 6 | A | Yes. |
| 7 | Q | You wanted to leave, Chris didn't?  Is that your |
| 8 | | statement? |
| 9 | A | I never stated that I wanted to leave and Chris |
| 10 | | didn't.  I stated that I seen somebody in there. |
| 11 | | I've never said that I told him that I wanted to |
| 12 | | leave.  I was telling him -- like I said, on my |
| 13 | | statement I seen someone in the house.  I told |
| 14 | | Chris we ought to leave. |
| 15 | Q | And the rest of what you said is Chris didn't want |
| 16 | | to leave and you didn't? |
| 17 | A | He said that we shouldn't.  He had the gun.  He |
| 18 | | said the house was too good. |
| 19 | Q | Your statement is Chris found the house, Chris |
| 20 | | drove you there, Chris had a gun, Chris wanted to |
| 21 | | hang out and you wanted to leave.  But you didn't |
| 22 | | do anything, right? |
| 23 | A | I wanted to leave when I seen somebody.  Like I |
| 24 | | said, I wanted to leave when I seen someone in the |
| 25 | | house.  Because this crime not here just this |

1      one.  I burglarized the house, but I knew no one

2      was at them houses.  If someone out there I don't

3      like to carry a gun.

4   Q  You had a bandanna on that day, sir, to obscure

5      your face so nobody could find you?

6   A  Yes.

7   Q  So nobody could tell who you were?

8   A  Yes.

9   Q  So you would not be caught?

10  A  Yes.

11  Q  So you would not get in trouble, right?

12  A  Yes.

13  Q  That's the whole point.  You have lied to the

14     police before for the same reason, right?  You

15     lied to the police so that you would not be

16     detected just like a mask to get out of trouble;

17     is that right?

18  A  Them cases they got where they say I lied to the

19     police --

20  Q  The cases we talked about, the one here, you lied

21     to the police so that you would not be detected

22     just like you were here, just like wearing a mask,

23     right?  Is that why you were lying to the police?

24  A  Well, I told them my name later on.

25  Q  But you lied to begin with to avoid detection,

1           right?

2     A     Situation when they caught me.

3     Q     Are you going to answer my question, or should I

4           have the Judge instruct you to answer the

5           question?

6     A     I answered the question.

7     Q     You lied to the police before to avoid detection?

8     A     Yes.

9     Q     You lied to the police so that you wouldn't get in

10          trouble?

11    A     Yes, ma'am.

12              MS. KELIUM:  That's all I have.

13              THE COURT:  Anything further from the State

14          from this witness?

15              MR. LISENBY:  No, Your Honor.  May this

16          witness be excused?

17              THE COURT:  You may step down.

18              MR. LISENBY:  State calls Jeff Blackstone.

19                      JEFF BLACKSTONE

20          called as a witness by the State, having been

21          first duly sworn, was examined and testified as

22          follows:

23                      DIRECT EXAMINATION

24    BY MR. LISENBY:

25    Q     Would you tell us your name, please, sir?

1    A    Jeff Blackstone.

2    Q    Where are you employed?

3    A    Chambers County sheriff's department.

4    Q    What is your present position with the sheriff's

5         department?

6    A    Chief investigator.

7    Q    How long have you been with the sheriff's

8         department?

9    A    Ten years.

10   Q    How long have you been involved in investigation?

11   A    Five years.

12   Q    I want to direct your attention back to March the

13        19th of 2002.  And on that day did you have the

14        occasion to see the defendant in this case Chris

15        McCullough?

16   A    Yes, I did.

17   Q    Where were you at when you saw him?

18   A    Lanett Police Department.

19   Q    Did you have the occasion on that day to advise

20        Mr. McCullough of his constitutional rights?

21   A    Yes, I did.

22   Q    How did you go about doing that?

23   A    We have a rights form we use and read him his

24        rights off the form.

25   Q    I want to show you what is marked as State's

1        Exhibit Number 1 and ask if you recognize that?

2   A    Yes.

3   Q    What is that, please?

4   A    Copy of the rights form that I read Mr.

5        McCullough.

6   Q    You said that's a copy; is that correct?

7   A    Yes, sir.

8   Q    Any changes, marks, or alterations other than the

9        State's exhibit marker from the original that you

10       maintained?

11  A    No, sir.

12  Q    You indicated that you advised Mr. McCullough of

13       some constitutional rights; is that correct?

14  A    Yes.

15  Q    Did you do that off this form, the original of

16       this form?

17  A    Yes, sir.

18  Q    If you would tell the members of the jury what

19       rights, if any, you advised Mr. McCullough off?

20  A    I read Mr. McCullough's right and advised him he

21       had the right to remain silent, anything he said

22       will be used against him in a court of law.  You

23       have a right to a lawyer and have him present with

24       you while you're being questioned.  If you cannot

25       afford to hire a lawyer one will be appointed to

1    represent you before any questions if you wish, if

2    you decide at any time to exercise these rights

3    and not answer any questions.

4  Q    Is there something else on that form with regard

5    to those rights?

6  A    Yes.

7  Q    What is that?

8  A    It's a waiver of rights that I read him.  I have

9    read this statement of my rights or had them read

10    to me and understand what my rights are.  I am

11    willing to waive these rights and make a

12    statement.  No promises or threats have been made

13    to me or pressure or coercion of any kind has been

14    used against me.

15  Q    In some manner did Mr. McCullough acknowledge that

16    he understood each of the rights that you read to

17    him?

18  A    Yes, he did.

19  Q    How did he do that?

20  A    I gave him the form and told him to read it again

21    himself and as he read his rights to initial what

22    he read.  And the top part is one through five.

23    And he initialled every time he read one.

24  Q    With regard to the waiver of rights portion in

25    some way did he acknowledge that he understood

1    that and was willing to speak?

2    A    Yes, sir.

3    Q    How did he do that?

4    A    He signed the form.

5    Q    Was that in your presence?

6    A    Yes, sir.

7    Q    Were there other officers present?

8    A    Yes, there were.

9    Q    Did you note that on the form that you have?

10    A    Yes, sir.

11    Q    Who were other officers present?

12    A    It was Kenny Vines, Lafayette PD; Steve Smith,

13    Lafayette PD, Mike Looser from Chambers County

14    sheriff's department; myself Chambers County

15    sheriff's department.  And also Lincoln Whaley he

16    was in.  But when I read the rights he had walked

17    out when I took the statement.

18    Q    There also a place on the top of that form for

19    place, date, and time.  You see that?

20    A    Yes.

21    Q    Did you fill that out?

22    A    Yes, I did.

23    Q    Can you tell the members of the jury what that is?

24    A    The place was Lanett PD, the date was 3/19/02, and

25    the time was 14:47 which was 2:47 central time.

```
 1    Q      Why (  ) it that you have a central time zone time

 2           on there?

 3    A      The time zone splits the county.  One-half the

 4           county is an hour behind the other half.

 5    Q      Why did you use central time?

 6    A      Because I work on central time.

 7    Q      Your main office is here in Lafayette on the

 8           central time zone; is that correct?

 9    A      That's correct.

10                  MR. LISENBY:  At this time we would offer

11           State's Exhibit Number 1.

12                  THE COURT:  Admitted.

13                      (State's Exhibit 1, statement,

14                       admitted.)

15    Q      Investigator Blackstone, after you advised Mr.

16           McCullough of his rights -- before you advised Mr.

17           McCullough of his rights for that matter did you

18           or anyone in your presence threaten or coerce him?

19    A      No.

20    Q      Did you or anyone in your presence promise him

21           anything or offer him any hope of reward?

22    A      No.

23    Q      Did you or anyone in your presence tell him it

24           would be better for him to make a statement as to

25           not make a statement?
```

```
 1    A    No, he didn't.

 2              MR. LISENBY:  May we show State's Exhibit 1?

 3              THE COURT:  Yes.

 4              MR. LISENBY:  Thank you, investigator.  Ms.

 5    Kelium may have some questions for you.

 6                         CROSS EXAMINATION

 7    BY MS. KELIUM:

 8    Q    I just have a couple.  Investigator Blackstone,

 9         this waiver of rights form says that he's willing

10         to waive these rights and make a statement.  Is

11         that what's printed on that?

12    A    Yes, ma'am.

13    Q    A waiver of rights form?

14    A    Yes.

15    Q    That's not something that the person would write

16         in there to make a statement?

17    A    No, ma'am.  It's in the waiver, bottom portion of

18         the waiver.

19    Q    I'm referring specifically to State's Exhibit

20         Number 1.  Is there a place on this waiver of

21         rights form -- first of all this is a form, right?

22    A    Yes.

23    Q    One of a whole big stack you've got printed that

24         are exactly the same?

25    A    All the same.
```

1    Q    With the exception of this one that's filled in?

2    A    That's correct.

3    Q    It got filled in from a blank one which is one of

4         several hundred or more that are laying around?

5    A    That's correct.

6    Q    Is there a different form that you use for a

7         waiver of rights for somebody to sign that's not

8         going to make a statement?

9    A    No, the same form.

10   Q    As long as they said they understood their rights

11        you use this form, but then thereafter they may

12        not give you a statement, right?

13   A    They may not.

14   Q    They may not answer any of these questions?

15   A    If they don't I usually put on the form refuse to

16        give a statement.

17   Q    So this would be the same form no matter what they

18        decided to do?

19   A    This is the same form I read to everybody.

20             MS. KELIUM:  That's all the questions I have.

21        THE COURT:  You may step down.

22        MR. LISENBY:  May this witness be excused?

23        THE COURT:  Yes, he is excused.

24             (The following occurred at the bench

25             outside the hearing of the jury.)

1    MS. LISENBY:  I'm going to call Lieutenant

2    Carter.  The video takes about 30 or 40 minutes.

3    MS. KELIUM:  I had talked to Bill about fast

4    forwarding.  It's like watching paint peel for

5    most of it.  It's like watching paint peel with my

6    client lying on the ground in handcuffs for 30

7    minutes.  And virtually nothing is gained from

8    that.

9    MR. LISENBY:  We may fast forward through

10    parts of it, but there are other parts.  That's

11    not the only thing we have.  I wondered if you

12    wanted to take a break was the only reason I came

13    up here.

14    THE COURT:  You say be 30 or 40 minutes at

15    least.

16    MR. LISENBY:  Overall testimony is going to

17    be at least that long.

18    (JURY PRESENT)

19    THE COURT:  Ladies and gentlemen, the next

20    witness may take 40/45 minutes or longer.  Would

21    y'all like to take a break at this time before we

22    start the next witness?  Let's just go ahead and

23    start.  Call your next witness.

24    MR. LISENBY:  Call Richard Carter.

25    RICHARD CARTER

1    called as a witness by the State, having been

2    first duly sworn, was examined and testified as

3    follows:

                    DIRECT EXAMINATION

5    BY MR. LISENBY:

6    Q    Would you tell us your name, please, sir?

7    A    Richard Carter.

8    Q    Where are you employed?

9    A    With the Lanett Police Department.

10   Q    What is your present position with the Lanett

11   Police Department?

12   A    I'm the lieutenant in charge of the detective

13   division.

14   Q    How long have you been employed at the Lanett

15   Police Department?

16   A    About 12 years and 4 months.

17   Q    How long have you been involved in investigations?

18   A    About 7 years and 4 months.

19   Q    You said you were now the head of the detective

20   division?

21   A    Yes, sir.

22   Q    Lieutenant Carter, I want to direct your attention

23   back to March the 19th of 2002 and ask if you were

24   working that particular day?

25   A    Yes, I was.

1    Q    In regard to this particular case did you have the
2         occasion to respond to an area of a burglary or
3         attempted burglary call?

4    A    Yes, I did.

5    Q    How did you go about doing that?

6    A    I responded to the area of Hillcrest Cemetery when
7         I heard Lieutenant Bettis request back-up there.

8    Q    Do you recall where you were when you first
9         received the call or heard that information?

10   A    Somewhere on the Southside of Lanett.

11   Q    Just your best judgment, how long would you say it
12        took before you arrived?

13   A    Probably took me about three minutes.

14   Q    Just describe for us what you observed when you
15        arrived at the scene.

16   A    When I come into the cemetery I come over a rise
17        toward the back of the cemetery that goes down.  I
18        saw Lieutenant Bettis' car behind I believe it was
19        a gray Mustang.  I saw Sergeant Rick Brown's
20        vehicle parked on the side of the Mustang.  And I
21        believe I saw another vehicle, possibly our animal
22        control officer's vehicle, parked further back
23        toward the hill from where I was coming in.

24   Q    And for the members of the jury would you describe
25        the overall area out there where the vehicle was

**VOL. 2 OF 2**

Court of Criminal Appeals No. **CR-03-1163**

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS
## FROM
# CIRCUIT COURT OF CHAMBERS COUNTY, ALABAMA

### Circuit Court Case Number: CC 2002-318
### Circuit Judge: Honorable Ray Martin

Type of Conviction / Order Appealed From:   State Conviction

Sentence Imposed:   40 years

Defendant Indigent:  _X_ YES   _ NO

## CHRISTOPHER MCCULLOUGH

NAME OF APPELLANT

## KYLA KELIM
APPELLANT'S ATTORNEY                                    (TELEPHONE NO.)

## Post Office Box 1977
ADDRESS

## ALEXANDER CITY        ALABAMA        35010
CITY                STATE                ZIP CODE

v.

## STATE OF ALABAMA

NAME OF APPELLEE

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
Name and address of municipal attorney below.

(For Court of Criminal Appeals use only)

1     stopped?

2   A   It was at the back side of the open area adjacent

3     to a wooded area.  There's a pulpwood road that

4     goes back into the woods on the furtherest part of

5     the drive that you could be at.

6   Q   Now, did you see any individuals that were at some

7     point identified to you as people that came from

8     the automobile?

9   A   Yes.

10   Q   Where were they?

11   A   The driver was laying behind the Mustang in

12     handcuffs.  And the passenger was outside the

13     passenger door laying on the ground handcuffed

14     also.

15   Q   Would that have been Mr. McCullough and Mr.

16     Norris?

17   A   Yes.

18   Q   With regard to this after you received the call

19     and responded out to the area were you involved in

20     looking into this vehicle?

21   A   Yes, I was.

22   Q   Tell me what, if anything, you observed or

23     located.

24   A   In the passenger front floorboard I observed a

25     blue bandanna, some brown work type gloves, roll

1       of duct tape, later on when I searched the vehicle

2       located two handguns hidden in a compartment

3       behind the back seat, between the back seat and

4       the trunk on the driver's side.

5    Q    When you say handgun you're talking pistols; is

6       that correct?

7    A    Yes.

8    Q    Do you recall anything about what kind of pistols

9       they were?

10   A    One of them was a revolver, I believe a .357.  And

11       the other was a semi-automatic I think it was a 9

12       mm.

13                (State's Exhibit 5, envelope, marked for

14                identification.)

15   Q    Show you what's mark as State's Exhibit Number 5.

16       And if you would Ms. Kelium has stipulated and we

17       placed it in that envelope.  If you'd look at the

18       contents of that and see if you recognize the

19       items contained in it?

20   A    Yes, sir.

21   Q    What are those items, please?

22   A    One pair of brown work gloves, one blue bandanna,

23       and one roll of duct tape.

24   Q    Now, it looks like the bandanna was tied in some

25       manner; is that right?

1   A   Yes.

2   Q   Is that the way you found it?

3   A   Yes, it is.

4   Q   Those are the items that you recovered out of the

5      vehicle when you responded on March the 19th; is

6      that correct?

7   A   Yes, sir.

8        MS. LISENBY:  We would offer State's Exhibit

9      5 and its contents.

10       THE COURT:  Admitted.

11         (State's Exhibit 5 admitted.)

12   Q   With regard to this area out there and the vehicle

13      itself, Lieutenant Carter, was a videotape made by

14      the police?

15   A   Yes, there was.

16   Q   Have you had an opportunity to view that

17      videotape?

18   A   Yes, I have.

19   Q   Does it fairly and accurately depict or show the

20      area where the vehicle was stopped and the area

21      inside the vehicle?

22   A   Yes, it does.

23        MS. KELIUM:  Could I approach the bench?

24        THE COURT:  Yes.

25         (The following occurred at the bench

1          outside the hearing of the jury.)

2          MS. KELIUM:  I just want to get another

3     objection on the record to preserve my motion in

4     limini about our jumping up and down about my

5     client being viewed in handcuffs for the duration

6     of this video.  It proves absolutely nothing.

7     They're not on the property.  We offered to

8     stipulate to the fact they were stopped within 2

9     to 300 yards of the property.  I have no objection

10    to stipulating that the guns were in the trunk of

11    the car that my client owned.  I think no purpose

12    is served by this.  Its probative value is nil.

13    Even if it had any minimum probative value, the

14    prejudicial effect far outweighs that.  We've

15    provided the Court with some case law that would

16    cover that.

17          I know for a fact there's other out there,

18    and I just could not pull them all.  You know,

19    with the case I have given the court of the

20    Eleventh Circuit says you're not even supposed to

21    see the defendant in handcuffs.  The jury is not

22    supposed to see him in handcuffs at all.

23          THE COURT:  In that case that defendant had

24    already been in jail, was charged, and was

25    subsequently removed from jail and carried out to

160

the scene.  This is the actual scene of the

arrest.

MS. KELIUM:  And it proves not the arrest.

There's nothing that's extremely prejudicial.  The

fact of the arrest is extremely prejudicial.  They

know he's arrested.  They know he's been indicted.

But they don't need to see him laying on the

ground on his stomach in handcuffs.

THE COURT:  All of this happened within a

matter of minutes as I understand the testimony,

back to back from the time they were at the house

to time they were actually arrested.  This was a

very short span of time.  Previously I've denied

the motion in limini.  And it's again denied.  You

have got your objection on the record.

MS. KELIUM:  Can I have a continuing

objection through the tape?

THE COURT:  Yes.

MR. LISENBY:  While you're up here.  If it's

all right with you, Judge, we'll show the

videotape.  And we'll speed through portions of it

as Ms. Kelium has said.  We're not going to do the

whole thing.  Then after that if you could read

the stipulation.

THE COURT:  I have got the stipulation ready

1        I believe.  So move on with it.

2                        (Jury Present)

3    BY MR. LISENBY:

4    Q    Let me show you State's Exhibit Number 6 and tell

5         me if you recognize that as the videotape involved

6         in this case, please.

7    A    Yes, sir.

8    Q    That's the one that you indicated that you had

9         previously viewed; is that correct?

10   A    That's correct.

11            MR. LISENBY:  At this time we would offer

12       State's Exhibit Number 6.

13            THE COURT:  Admitted.

14                (State's Exhibit 6, tape, admitted.)

15            MR. LISENBY:  With the Court's permission we

16       would like to play it for the jury.

17            THE COURT:  You may.  Can everybody on the

18       jury see?  Mr. Lisenby has placed this

19       television.

20            MR. LISENBY:  If anyone thinks it would be

21       better to put it at an angle.

22            MR. LISENBY:  Before you start playing it,

23       Ms. Kelium and I have discussed this.  There may

24       be portions where we fast forward this tape.

25            THE COURT:  Yes.

```
 1              (VIDEOTAPE PLAYED)

 2          THE COURT:  Ladies and gentlemen, the State

 3      and the defendant with advice of counsel have

 4      stipulated, that means they have entered a

 5      stipulation or an agreement, that two pistols were

 6      recovered from the vehicle involved in this case.

 7      And they have agreed that those weapons do not

 8      need to be brought into court today.  Based on

 9      this stipulation or agreement between the parties

10      you, the jury, shall consider these weapons as

11      evidence just as if they were presented here in

12      open court today.  You may proceed.

13          MR. LISENBY:  Thank you, Your Honor.

14   BY MR. LISENBY:

15   Q   Now, Lieutenant Carter, I want to ask you just a

16      couple of things about the videotape.  You were

17      able to observe it; is that correct?

18   A   Yes.

19   Q   There was a shot by the camera with regard to the

20      tires of the vehicle.  What was that for?

21   A   Showing the mud on the tires, to show the path

22      through that muddy pulpwood road where Lieutenant

23      Bettis saw it coming out from.

24   Q   Is that area back in there, further back, would

25      not be abutting the Gragg residence property?
```

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Now, with regard to this particular case, |
| 3 | | Lieutenant Carter, on March the 19th of 2002, did |
| 4 | | you have the occasion to speak to the defendant |
| 5 | | Chris McCullough? |
| 6 | A | Yes, I did. |
| 7 | Q | Prior to your speaking to him did you or anyone in |
| 8 | | your presence threaten or coerce him? |
| 9 | A | No. |
| 10 | Q | Did you or anyone in your presence promise him |
| 11 | | anything or offer him any hope of reward? |
| 12 | A | No. |
| 13 | Q | Did you or anyone in your presence tell him it |
| 14 | | would be better for him to make a statement than |
| 15 | | to not make a statement? |
| 16 | A | No. |
| 17 | Q | Did he then make a statement with regard to this |
| 18 | | case? |
| 19 | A | Yes, he did. |
| 20 | Q | How was that taken down? |
| 21 | A | In written form. |
| 22 | Q | Who wrote it? |
| 23 | A | I did. |
| 24 | | MS. KELIUM:  Can I approach, Your Honor? |
| 25 | | (The following occurred at the bench |

(outside the hearing of the jury.)

MS. KELIUM:  I just wanted to place my objection on the record to the introduction or admission of this statement.  We've previously had a hearing on.  And the Court has ruled they're going to allow it in, but give a jury instruction giving the jury information on things that they can take in account or we're stating that that's not good enough and he wouldn't sign it.  But there's other evidence we presented that shows it's not voluntary and not willingly waived his rights at all and didn't voluntarily give them a statement.

THE COURT:  Objection overrule.  Motion to suppress has previously been denied.  Go ahead.

(Jury Present)

BY MR. LISENBY:

Q    I want to show you what has been previously marked as State's Exhibit Number 2 and ask if you recognize that?

A    Yes, I do.

Q    In regard to the Gragg residence events is that the statement that you took from Mr. McCullough?

A    Yes, it is.

Q    I notice that there's some information at the top

```
 1            that's filled in.  There's I guess blank spaces;
 2            is that correct?
 3     A      Yes.
 4     Q      Can you tell us what those are, please?
 5     A      It has the name Chris McCullough, address of 604
 6            South First Avenue, Lanett, Alabama; and a phone
 7            number of 586-1158; date, March 19th, '02; time of
 8            statement 16:53 hours which is 4:53 eastern time;
 9            and page one of one pages.
10     Q      Why do you use eastern time?
11     A      Because we work in the eastern time zone.
12     Q      So Lanett is an eastern time zone in this county?
13     A      Yes.
14     Q      Now, this is not the original; is that correct?
15     A      That's correct.
16     Q      It is a copy with regard to the statement
17            involving Mr. Gragg's residence; is that right?
18     A      That's right.
19     Q      Any changes, marks, or alterations other than
20            State's Exhibit sticker from the statement
21            involving Mr. Gragg's residence?
22     A      No, sir.
23                 MR. LISENBY:  Offer Number 2, Your Honor.
24                 THE COURT:  Admitted.
25                    (State's Exhibit 2 admitted.)
```

```
 1    Q    If you would if you would read that to the jury,

 2         please?

 3    A    Today I picked him up at my house.  I had been to

 4         Lafayette to the food stamp office.  I was headed

 5         back to Lafayette when we saw the house.  We

 6         stopped and parked down at the cemetery.  When we

 7         got out I had a mask and the 9 mm.  Billy had a

 8         bandanna and gloves.  He left the duct tape in the

 9         car.  We went through woods to the house.  When we

10         got to the house Billy saw a lady inside folding

11         clothes.  He told me.  And I said let's go.  He

12         said you got a gun.  You might as well go on and

13         do it.  I told him no.  Then we was walking back

14         towards the woods when we heard the police car

15         coming up.  Then we ran through the woods to the

16         car.

17              Mr. McCullough read this statement and

18         advised it was true and correct but would not sign

19         it.  And then I signed it.

20    Q    Up there on the first sentence it says I picked

21         him up.  Who is that in reference to?

22    A    His co-defendant Billy Ralph Norris.

23    Q    And you said that Mr. McCullough read this

24         statement; is that correct?

25    A    Yes.
```

1    Q    Did you ask him if that was correct?

2    A    Yes, I did.

3    Q    Did he acknowledge that it was, in fact, correct?

4    A    He did.

5    Q    Did you ask him to sign the statement?

6    A    Yes, I did.

7    Q    But he would not sign the statement?

8    A    No, sir.

9    Q    This residence involving Mike Gragg that's here in

10        Chambers County; is that correct?

11   A    Yes, sir.

12        MR. LISENBY:  At this time we would like to

13        publish to the jury State's Exhibits 2 and 5.

14        THE COURT:  You may publish.

15        MR. LISENBY:  I believe that's all the

16        questions I have.  Ms. Kelium may have some for

17        you.

18                    CROSS EXAMINATION

19   BY MS. KELIUM:

20   Q    Were you present when Mr. McCullough was read his

21        rights before giving a statement?

22   A    No, ma'am.

23   Q    There were other officers present though?

24   A    Yes, ma'am.

25   Q    Throughout the incident, the fact State's exhibit

1    showing his waiver of rights there shows four

2    officers?

3  A    During when he was Mirandized.

4  Q    When he was Mirandized.  You also questioned Billy

5    Norris about this offense, didn't you?

6  A    Yes, ma'am.

7  Q    You questioned Billy Norris first?

8  A    Yes, ma'am.

9  Q    So Billy Norris made a statement prior to the time

10    you spoke to Mr. McCullough; is that right?

11  A    Yes, ma'am.

12  Q    Is it fair to say that you were telling Mr.

13    McCullough quite a bit about what Mr. Norris was

14    saying before he gave a statement; is that right?

15  A    Some of the things.

16  Q    In fact, a lot of things would you agree that were

17    in Mr. McCullough's statement were in Mr. Norris'

18    statement?  Wouldn't you agree with that?

19  A    Yes, ma'am.

20  Q    It took you about three minutes to arrive at the

21    scene where the car was; is that correct?

22  A    Yes, ma'am.

23  Q    Three minutes of the time the car was stopped or

24    three minutes at the time of the initial call?

25  A    Three minutes of the time that Lieutenant Bettis

1          called for a back-up unit.

2     Q    You were there about three minutes?

3     A    Yes, ma'am.

4     Q    I think we all saw the videotape.  I know we fast

5          forwarded several portions.  It took you quite a

6          while to locate guns?

7     A    Yes, ma'am.

8     Q    They were not located when you first walked up?

9     A    No, ma'am.

10    Q    In fact, there were a number of officers in the

11         video, right?

12    A    Yes, ma'am.

13    Q    Half a dozen?

14    A    I don't know if there was six or more, but there

15         was only three at most doing the search.

16    Q    But there was several of you in and around the

17         car?  It was quite a while before those guns were

18         located?

19    A    Yes, ma'am.

20    Q    They were not in Mr. McCullough's waist band?

21    A    No, ma'am.

22    Q    Not the small of his back?

23    A    No, ma'am.

24    Q    Not in the pocket?

25    A    No, ma'am.

1   Q   Not in the boot?

2   A   No.

3   Q   Not down his shirt?

4   A   No.

5   Q   Where were they?

6   A   They were behind the driver's seat in the back

7       passenger seat.  The seat folds down and were put

8       right there behind the speaker box which the

9       opening goes to the trunk area.

10  Q   That sounds quite complicated?

11  A   It's not.

12  Q   This wasn't just tossed into the floorboard?

13  A   No, ma'am.

14  Q   Do you recall the ski mask in his pocket?  See

15      that on the video, right?

16  A   Yes, ma'am.

17  Q   It's not laying there on the floor when you walk

18      up.  It's a two-door car, right?

19  A   Yes, ma'am.

20  Q   When you open the car door in the back, it wasn't

21      laying there where you could see it, right?

22  A   Right.

23  Q   When you pulled the back seat up, was it laying

24      there where you could see?

25  A   Pull the back seat down.

1   Q   Pull the back seat down?

2   A   Yes.

3   Q   Then there's a speaker box?

4   A   Yes, ma'am.

5   Q   It was behind that speaker box?

6   A   No.  If you let the back seat down, the back rest

7      portion, the guns were laying right there and the

8      speaker box is further back.  So the guns were

9      between the back seat and the speaker box.

10   Q   It's not anywhere where you could see it?

11   A   Not through just plain view, no.

12   Q   In fact, y'all were looking for about 20 minutes?

13      I think you said three of you were looking in

14      there before these were located; is that right?

15   A   I'm not sure how long we searched.

16   Q   You saw the videotape.  If I said about 20 minutes

17      give or take a few would that seem about right?

18   A   Probably reasonable.

19      MS. KELIUM:  That's all the questions I have.

20      THE COURT:  Anything further?

21      MR. LISENBY:  No, Your Honor.

22      THE COURT:  You may step down.  Call your

23   next witness.

24      MR. LISENBY:  State rests, Your Honor.

25      THE COURT:  State rests.  Ladies and

1   gentlemen, I'll need for y'all to step out to the

2   jury room for just a few minutes.  I'll call you

3   back in.

4                  (JURY NOT PRESENT)

5       THE COURT:  The jury is now in the jury room.

6       MS. KELIUM:  I have a motion to make.  The

7   defense moves for a judgment of acquittal.  The

8   State has failed to prove their case for attempted

9   burglary.  They have to prove that Mr. McCullough

10  attempted to break into Mr. Gragg's home with the

11  intent to commit a crime therein.

12      The most they have been able to show credibly

13  is a charge of attempted or a charge of criminal

14  trespassing according to the testimony on the

15  property.  That does not a Class B felony make.

16  The State has the burden.  The State has fail to

17  meet their burden.  They have a statement that's

18  unsigned from my client regarding a gun.  They

19  have Billy Norris a convicted liar talking about a

20  gun.  No one else there was able to see a gun.

21  The had the gun located in a portion of the car

22  that they're in that's so hard to get to, it's not

23  credible to have that excluded every possibility

24  of innocence in this case except for a charge of

25  criminal trespass.

1    THE COURT:  What says the State?

2    MR. LISENBY:  Judge, this is about the

3    clearest case I think I have ever seen as far as

4    the evidence involving what took place.  We have a

5    confession from the defendant saying that they

6    were going to go into the house, was armed with a

7    gun, and a mask on, the mask still in his back

8    pocket when the police got to him, guns in the

9    car.

10    The individual that was with him Mr. Norris

11    indicated that they went there with intent to

12    steal items.  They were searching around for a

13    place to get into it.  They just happened to see

14    somebody there.  If this isn't an attempted

15    burglary in the first degree I'm afraid people in

16    this society have no way of ever being able to

17    defend themselves other than getting out and start

18    shooting people that are crouching around their

19    house with masks on.

20    THE COURT:  Motion for judgment of acquittal

21    denied.

22    How long do you think your case will be?

23    MS. KELIUM:  About 15 or 20 minutes.  I

24    wanted to take a short break.  I need a personal

25    break.  And I need a break to talk to my client

1   for a few minutes.

2        THE COURT:  Let's take that break.

3                    (BREAK)

4        MS. KELIUM:  My client is going to testify.

5        MR. LISENBY:  Being that I would like to go

6   ahead and ask the Court to -- previous discussion

7   about the prior convictions.

8        THE COURT:  What are the convictions for?

9        MR. LISENBY:  Receiving stolen property

10  second degree in '93, burglary first degree in

11  November of '02 and theft of property second

12  degree in November of '02.

13       MS. KELIUM:  I have two separate issues.  The

14  first one is going to be the '93 conviction is 10

15  years old for the receiving.  The second is that

16  the burglary was one of these series of events

17  which he was charged right after he was arrested

18  for this event.

19       MS. LISENBY:  Actually the '93 case was

20  November 22nd, 1993.  Today is November 13th,

21  1993.  It's not yet 10 years old.

22       MS. KELIUM:  It's real close though.  I think

23  the Judge has the discretion not admit it when

24  it's that close.

25       THE COURT:  It's admissible now.  What's the

1    other one?

2         MS. KELIUM:   The other burglary is one of

3    these series that he was arrested for all at the

4    same time.   The State is trying them one at a

5    time.

6         THE COURT:  Was he convicted by a jury?

7         MR. LISENBY:  Yes, sir.

8         THE COURT:  Sentenced?

9         MR. LISENBY:  Yes, sir.

10        THE COURT:  It's admissible.

11        MS. KELIUM:  It's still on appeal, too.  It's

12   not final.

13        MR. LISENBY:  That's an issue that can be

14   brought up on redirect examination according to

15   McElroy's.

16        THE COURT:  I think that's the proper way to

17   do it.  You can -- it is a conviction.  It is on

18   appeal.  Let's look at McElroy.  But I believe

19   that's the procedure to be followed.  Because it's

20   on appeal I don't think prohibits its use in

21   impeachment.

22        MR. LISENBY:  That might even be in the rule

23   of evidence.

24        THE COURT:  Let's look at that.

25        MR. LISENBY:  Yes, sir.  Rule 609E, pendency

of appeal.  The pendency of an appeal therefrom

does not render evidence of a conviction

inadmissible.  Evidence of the pendency of an

appeal is admissible.

THE COURT:  So you can use it.  And you can

state that it's still on appeal.  All right.

After this then we'll send the jury back out.

He's your witness.

MS. KELIUM:  Burglary first and theft second

in that case, right?

MR. LISENBY:  These are our requested

charges.

THE COURT:  Let me be looking over those.

Okay.  All right.

(JURY PRESENT)

THE COURT:  Okay.  At this point the State

has rested.  And the defense may proceed.

MS. KELIUM:  Thank you.  Defense calls Chris

McCullough.

CHRISTOPHER MCCULLOUGH

called as a witness in his own behalf, having been

first duly sworn, was examined and testified as

follows:

DIRECT EXAMINATION

BY MS. KELIUM:

| | | |
|---|---|---|
| 1 | Q | Can you state your name for the record? |
| 2 | A | Christopher Keneshia McCullough. |
| 3 | Q | Chris, you're from the Valley area; is that right? |
| 4 | A | Yes, ma'am. |
| 5 | Q | That's where you grew up? |
| 6 | A | Yes, ma'am. |
| 7 | Q | Your family all lives in Valley? |
| 8 | A | Yes, ma'am. |
| 9 | Q | I'm going to draw your attention to March 19th, |
| 10 | | 2002.  You have been sitting here through the |
| 11 | | trial and have heard a lot of testimony about that |
| 12 | | date.  Can you tell the jury what you did on that |
| 13 | | date starting in the morning? |
| 14 | A | I got up around about 8:00, took my girlfriend to |
| 15 | | the Department of Human Resources up here in |
| 16 | | Lafayette. |
| 17 | Q | And took her there for a food stamp interview? |
| 18 | A | Yes, she had a food stamp interview. |
| 19 | Q | What did you do after you left there? |
| 20 | A | I left there.  Me and Billy Norris had talked like |
| 21 | | on a Saturday night about some activity that he |
| 22 | | wanted to do.  But more like he wanted to be a |
| 23 | | member of a gang really what it was. |
| 24 | Q | Then what happened? |
| 25 | A | We talked.  And he told me he wanted me to do some |

1      gang.  He said what do you want to do.  So I

2      picked him up at Kroger.  Like he said I picked

3      him up.  I said what you going do to the gang. He

4      said I know somebody by the cemetery.  So I took

5      him to the cemetery.

6    Q    Which cemetery did you take him to?

7    A    They said name of it is Hillcrest.

8    Q    Once you got there what happened?

9    A    Got out the car, went through the woods.  I

10     stopped in the edge of the woods right there.

11     Billy went around and looked in the window, looked

12     around the house and looked in the window.  He

13     seen an old black lady folding up clothes.  She

14     had a yellow blouse on.  He came back and told me.

15     He said a black woman in there folding clothes.  I

16     said who she is.  He said I don't know.  I said

17     okay, just go.  He said, no, want to do something

18     gangster.  He had duck tape that he stole that

19     from Kroger.

20   Q    Then what happened?

21   A    Billy Norris had a bandanna around his face.  He

22     seen the woman from the back side.  He went around

23     the front side of the house.  So we went around

24     the front side.  He tells me he still going to

25     kick the door in.  The honest God's truth, he told

1  me he was going to kick the door in.  I asked him

2  what he going to do.  He said it's gangster.  If I

3  do enough gangster if I kick the door.  I said put

4  on death row.  I talked him out of it.  Only part

5  I talked him out of it.  I told him no.

6  Q    Then what did you do?

7  A    Well, by me having influenced him not to do it he

8       said the woman (inaudible).  I said she probably

9       see you, too.  I going to do this.  I said, man,

10      police coming.  I bribe him.  I bet you 15 minutes

11      the police coming.  Let's see.  Went back to the

12      edge of the woods and laid down.  Before we know

13      it here a car come up the driveway.  We got up and

14      ran back through the woods.

15  Q    When you were on this property did you have a gun

16      with you?

17  A    No.

18  Q    Did you have a gun in the car?

19  A    They said I had a gun in the car.  I didn't have

20      no knowledge of no gun in no car.  I didn't put it

21      in there.

22  Q    You heard Billy Norris say that you had the gun in

23      your waist band?

24  A    What he said.

25  Q    Did you have a gun in your waist band?

1    A    No, ma'am.

2    Q    What were you intending to do at that house?

3    A    I observed him do something foolish.

4    Q    What?

5    A    I said I was really there.  I observed him doing

6         some foolish, stupid, really say for real.

7    Q    So then you turned around and you left?

8    A    Yes, ma'am.

9    Q    What happened after that?

10   A    In the process me leaving the cemetery make like a

11        U-shape like a car parked like this.  Process of

12        me leaving I seen a police car on top of the hill.

13        I seen the police officer.  I immediately stopped

14        my vehicle.  And there was Lieutenant Bettis

15        pulled about two feet behind me.  When he did that

16        he made us get out of the car, drawed the pistol,

17        told us to get out the car.

18   Q    That happened right after you were leaving their

19        property?

20   A    Yes, ma'am.

21   Q    Chris, you have been in trouble before; is that

22        right?

23   A    Back in 1993.

24   Q    And you're the same Christopher McCullough that

25        was convicted of receiving stolen property in the

1      second degree in 1993; is that correct?

2  A    Yes, ma'am.

3  Q    You're also the same Christopher McCullough that

4      was convicted of burglary first and theft of

5      property second last year; is that correct?

6  A    Yes, ma'am.

7  Q    Is that case still on appeal now?

8  A    It's in the Alabama Supreme Court.

9  Q    So the conviction is not final in that case?

10  A    No, ma'am.

11  Q    You heard the testimony today from Billy Norris

12      that you had this gun with you?

13  A    Yes.

14  Q    That it was your idea to go to this house and your

15      car and your gun and you wanted to stay there?

16  A    No, that's wrong.  By me traveling on that road

17      going to Lafayette I mean impossible to see

18      people's house on that road.  It's impossible.

19  Q    So you're saying that Billy is lying?

20  A    Yes, ma'am.

21  Q    And you had also said you heard the testimony of

22      Lieutenant Carter and you have seen the statement

23      that they say you gave.  Did you give Lieutenant

24      Carter that statement?

25  A    No.  It wasn't a statement, nothing like a

1      statement.  It was a verbal conversation between

2      me and Mr. Carter about what happened.  But

3      everything I told him we conversated about he

4      switched around.

5   Q   Did he have you write something down?

6   A   No, ma'am.

7   Q   Write any notes for him?

8   A   No.

9   Q   He wrote everything, didn't he?

10   A   He wrote everything and telling me what Billy

11      Norris said.

12   Q   Then did he give you an opportunity to look at

13      that statement?

14   A   Yes.

15   Q   Did you note on the statement where it stated that

16      you said it was true and correct?

17   A   What he said.

18   Q   Is that true?

19   A   I read he said it.  After I read it, I refused to

20      sign it.

21   Q   Why did you refuse to sign it?

22   A   It wasn't statutory of my rights.  It wasn't true.

23   Q   It wasn't true?

24   A   No, ma'am.

25        MS. KELIUM:  That's all the questions I have

```
 1        right now.  Mr. Lisenby is going to have some

 2        questions for you.  Answer his questions.

 3             THE COURT:  Cross examination.

 4             MS. LISENBY:  Thank you, Your Honor.

 5                  CROSS EXAMINATION

 6   BY MR. LISENBY:

 7   Q    Mr. McCullough, you indicated to Ms. Kelium that

 8        you had been to Lafayette earlier that day; is

 9        that correct?

10   A    Yes, sir.

11   Q    And you had actually been there to take your

12        girlfriend to the Department of Human Resources

13        for a food stamp interview; is that right?

14   A    Yes, sir.

15   Q    You heard Mr. Norris indicate that you had been to

16        Lafayette and that you had taken your girlfriend

17        for a food stamp interview; is that right?

18   A    He said I was on the way back to Lafayette to pick

19        her up.  What he stated.

20   Q    So you didn't hear him say that you had been to

21        Lafayette?

22   A    Yes.

23   Q    So he did say that?

24   A    Yes.

25   Q    That you had carried your girlfriend or something
```

|     |   |                                                        |
| --- | - | ------------------------------------------------------ |
| 1   |   | with regard to food stamps?                            |
| 2   | A | Yes, sir.                                               |
| 3   | Q | You indicated to Ms. Kelium that you and Mr.           |
| 4   |   | Norris had talked on Saturday night?                   |
| 5   | A | Yes, at a club called Soul Inn in Tuskegee.            |
| 6   | Q | This would have been March 19th I believe was a        |
| 7   |   | Tuesday; is that correct?                               |
| 8   | A | A Monday.                                               |
| 9   | Q | Sorry?                                                  |
| 10  | A | A Monday.                                               |
| 11  | Q | You think it's a Monday.  When you had this            |
| 12  |   | conversation with Mr. Norris you said that he was      |
| 13  |   | talking about activity he wanted to do?                |
| 14  | A | Yeah, he wanted to be a gang member.                   |
| 15  | Q | Wanted to be a gang member.  Are you a gang            |
| 16  |   | member?                                                 |
| 17  | A | No.                                                    |
| 18  | Q | You're not?                                             |
| 19  | A | No.                                                    |
| 20  | Q | Well, in order to get in a gang don't you have to     |
| 21  |   | have a gang member observe you do something?           |
| 22  | A | I know a lot of gangs down in Montgomery.  We go      |
| 23  |   | to the club, we kick it, right.  They said that       |
| 24  |   | Billy said he wanted to be done with them.  He        |
| 25  |   | asked me what was a good start.                        |

185

```
 1    Q    My question is isn't it true that in order to be a
 2         gang member you have to have a gang member observe
 3         you do something?
 4    A    Not necessarily.
 5    Q    You can just tell them you've done it?
 6    A    No.  They can beat you down.  You can't tell them
 7         nothing.  They jump on you.
 8    Q    You indicated it was true what Mr. Norris said
 9         that you picked him up at Kroger?
10    A    That's true.
11    Q    You don't live in Lafayette?
12    A    No.
13    Q    He didn't live in Lafayette, did he?
14    A    No.
15    Q    He went back up/down, however you want to describe
16         it, Country Club Road back towards the residence
17         of Mr. Gragg; is that correct?
18    A    We went to the cemetery.
19    Q    Went to the cemetery.  That's back up toward the
20         area where Mr. Gragg's residence is, isn't it?
21    A    You can say that.
22    Q    You said that you were driving the car?
23    A    My Mustang.
24    Q    Your Mustang?
25    A    Yes.
```

| | | |
|---|---|---|
| 1 | Q | Mr. Norris had not been in your Mustang earlier in |
| 2 | | the day? |
| 3 | A | No. |
| 4 | Q | Till you picked him up at Kroger? |
| 5 | A | Yes. |
| 6 | Q | Your testimony and questions by Ms. Kelium was you |
| 7 | | didn't know there were guns in the car? |
| 8 | A | Ugh-uh. |
| 9 | Q | Mr. Norris didn't put them in there though, did |
| 10 | | he? |
| 11 | A | No that I know of. |
| 12 | Q | You don't know how it got there? |
| 13 | A | I keep a crowd full of people in my house and in |
| 14 | | my car every weekend. |
| 15 | Q | You just don't know how those guns got in your |
| 16 | | car? |
| 17 | A | No. |
| 18 | Q | You said when you got into the cemetery that he |
| 19 | | got out of the car.  Did you get out of the car, |
| 20 | | too? |
| 21 | A | I said I did. |
| 22 | Q | You both got out of the car? |
| 23 | A | Yes. |
| 24 | Q | You went where? |
| 25 | A | Went through the woods.  He went to the man's |

```
 1              premises.

 2    Q    So your testimony is you stopped at the woods at

 3         the wood line?

 4    A    Whatever you call it.  I don't know what they call

 5         it.

 6    Q    Is that what you're talking about where the woods

 7         stopped you stopped?

 8    A    Yes.

 9    Q    What distance would you say that was from the

10         house?

11    A    About a hundred feet.

12    Q    Longer than this room or shorter than this room?

13    A    Little longer.

14    Q    Little longer than this.  It's your testimony that

15         you and Mr. Norris had a conversation back and

16         forth from that distance?

17    A    No.

18    Q    No?

19    A    No.

20    Q    Well, you said something about that he went up to

21         the house and said that there was an old black

22         woman -- came back to you and said there was an

23         old black woman folding clothes?

24    A    Yes.

25    Q    You told him let's go, he said he was going to do
```

```
1              something gangster?

2    A    That's what he said.

3    Q    The next thing you said is that he was back up at

4         the house talking about he was going to kick the

5         door down?

6    A    He was.

7    Q    Means you must have been at the house?

8    A    I had to stop him.

9    Q    I'm sorry.

10   A    I had to stop him.

11   Q    You had to stop him?

12   A    Yeah.

13   Q    You were there to stop him now; is that correct?

14   A    When any time you see a situation get out of hand

15        somebody has got to step up and stop something,

16        getting out of hand.

17   Q    You told Ms. Kelium the reason that you were there

18        is that you were going to observe Norris do

19        something foolish?

20   A    Super foolish, going in that house while that

21        woman in there.  That's beyond foolish.  That's

22        stupidity.

23   Q    But you were there watching him do something

24        foolish.  Now, you're telling me that you were

25        there to stop him?
```

| | | |
|---|---|---|
| 1 | A | Foolish if he was going to break in the house |
| 2 | | somebody there, hurt somebody that's nonsense. |
| 3 | Q | Your testimony is you did go up to the house? |
| 4 | A | I had to go stop him one time. |
| 5 | Q | You did go up to the house? |
| 6 | A | Yeah.  I didn't have no intention breaking in |
| 7 | | nothing. |
| 8 | Q | When you went to the house you had a mask on, |
| 9 | | didn't you? |
| 10 | A | Yes. |
| 11 | Q | Because Ms. Trammell saw you with a mask on, |
| 12 | | didn't she? |
| 13 | A | Didn't nobody see me with no mask on.  It's |
| 14 | | impossible.  When I was there I was on the ground. |
| 15 | | I'm not no fool, seeing in the yard with no ski |
| 16 | | mask on. |
| 17 | Q | I just want to be clear now.  You're having to |
| 18 | | wear a mask to go up to a house because you're |
| 19 | | going to try to stop him from doing something |
| 20 | | foolish?  Is that what you're telling us? |
| 21 | A | I didn't want anybody to see my face. |
| 22 | Q | Didn't want anybody to see your face? |
| 23 | A | No. |
| 24 | Q | That might indicate you were involved? |
| 25 | A | Not necessarily that.  I wasn't no fool. |

Q    Now, your testimony was that Mr. Norris made some

     comment about I'm going to kick the door in.  I

     think you said he went around to the front?

A    God as my witness if I hadn't stopped that fool,

     he would have kicked that man's door in.  He was

     fixing to do it.

Q    So you talked him out of doing it?  Is that your

     testimony?

A    Yes.

Q    I believe the next thing you said that happened

     was that you said the police are probably going to

     be here in about 15 minutes; is that right?

A    It's common sense.  He's about your height.  He

     standing looking in the window.  He said the lady

     back toward him one time.  Then he said the lady

     seen him.  Evidently something ain't right.

Q    So you said let's just watch and see if the police

     get here?

A    No.  I told him police coming.

Q    They thought you said that y'all laid in the woods

     and watched?

A    We did.

Q    So you told him the police are coming.  Then y'all

     went back to the woods and laid down and watched

     for the police to come?

1   A   He didn't believe me.

2   Q   You had to convince him?

3   A   That's right.

4   Q   Are you still wearing the mask?

5   A   I didn't have the mask on then.

6   Q   You had already put it in your back pocket then?

7   A   That's right.

8   Q   In fact, when the police got there you had a mask

9       in your back pocket?

10  A   Yes.

11  Q   That's this mask right here that's marked State's

12      Exhibit Number 4?

13  A   I don't know that exact mask, but --

14  Q   Take a look at it.

15  A   I can't remember that mask.  Last time I seen it

16      put it in my back pocket.  The police car I stuck

17      it up under the seat.

18  Q   Even though Ms. Trammell says that you had on a

19      dark mask, ski mask like this, you don't remember

20      if you had this kind of mask on?

21  A   I know the ski mask was blue.

22  Q   Now, you indicated to Ms. Kelium that Mr. Norris

23      had a bandanna on his face?

24  A   Yes.

25  Q   Is that right?  I believe that's when you made the

192

| | | |
|---|---|---|
| 1 | | comment that's the only part of the statement that |
| 2 | | Lieutenant Carter got right? |
| 3 | A | No, I didn't. |
| 4 | Q | Didn't say that? |
| 5 | A | I don't think I said that though.  I said he had |
| 6 | | it right when I told him I talked him out of it if |
| 7 | | I ain't mistaken. |
| 8 | Q | When Lieutenant Carter wrote down I had been to |
| 9 | | Lafayette at the food stamp office that was |
| 10 | | correct, wasn't it? |
| 11 | A | He got all that from Billy Norris.  He had talked |
| 12 | | to Billy Norris about two or three hours before |
| 13 | | they talked to me.  He already knew.  Everything I |
| 14 | | had told Billy he already knew. |
| 15 | Q | So you didn't tell Lieutenant Carter that? |
| 16 | A | No.  We stopped and parked down at the cemetery. |
| 17 | Q | He didn't get that from you either? |
| 18 | A | No. |
| 19 | Q | We got out.  I had a mask and a 9 mm? |
| 20 | A | I didn't tell him I had no 9 mm. |
| 21 | Q | Did you tell him you had a mask? |
| 22 | A | No.  He didn't see me with a mask. |
| 23 | Q | You didn't tell him that either? |
| 24 | A | No, I ain't that stupid. |
| 25 | Q | You only had a bandanna? |

| | | |
|---|---|---|
| 1 | A | Billy told him that. |
| 2 | Q | You didn't tell him it was in the car? |
| 3 | A | No. |
| 4 | Q | We went through the woods to the house, didn't |
| 5 | | tell Lieutenant Carter that? |
| 6 | A | I ain't told Carter nothing. |
| 7 | Q | You told us earlier that you and he were having a |
| 8 | | conversation? |
| 9 | A | Conversation, I told him -- everything I said he |
| 10 | | switched around.  Why I tell this man I was fixing |
| 11 | | to commit a crime.  I had a ski mask, I got a |
| 12 | | pistol. |
| 13 | Q | What I'm trying to figure out is you said you and |
| 14 | | Lieutenant Carter had a conversation about what |
| 15 | | took place? |
| 16 | A | He was telling me what Billy Norris had said.  I |
| 17 | | told him I ain't telling him. |
| 18 | Q | Let me ask it this way.  Did you or did you not |
| 19 | | say earlier today when you were testifying that |
| 20 | | you and Lieutenant Carter were having a |
| 21 | | conversation about what took place? |
| 22 | A | That's it, a conversation. |
| 23 | Q | Those things that I was just reading to you you |
| 24 | | never told Lieutenant Carter, is that what you're |
| 25 | | telling us? |

```
 1    A    Ugh-uh, not for no statement.

 2    Q    When we got to the house Billy saw a lady inside

 3         folding clothes, didn't tell him that either?

 4    A    He told all that.  Anything on that statement he

 5         already knew before they asked me two hours later.

 6    Q    We was walking back towards the woods when we

 7         heard the police car coming, ran through woods to

 8         car, didn't tell Lieutenant Carter that either?

 9    A    No.

10    Q    So this conversation that you're saying that you

11         had with Lieutenant Carter has absolutely nothing

12         to do with what's written down on this statement?

13         Is what you're telling me?

14    A    If I had told him I would have signed it.

15    Q    What I'm asking is are you telling us that nothing

16         that's in this statement --

17    A    All I said --

18    Q    Let me finish.  Are you telling us that what is in

19         this statement is nothing about what you and

20         Lieutenant Carter talked about?

21    A    Yes.  It's something was said Billy said -- I said

22         Billy wrong.  Billy said this, Billy wrong.  Why

23         I'm going to tell him.  I'm ex-con.  Why I'm going

24         to tell him I had a 9 mm, and they charge me for

25         convicted felon.
```

1    Q    Well, are those things that were in the statement

2         what you were telling him that Billy Norris said

3         were wrong?  I'll ask it that way.

4    A    I told him no.

5    Q    I'm sorry?

6    A    I told him no.

7    Q    You told him no?

8    A    That wasn't right.

9    Q    So you're saying that what you testified to

10        earlier today is not correct then?  That you had

11        gone to Lafayette, that you had been to the food

12        stamp office, that you had picked up Billy Norris,

13        that you had driven him to the cemetery, that you

14        had gotten out of the car, that y'all had gone

15        through the woods, that you had a mask, that you

16        had been up to the house, Billy saw a woman in the

17        window, that after that there was a conversation

18        between you and Billy, that y'all went back to the

19        car and the police stopped you?  None of that that

20        you have testified to is correct?  Is that what

21        you're telling us?

22   A    I didn't say that.

23   Q    Isn't that what's in the statement?

24   A    It don't matter what's in that statement.  I know

25        what me and him said face to face.  That's what

1   counts.

2  Q  Did you lay in the woods and watch and wait for

3   the police?

4  A  I said yes.

5  Q  So even though you have now -- at that point, you

6   have been up to a house where you say Billy Norris

7   was going to kick the door in, you're wearing a

8   mask, you have told him the police are going to be

9   coming, you just going to lay and watch and wait

10   for the police?  Isn't that what you're telling

11   us?

12  A  Any time --

13  Q  Yes or no.  Is that what you're telling us?

14  A  Yes.

15  Q  All right.  And the conviction in 1993 you said

16   was for receiving stolen property?

17  A  Yes.

18  Q  Five year sentence for that?

19  A  Yes.

20  Q  Burglary first degree 2002, November of 2002;  is

21   that correct?

22  A  Yes.

23  Q  Got a 15 year sentence for that?

24  A  Yes.

25  Q  And a theft of property second degree in 2002,

197

1     November of 2002, a 10 year sentence for that?

2  A   Yes.

3       MS. LISENBY:  No further questions.

4       MS. KELIUM:  I don't have any other

5     questions.

6       THE COURT:  Hold on for just a second.

7  BY THE COURT:

8  Q   Mr. McCullough, did you ever go up to this house?

9  A   I went up there to talk him out of it.  I admit I

10     told him that.  I'm going to be straight up with

11     y'all, straightforward.

12  Q   It's your testimony that the only time you went to

13     the house was with the purpose of having him stop

14     what he's doing?

15  A   Yes, sir.

16  Q   Did you ever other than that one time get out of

17     this wood line?  Did you ever get out of the woods

18     other than when you went up to the house to get

19     him to come back?

20  A   No, sir, and other than go back to my car.

21  Q   So the only time you approached that house from

22     the woods --

23  A   He walked up to the front door and kick it in and

24     I told him he done went crazy.

25  Q   At any time after you left that car did you have a

```
 1          pistol?

 2   A      No, sir.

 3   Q      Did Billy have a pistol?

 4   A      Not that I know of.  They had stopped my car

 5          for -- reason they searched my car by saying they

 6          seen Billy with a pistol.  Their own purpose of

 7          stopping my vehicle.  I come back around and none

 8          of that happened.

 9   Q      You were there with Billy?

10   A      Yes.

11   Q      When he approached that house did he have a

12          pistol?

13   A      No, sir.

14   Q      He did not?

15   A      I didn't see one.

16              THE COURT:  Anything further from the State

17          or defense?

18              MS. KELIUM:  No, Your Honor.

19              MR. LISENBY:  No, Your Honor.

20              THE COURT:  You may step down.  Call your

21          next witness.

22              MS. KELIUM:  Defense rests.

23              THE COURT:  Defense rests.  Ladies and

24          gentlemen, I'll need for y'all to once again step

25          back to the jury room.  And I'll call you back out
```

1    in a few minutes.

2                    (Jury not present)

3         THE COURT:  The jury is now in the jury room.

4    Any motion?

5         MS. KELIUM:  Your Honor, the defendant renews

6    his motion for judgment of acquittal.  Again the

7    State has not born their burden of proof in this

8    case with several elements.  They had to prove

9    that the defendant attempted to break and enter

10   into Mr. Gragg's home with intent to commit a

11   crime therein while armed.  They haven't done

12   that.  The burden is higher at this point.  The

13   Court has to review it under a higher burden.

14   They have not met it.  They have not excluded

15   every reasonable hypothesis except that leading to

16   the defendant's guilt.

17        THE COURT:  Motion denied.  Now, let's talk

18   about charges.

19        What's requested by the defense as far as the

20   charge itself?  Charge is attempted burglary first

21   degree.

22        MS. KELIUM:  That's correct.  We've also

23   requested attempted burglary third degree and

24   attempted criminal trespass first and criminal

25   trespass second.  I think I put all those in.  If

1   I didn't that's what I want.

2       THE COURT:  What says the State?

3       MR. LISENBY:  I don't think attempted

4   burglary third would apply because we're talking

5   about an occupied dwelling.  If it's anything it

6   would be attempted burglary second degree.

7       MS. KELIUM:  Second was a building and third

8   was anything without a gun.

9       MR. LISENBY:  Second was an occupied

10  dwelling.

11      MS. KELIUM:  I don't think so.

12      MS. LISENBY:  Part B.  You have to read Part

13  B, 13a-7-6B.

14      THE COURT:  Dwelling house.

15      MR. LISENBY:  I think the testimony is

16  undisputed this is a dwelling.  So I don't think

17  attempted burglary third would be correct.

18  Attempted burglary second wasn't requested.  I

19  don't think either one of those two apply.

20      THE COURT:  Okay.  I don't think attempted

21  burglary third degree applies.

22      MS. KELIUM:  13A, we either request burglary

23  second, 13A-7-6B.

24      THE COURT:  I'll hold on that one.

25      MS. KELIUM:  I think the testimony is clear

1   he's saying that he didn't have a gun.  Nobody at

2   the house saw him with a gun.

3        THE COURT:  That's why I'm saying I'm holding

4   on that one.

5        MR. LISENBY:  As far as other two attempted

6   criminal trespass first degree that would be the

7   attempt to get into the dwelling.  There's been no

8   testimony at all from Mr. McCullough that he was

9   trying to get into the dwelling at all.  The only

10  testimony produced by the State is the only

11  purpose for going into the dwelling would be to

12  commit a theft which would take it out of the

13  trespass statute and make it only a burglary.  So

14  I don't think attempted trespass first would

15  apply.

16       MS. KELIUM:  I think the case law is pretty

17  clear the criminal trespass in the first is a

18  lesser included of the burglary first if the State

19  has not proven what the attempt was.

20       THE COURT:  But this is an attempt.

21       MS. KELIUM:  That's why we requested an

22  attempted.

23       MR. LISENBY:  Top of that he specifically

24  testified during his testimony that he wasn't

25  trying to get into the house.  So there's no

1  evidence before the court either by the State or

2  the defendant that he was trying to get in the

3  house for any purpose other than to commit a theft

4  therein.   That takes it out of the criminal

5  trespass.

6      THE COURT:  His testimony is that -- there's

7  no testimony from him stating that he was trying

8  to get in the house period.  It would be contrary

9  to his testimony.  The only thing shown by the

10  State would be the intent to commit a crime

11  therein of theft.

12      MS. KELIUM:  If the jury believes that

13  testimony.

14      THE COURT:  But what I'm saying even if they

15  don't there's no evidence to show that he was

16  trying to simply get into the house.

17      MS. KELIUM:  I think we're entitled to the

18  instruction even if it's weak, even if it is

19  advisable.

20      THE COURT:  But not when there's no basis.

21  I'm saying I don't think there's any basis in the

22  evidence for that charge of attempted criminal

23  trespass in the first degree.  The only evidence

24  presented is that presented by the State of him

25  attempting to enter the dwelling and was that

specifically to commit a crime therein being the

theft.

MS. KELIUM:  I just think it's arguable.  I

mean he walked up to the property line.  And

trespass on the property was his own testimony.

THE COURT:  Well, his testimony is the only

reason he ever left that tree line was to stop his

co-defendant from doing what he was doing.  And

that would not be a trespass.  I specifically

asked him that question.

MS. KELIUM:  Not a trespass in the first

degree.

THE COURT:  Not a trespass at all, not for an

illegal purpose.

MR. LISENBY:  I agree with what the Court

said.

MS. KELIUM:  We'd say clearly criminal

trespass in the second degree applies.  His own

testimony, based on Mike Gragg's testimony that

his property was posted.  He knows he was on the

property.  He said he was trespassing on the

property.

THE COURT:  His testimony is that the only

reason he entered was to prevent his co-defendant

from doing what he was doing.

1    MS. KELIUM:  But under 13A-7-3 criminal

2    trespass in the second he doesn't need to have an

3    evil intent.  He just has to be trespassing.

4        MS. NEWSOME:  To enter or remain unlawfully.

5    If the only reason he's going on the property is

6    to prevent a felony from occuring that would be --

7        THE COURT:  Exactly what I'm saying.  His

8    testimony is that he was trying to prevent the

9    commission of a felony.  And I don't see how that

10   can be construed as an unlawful entry for the

11   purpose of giving that charge.

12       MS. KELIUM:  I think at some point he says he

13   wanted to go stop him.  I think he also said he

14   went up there to the tree line with him and he was

15   going to watch him do something dumb, but ran up

16   there to stop him when he said there was somebody

17   in the house.

18       THE COURT:  I specifically asked him about

19   leaving the tree line and entering onto the open

20   area before the house.  And he said the only time

21   he did that was to basically stop his co-defendant

22   and then he left.

23       MS. KELIUM:  I'd love to have that defense

24   available when it's true.  If I could have that

25   and know my clients wouldn't get convicted of

criminal trespass.  But that's not the case, Your

Honor.  That's not what happens when they get

charged with criminal trespass.  Were you on the

property?  Was it your property?  Were you

supposed to be there?  Was it posted?  No, boom.

MS. NEWSOME:  One of the elements of unlawful

entry.

MS. KELIUM:  If it's posted, already said the

property was posted.

THE COURT:  After you've engaged in a

criminal plan, conspiracy, or whatever I think

that the law imposes a duty on you to not just

walk away, but to prevent that.

MS. KELIUM:  That's his testimony that he

did.  I guess that kind of goes to the end.

THE COURT:  That's what I'm saying.  His

testimony is that the only entry on these premises

was to stop the commission of the offense by his

co-defendant.  That's his testimony.  The State's

testimony is basically that they were armed, that

the intent was to break into this dwelling that

they knew to be occupied.  I don't think any of

the lesser included charges apply save with the

exception of the burglary second.  And for the

record that's based on the actual testimony and

1    evidence presented and looking at both the State's

2    evidence and defense evidence.

3        MS. KELIUM:  Just like our exceptions noted

4    on those.

5        THE COURT:  Okay.  We've got that much.

6        MS. KELIUM:  Abandonment.

7        THE COURT:  I will charge on abandonment

8    either through your charge or the pattern jury

9    instruction.

10        MS. KELIUM:  What I used I quoted out of this

11    case.

12        MR. LISENBY:  Where are we looking at?

13        MS. KELIUM:  First charge.

14        MR. LISENBY:  I haven't had a chance to read

15    these.

16        MS. KELIUM:  This is verbatim out of the case

17    Young v State 1998.  Sodomy to burglary.

18        MS. NEWSOME:  I think there's a grammatical

19    error in the first sentence.

20        THE COURT:  It's not liable of.

21        MS. NEWSOME:  Applies to that to someone who

22    attempts a crime.

23        MS. KELIUM:  There is, sorry.

24        MR. LISENBY:  I sure hope the pattern jury

25    charge is a lot clearer because I have read this

and it doesn't make a bit of sense to me.

MS. KELIUM:  Parts of it I would like to take out, but I figured you guys would jump and down and scream.

MR. LISENBY:  This charge was taken verbatim with the exception of the nature of the charge and what appears to be a typographical error rendering a portion of it unreadable.

MS. KELIUM:  Quite frankly I would welcome a clearer one.  Just quoting the statute.

MR. LISENBY:  I think to have that out of the statute.  I can at least understand that.

MS. KELIUM:  Tracks the statute.

THE COURT:  I'll give that out of the statute.

MS. KELIUM:  We requested an instruction number five of bias.

THE COURT:  I have got a good one on that.

MS. KELIUM:  Refusing that, but giving the one in the book.

THE COURT:  On the first one, number two, attempted burglary third degree refused.

MS. KELIUM:  I would just say if you could fill in attempted second degree because that's what you said you were giving instead of third

1    that's fine.  We amend our request just to make

2    the record clearer.  Actually did an order on

3    this.

4         THE COURT:  So I'm going to read burglary

5    second that paragraph.

6         In determining what the true facts are from

7    the evidence you may take into consideration any

8    natural interest or bias a witness may have as a

9    result of any connection with the case.  You make

10   take into consideration the interest or bias a

11   witness may have shown while testifying.  You make

12   take into consideration the demeanor of any

13   witness as to whether that witness has apparently

14   testified frankly or evasively.  You may take into

15   consideration any matter which you in your

16   everyday affairs in passing upon the truthfulness

17   and accuracy of the testimony weigh the testimony

18   in light of your common observation and experience

19   and reach a verdict that would be based upon the

20   truth as you determine it to be from all of the

21   evidence and the law as I charge you.

22        As to the burden of proof and the way it fits

23   into that I would charge a reasonable doubt is

24   doubt of a fair-minded juror honestly seeking the

25   truth after careful and impartial consideration of

1    all evidence in the case.  It does not mean a fair

2    or arbitrary notion, but it is an actual doubt

3    based upon the evidence, lack of evidence,

4    conflict in evidence or any combination thereof.

5        If after considering all of the evidence you

6    are convinced of the defendant's guilt beyond a

7    reasonable doubt, then it would be your duty to

8    convict the defendant.  However, if you still have

9    a reasonable doubt, the defendant is entitled the

10   benefit of that double.  And the defendant should

11   be acquitted.  And I think that says the same

12   thing that you do in five.  Okay.  It's from the

13   statute.

14       Now, State has Requested Charges One, aiding

15   and abetting, two aiding and abetting, three

16   aiding and abetting, four attempt.

17       Charge number one is basically the Code.

18       MR. LISENBY:  Yes, sir.

19       THE COURT:  Two.

20       MS. KELIUM:  My question is was he charged as

21   an aider or abettor.  I don't think he was.  He

22   was charged as a principal.

23       MR. LISENBY:  Both the same.

24       MS. KELIUM:  He was never indicted as an

25   aiding and abetting.

1    THE COURT:  Not indicted as an aider or

2    abettor.  One and two are both correct.

3        Now, no particular act or acts are necessary

4    on the part of the defendant.

5        MS. KELIUM:  That's not true.

6        THE COURT:  I'm going to refuse three, grant

7    one and two.  What is last?

8        MS. KELIUM:  That's really thick, Your Honor,

9    and misleading.

10       THE COURT:  What does Harris say?  On this

11   kind of offense there's preparation and that's one

12   thing.  You get the glass jug, you got some gas,

13   you got a rag, you got some matches.  Next you put

14   it all together.  At some point it stops being

15   preparation and it's an overt act toward the

16   commission.

17       MR. LISENBY:  Harris was attempted possession

18   or attempted trafficking.

19       THE COURT:  Let me think on that.

20       MS. KELIUM:  I want part of the commentary

21   that says the authorities have found it impossible

22   to formulate a precise rule with definition or

23   what constitutes an intent which may be a part of

24   the test in all cases.

25       THE COURT:  I want to say it's the jury's --

1    it is up to them.

2        MS. KELIUM:  I think that the pattern

3    instruction is going to cover it.  And it covers

4    what's in the statute without pulling out little

5    nuggets from the commentary as the State would

6    like.  If so, I would like to pull out my own from

7    the commentary which is several pages long.  What

8    it says is we don't know quite what an attempt is.

9    And we don't know quite what an attempt isn't.

10       THE COURT:  Y'all come up with something

11   closer on Harris and less on commentary.  You come

12   up with something as well.

13       MS. KELIUM:  Wouldn't the standard one that

14   you were looking at cover it?

15       THE COURT:  It does.  But it's poor.  Quite

16   frankly it gives an outline.  It requires that the

17   defendant do some act directed toward the eventual

18   effectuation of the crime however mere, remote,

19   preparatory acts which are not reasonably in the

20   chain of causation leaving to effectuation of the

21   crime are not sufficient.  Please tell me what

22   that means?  I think I can sit here and break it

23   down.  But as a jury charge it leaves something.

24       We're going to break tonight then.  All

25   right.  In the morning let's come back and

everything else we've got on the record.

MR. LISENBY:  Get a copy of what's in that

pattern there.

(JURY PRESENT)

THE COURT:  Ladies and gentlemen, it's now 20

minutes till 5.  What time would it be in Valley?

JURORS:  20 minutes to 6.

THE COURT:  We still lack a little time.

We've got closing arguments of counsel. We've got

the charge on the law.  During this recess the

attorneys both for State and defense have been

presenting to me some legal arguments.  I think

that it's going to be best to break for the day

and begin in the morning at 9:00.  We'll be able

to finish the case in due course after that time.

And I think it would be better to go ahead and

break now because it will take some time to go

through the attorneys' arguments and through my

charge.  It could well be that we'd be sending you

out to deliberate at a rather late hour.  I'd just

rather go ahead and say that we'll finish that in

the morning.  Follow all the instructions that

I've given up to this point.  Don't discuss the

case with anyone not even amongst yourselves.  I

do not know if there will be any media coverage of

this case.  If there is don't look at it, don't

listen to it, don't read it.  Turn away from it.

When your family and friends ask you about

this case and what's going on you have to tell

them that you're under an order not to discuss it.

After this case is over it will be up to you.  You

can discuss it with anyone you wish or tell anyone

if you wish that you still don't want to discuss

it.  That is up to you.  But for now we've got to

follow this rule.

Everyone remain in while the jury exits.  Be

back in the jury room at 9:00, and we'll proceed.

Thank you.

(END OF DAY)

1        (November 14, 2003, 9:00 a.m.)

2        THE COURT:  Go ahead.

3        MS. KELIUM:  Your Honor, I provided the State

4    and the Court with the case of Popwell v State

5    1987 Alabama Court of Criminal Appeals case.  The

6    cert was denied in 1988 by the Supreme Court of

7    Alabama.

8        In that case the facts are strikingly similar

9    to this case where they find without an actual

10   attempt to break in an overt act that involved

11   some sort of attempt to get in the house other

12   than just being there, there was no attempted

13   burglary. Here we have a case where no one

14   actually attempted to get in a door or a window or

15   a screen.  And in this case Popwell v State the

16   Court clearly said it ain't enough.  If you're

17   sitting there with a screwdriver trying to pry a

18   screen off it is enough.  If you're simply there

19   and then you leave for whatever reason that is not

20   enough.

21       We would just ask the Court again to consider

22   our motion for judgment of acquittal considered in

23   the light most favorable to the State.  Any

24   reasonable inference that the Court could take

25   from that there was no overt act committed by

1    Christopher McCullough in this case to get in the

2    house.  So the attempt was not far enough.

3        THE COURT:  Any further and it would have

4    been a burglary.  There's evidence in this case

5    that these two defendants were wearing ski masks

6    and/or bandannas and were armed with high powered

7    pistol or pistols, at least one pistol, I think

8    that being a 9 mm.  They actually approached the

9    house.  There's testimony that they were at the

10   window of the house, that there's evidence

11   previously prior to that time -- prior to them

12   being at the window that they went to this house

13   with intent to burglarize this house.  There's

14   even evidence and testimony that after they

15   discovered that the dwelling was occupied that

16   there was even a further evidence of still an

17   intent on the part of at least one of them to go

18   on and burglarize the house.  Actually the end of

19   their action was caused only when the police

20   arrived.

21       Should there be a conviction and if under

22   those facts the Court of Criminal Appeals or

23   Supreme Court find that that's not an attempted

24   burglary, then I don't know what would be.

25       MS. KELIUM:  We would just state in this case

clearly a woman observes somebody outside her

bedroom window unless she screams he runs away in

this case Popwell v state.

MR. LISENBY:  Lot more evidence in this case

than Popwell.

THE COURT:  That's strikingly different. Here

we have evidence that they intended to break into

the house as I've already put on the record either

with or without occupancy.

I'm going to grant on attempted burglary.

I'm going to give defendant's charge, State's

charge, and pattern charge.

I mean I agree, Ms. Kelium, attempt is one of

those strange areas of the law.  And a lot of it

is based on subjective criteria that being

intent.  Y'all ready.

MR. LISENBY:  We had some others we were just

making copies of.  I don't know if you want to

take a look at them.

THE COURT:  I doubt it, but let me look.

MS. KELIUM:  We object.

THE COURT:  This is better than your

requested charge from yesterday, Mr. Lisenby.  I

don't know that I would grant all of these.  But

you had number four requested.  I think I'm going

1  to reuse it.  I stated earlier on the record I

2  would give State's four.  I'm not.

3      MS. KELIUM:  There's a whole lot of cases

4  interpreting that, mere preparation, even though

5  it might be an overt act is not the same.

6      THE COURT:  That's exactly what we're going

7  to.

8      MS. KELIUM:  I object to these things coming

9  straight out of the commentary unless you read the

10 whole commentary.

11     THE COURT:  Number five is out of the Code.

12     MS. NEWSOME:  Yes, it is.  It's a direct

13 quote.

14     THE COURT:  Number one, it's straight out of

15 the pattern charge.  I'm already giving that one

16 anyway.  This basically restates what Ms.

17 Kelium -- Number six is practically a statement of

18 what -- Ms. Kelium is actually I think a clearer

19 statement.  Number six will be denied.  Number

20 seven is a correct statement.

21     Do you have any objection to Number eight?

22 That again is a Code.

23     MS. NEWSOME:  It's very similar to the one

24 Ms. Kelium requested, too.

25     MS. KELIUM:  I hate throwing so much at them

that they're going to throw their hands up and say

we don't know what any of this means.

THE COURT:  I'm going to grant it.  I'm going

to try to put this together in a logical order.

An attempt I'm going to deny that.

MS. KELIUM:  Can the Court put in the

statement the mere presence at the scene is not

enough.  That's what Popwell says, mere presence

is not enough.

THE COURT:  I will add that mere presence is

not sufficient.

MR. LISENBY:  I think then we have to add in

something to the effect that is a factor that

can't be used in making a determination.

MS. KELIUM:  That's not true.

MR. LISENBY:  True in every case.

MS. KELIUM:  Mere presence is not enough.

MR. LISENBY:  But it's not a complete

statement of the law.

MS. KELIUM:  Yes, it is.  Mere presence means

only presence.

THE COURT:  Mere presence is not sufficient

alone, but may be considered with other evidence.

Okay, y'all ready?

MR. LISENBY:  I'm sorry.  I have a couple of

1  quick questions.  You have got a jury charge with

2  regard to testimony of the defendant?

3       THE COURT:  Yes.

4       MR. LISENBY:  And a jury charge with regard

5  to having been convicted of certain crimes?

6       THE COURT:  Impeachment.

7       MR. LISENBY:  Then the issue with regard to

8  the first offender attempted impeachment I guess.

9  I wasn't quite clear what the court ruled on

10  that.

11       THE COURT:  She dropped it.  We never went

12  back to it.

13       MR. LISENBY:  It's just out.

14       MS. KELIUM:  I'm not going to bring it up.

15       THE COURT:  After objection she left it

16  alone.  We moved on.  I think from everything it

17  would be better just to leave it alone.

18       MS. KELIUM:  I know we went over the one on

19  bias, on the interest of the witness.  If we could

20  revisit that for a minute.

21       THE COURT:  I'm going over the one I did

22  yesterday.  Okay.  All right.  Bring the jury in.

23       MS. KELIUM:  I just don't remember.

24            (JURY PRESENT)

25       THE COURT:  Y'all be seated.  Let the record

1    reflect all jurors are present, counsel present,

2    parties present.  Ladies and gentlemen, at this

3    time the attorneys for both State and defense will

4    present their closing arguments to you.  Remember

5    the instructions that I gave you yesterday.  What

6    the attorneys say is not evidence.  But they have

7    a right, duty, and obligation at the appropriate

8    times in the trial to make arguments to you.  They

9    can tell you what they think the case has proven

10   or not proven.  They can ask you to draw

11   reasonable inferences from the evidence.  In short

12   they can argue their respective positions to you.

13   State your case to the jury.

14                    *    *    *

15   (MR. LISENBY, MS. KELIUM, AND MR. LISENBY MADE

16   CLOSING ARGUMENTS WITH NO OBJECTION.)

17                    *    *    *

18

19

20

21

22

23

24

25

JURY CHARGE

THE COURT:  Ladies and gentlemen of the
jury, at this point in the trial it is my duty to
instruct you as to the law which applies to this
case.  The defendant is charged by way of grand
jury indictment as follows:  The grand jury of
said county charges that before the finding of
this indictment Christopher McCullough did with
intent to commit the crime of burglary first
degree, Section 13A-7-5 of the Code of Alabama,
attempt to commit said offense by attempting to
knowingly or unlawfully enter or remain unlawfully
in a dwelling of another that being Mike Gragg
with intent to commit a crime therein, to wit:
theft, and while effecting entry or while in the
dwelling or in immediate flight therefrom the said
Christopher McCullough was armed with an explosive
or a deadly weapon, to wit:  a pistol, a further
description of which is otherwise unknown to the
grand jury in violation of 13A-4-2 of the Code of
Alabama against the peace and dignity of the State
of Alabama, signed Rea S. Clark, District
Attorney.

The indictment in this case is not evidence
against the defendant.  It is the formal method

under our constitution by which a defendant is accused of a crime and placed on trial. It provides no proof, no presumption, and no inference that the defendant is guilty of the offense charged therein.

When a judge and a jury sit together as a court of law it's the duty of the judge to see that the trial progresses in an orderly fashion, to rule upon all legal matters presented, and to instruct the jury as to the law which applies to the particular case. It is your duty as jurors to follow the law as I charge you.

You will therefore render a verdict in accordance with the facts as you determine them to be from the evidence and the law as I charge you. You are the sole and exclusive judges of the facts. It is your duty to attempt to reconcile the testimony of all witnesses so as to make them all speak the truth if you can reasonably do so. If you cannot reasonable reconcile all testimony it is then your duty to consider the testimony with a view of determining what the true facts are. In doing so you may accept or reject any part of the testimony of any witness and accept only the testimony you consider worthy of belief.

223

1    During the course of the trial I have ruled

2   on certain objections by both the State and

3   defense.  I don't want you to take any que one way

4   or the other as to whether I have sustained or

5   overruled those objections.  If I have sustained

6   an objection and not allowed an answer to a

7   question, don't try to guess or speculate what

8   that answer might have been.  At the same time if

9   I have overruled an objection and allowed a

10  witness to answer a question, don't place any

11  greater weight on the testimony that I have

12  allowed by overruling the objection.  My rulings

13  are based strictly on the law and the rules which

14  apply to the trial of this case.  You are to

15  consider all evidence that is admitted in light of

16  the instructions that I am now giving you.

17      I'm going to give you some other general

18  principles of law that apply generally to criminal

19  cases.  And then I'm going over some specific law

20  that applies to this particular case.

21      In determining what the true facts are from

22  the evidence you may take into consideration any

23  natural interest or bias a witness may have as a

24  result of any connection with the case.  You may

25  take into consideration the interest or bias a

witness may have shown while testifying.  You may

taken into consideration the demeanor of any

witness as to whether that witness has apparently

testified frankly or evasively.  You may take into

consideration any matter which you would in your

everyday affairs in passing upon the truthfulness

and accuracy of the testimony.  Weigh the

testimony in light of your common observation and

experience and reach a verdict that will be based

upon the truth as you determine it to be from all

of the evidence and the law as I charge you.

If you believe that any material part of the

evidence of any witness was willfully false, you

may disregard all of the testimony of that

witness.

In arriving at a verdict in this case you

must not permit sympathy, prejudice, or emotion to

influence you one way or the other.

Evidence may be introduced in any criminal

case for the purpose of impeaching certain witness

testimony, that is, to discredit their testimony.

The law permits that a witness may be impeached in

several ways.  For instance a witness may be

impeached by proof of contradictory statements

made by that witness while on the stand in this

225

case or by contradictory statements made by a

witness at other times or places whether under

oath or not or by evidence of bad character or by

a showing of a conviction of a crime involving

moral turpitude.  But the fact that a witness has

been impeached does not necessarily mean that you

must discard all of that witness's testimony

either in whole or in part.  There may be other

evidence in the case or other facts and

circumstances in the evidence which in your

judgment may tend to support or corroborate a

witness's testimony or some part or parts of it.

As I have already charged you you are the

sole and exclusive judges of the credibility of

witnesses and of the weight that you will accord

their testimony.

In arriving at the true facts you are

directed to take into account all of the testimony

of all witnesses.  It is your duty to attempt to

reconcile all the testimony so as to make all the

witnesses speak the truth if you can do so

reasonably.

If you cannot reasonably reconcile all of the

testimony of all of the witnesses, then you are to

use your common sense, your knowledge, and your

understanding that everyone gains in their

everyday affairs and that you are to use all of

your experience that you have acquired in your

dealings with other people in everyday life.  You

should take this knowledge with you and use it to

determine what the true facts are and the weight

that you are to give each part of the testimony of

the witnesses.  You're not speculate where there's

no evidence, but where there is conflicting

evidence use your common sense to resolve the

conflict if you can do so reasonably.

The defendant may testify as a witness in his

own behalf.  And when he does so you may take into

consideration the testimony of the defendant along

with all other evidence in the light of the fact

that he is the defendant and the interest he has

in your verdict.  This is to be taken in

consideration together with all other evidence or

lack of evidence.

In determining what the true facts are in

this case you are limited to the evidence that has

been presented from the witness stand as opposed

to matters that have been stated to you by the

attorneys during the course of the trial.  What

the attorneys have said both for the State and

1    defense is not evidence in the case and what they

2    have argued to you at various prints in the trial

3    is not evidence.  They have a right, duty, and

4    obligation at the appropriate times in the trial

5    to comment on the evidence and to ask you to draw

6    reasonably inferences from the evidence as they

7    argue their respective positions to you.  But what

8    they say is not evidence.  And you should put what

9    they say in the proper category in your thinking.

10   It should not be in the evidence category just as

11   the indictment in this case should not be in the

12   evidence category.

13       Under the law in Alabama it is the duty of

14   the judge to set a penalty after due consideration

15   presented at a sentencing hearing.  It is improper

16   for the jury to be concerned with the penalty to

17   be imposed upon the defendant in this case if

18   there should be a verdict of guilty as to any

19   offense charged.

20       In coming before you, a jury of his peers,

21   upon a plea of not guilty the defendant is

22   presumed to be innocent of the charges against

23   him.  This presumption remains with him throughout

24   every stage of the trial and during your

25   deliberations on the verdict and is not overcome

unless from all the evidence in the case you are

convinced beyond a reasonable doubt that the

defendant is guilty.  The presumption of innocence

with which the defendant enters trial is a fact in

this case which must be considered with all the

other evidence in the case and is not to be

disregarded by you.

As I have already told you the burden of

proof is upon the State to prove the defendant

guilty as charged.  Before a conviction can be had

in this case the State must satisfy each and every

member of the jury of the defendant's guilt beyond

a reasonable doubt.  Even if the State

demonstrates a probability of guilt it does not in

establish it beyond a reasonable doubt.  And in

that case you must acquit the defendant.

The phrase "reasonable doubt" is

self-explanatory.  Efforts to define it do not

always clarify the term.  It is not a mere

possible doubt because everything relating to

human affairs is open to some possible or

imaginary doubt.  A reasonable doubt is a doubt of

a fair-minded juror honestly seeking the truth

after careful and impartial consideration of all

evidence in the case.  It is a doubt based upon

1   reason and common sense.  It does not mean a vague

2   or arbitrary notion.  But it is an actual doubt

3   based upon the evidence, a lack of evidence, a

4   conflict in the evidence, or any combination

5   thereof.  It is a doubt that remains after going

6   over the entire case in your mind and giving

7   consideration to all testimony.  It is

8   distinguished from a doubt arising from mere

9   possibility, from bear imagination, or from

10  fanciful conjecture.

11      If after considering all of the evidence you

12  are convinced of the defendant's guilt beyond a

13  reasonable doubt, then it would be your duty to

14  convict the defendant.  However, if you still have

15  a reasonable doubt the defendant is entitled to

16  the benefit of that doubt and should be acquitted.

17      There can be direct evidence presented and

18  there can be circumstantial evidence presented.

19  In regard to circumstantial evidence I charge you

20  that a person charged with a crime may not be

21  convicted by circumstantial evidence alone unless

22  the evidence excludes beyond a reasonable doubt

23  and to a moral certainty every reasonable

24  conclusion other than that of the guilt of the

25  defendant.  No matter how strong the circumstances

1    they do not come up to the full measure of proof

2    which the law requires if they can be reasonably

3    reconciled with the theory that the defendant is

4    innocent.

5        Now, the indictment charges attempted

6    burglary in the first degree.  The law in Alabama

7    provides that there is a separate category for

8    attempts of certain crimes.  Now, the attempt or

9    the law on attempt incorporates whatever law is

10   alleged to have been attempted to be committed.

11   In this case we have a statute, a law, that deals

12   with attempts.  The indictment in this case

13   follows that law.

14       Now, for the offense alleged to be attempted

15   the indictment says that it's burglary in the

16   first degree.  Now, I'm going to charge you on

17   that.  But I'm also going to give you another

18   charge which I hope to explain thoroughly of

19   attempted burglary in the second degree.  So I'm

20   going to give you two separate charges on attempt,

21   one for burglary first, one for burglary second

22   degree.

23       The defendant is charged with attempted

24   burglary in the first degree.  A person commits

25   the crime of attempted burglary in the first

degree if with the intent to commit the offense

attempted he does any overt act towards the

commission of that offense.  To convict the State

must prove beyond a reasonable doubt each of the

following elements of the offense of attempted

burglary in the first degree.  One, that the

defendant Christopher McCullough intended to

commit the crime of burglary in the first degree;

two, that acting with the intent to commit the

crime of burglary in the first degree, the

defendant did an overt act towards the commission

of such offense.

A person commits the crime of burglary in the

first degree if he knowingly and unlawfully enters

or remains unlawfully in a dwelling and he does so

with the intent to commit a crime therein and

while effecting entry or while in the dwelling or

in immediate flight therefrom he or another

person, he or another person, in the crime is

armed with a deadly weapon.

To convict of burglary in the first degree

the State would have to prove beyond a reasonable

doubt that the defendant Chris McCullough

knowingly and unlawfully entered or remained

unlawfully in the dwelling of Mike and Judith

1    Gragg, that in doing so he acted with intent to

2    commit a crime therein, and three that while in

3    the dwelling or in effecting entry thereto or in

4    immediate flight therefrom the defendant or

5    another participant in the crime was armed with a

6    deadly weapon.

7        So I have just gone over the elements of

8    burglary in the first degree.  And I'll go over

9    the elements of burglary in the second degree at

10    this time.  I want you to keep in mind that the

11    attempt statute will apply to both charges, both

12    the charge of attempted burglary first degree and

13    to the charge of attempted burglary second degree.

14        A dwelling is a building which is used or

15    normally used by a person for sleeping, living, or

16    lodging therein.  An intruder acts knowingly if he

17    is aware of the fact that he is no license or

18    privilege to enter or remain.  A person acts with

19    intent with respect to a result or to conduct when

20    his purpose is to cause that result or to engage

21    in that conduct.  A person enters or remains

22    unlawfully in or upon a premises when he is not

23    licensed, invited, or privileged to do so.

24        A deadly weapon is a firearm or anything

25    manifestly designed, made, or adapted for the

1    purpose of inflicting death or serious, physical

2    injury.  I charge you that a pistol is a deadly

3    weapon.

4         A person would commit burglary in the second

5    degree if he unlawfully enters or -- excuse me, if

6    he unlawfully enters a lawfully occupied dwelling

7    and he does so with intent to commit a theft or a

8    felony therein.  To convict of burglary in the

9    second degree the State must prove beyond a

10    reasonable doubt each of the following elements of

11    burglary in the first degree:  That the defendant

12    Chris McCullough unlawfully entered or remained

13    unlawfully in a lawfully occupied dwelling of Mike

14    and Judith Gragg and that in doing so the

15    defendant acted with intent to commit a theft or a

16    felony therein, namely, theft.

17         The difference between first degree and the

18    second degree that I have just gone over with you

19    is that in first degree the defendant or a

20    participant, another participant in the crime,

21    must be armed with a deadly weapon.  In burglary

22    in the second degree the defendant must unlawfully

23    enter a lawfully occupied dwelling.  No mention of

24    a deadly weapon in that one.  Both of these

25    charges involve dwellings.  First degree involves

1    a weapon.  Second degree involves the entry into a

2    lawfully occupied dwelling.

3         What constitutes -- you have got to keep in

4    mind now I have just given you the law as pertains

5    to burglary.  You have got to keep both burglary

6    first and burglary second in mind of the attempt

7    statute.  The State in their indictment has not

8    alleged that there was a burglary in the first or

9    second degree.  It's that there was an attempted

10   burglary in the first degree as contained in the

11   indictment.  And I'm charging you simply so you

12   can consider whether the evidence applies to

13   burglary in the second degree that being the

14   attempt for the burglary in the second degree.

15        You have heard me say that there must be an

16   overt act for a finding of attempt.  What

17   constitutes commission of an overt act toward the

18   commission of burglary in the first degree or

19   burglary in the second degree is for the jury to

20   decide under the circumstances, it requires that

21   the defendant do some act directed toward the

22   eventual effectuation of the crime.  However, mere

23   remote preparatory acts which are not reasonably

24   in the chain of causation leading to the

25   effectuation of the crime are not sufficient.

1    Mere presence of a defendant is not sufficient

2    alone, but it is a factor that may be considered

3    along with all other evidence.

4        An attempted burglary consists of an act done

5    with the intent to effectuate a burglary carried

6    beyond mere preparation to commit it, but falling

7    short of its actual commission.  An indictable

8    attempt does consist of two important elements,

9    one, an attempt to commit burglary and, two, a

10   direct ineffectual act done toward its commission.

11       In order to prove an attempted burglary the

12   State must show an act done with the intent to

13   effectuate the alleged burglary.  Intent has been

14   defined as a state of mind existing at the time a

15   person commits an offense.  If intent required

16   definite and substantive proof, it would be almost

17   impossible to convict absent facts disclosing a

18   culmination of the intent.  The mind of an alleged

19   offender however may be read from his acts,

20   conduct, and inferences fairly deductible from all

21   of the circumstances.

22       Although an overt act does not establish the

23   particular intent to commit a specific crime,

24   intent being a state of mind or mental process may

25   be proved by the statement or act of the person

1  whose act is being scrutinized and may also be

2  inferred from the facts and circumstances as in

3  the case in consummated crimes.

4       A person is guilty of an attempt to commit a

5  crime if with intent to commit a specific offense

6  he does any overt act toward the commission of

7  such offense.  One is criminally liable for

8  attempting the commission of a crime even though

9  his endeavor falls short of the ultimate intended

10  objective.  An attempt to commit a crime consist

11  of three elements, one, an intent to commit a

12  crime, two, performance of some overt act toward

13  commission of that offense, and, three, failure to

14  consummate the commission of the crime.

15       A person is not liable if under circumstances

16  manifesting a voluntary and complete renunciation

17  of criminal intent he avoided the commission of

18  the offense attempted by abandoning his criminal

19  effort.  And mere abandonment is not sufficient to

20  accomplish the avoidance by taking further and

21  other affirmative steps toward preventing the

22  commission thereof.

23       So I want you to take all of the law that I

24  have just charged on attempt and consider it in

25  connection with first the allegation of attempted

burglary first degree, then attempted burglary

second degree.

If you find from the evidence that the State

has proved beyond a reasonable doubt all of the

elements of the offense of attempted burglary

first degree as charged, then you should find the

defendant guilty of attempted burglary first

degree as charged.

If, however, you are not satisfied that the

State has proven beyond a reasonable doubt each of

the elements of attempted burglary first degree as

charged, you may then consider whether the State

has proven the defendant guilty beyond a

reasonable doubt of the offense of attempted

burglary second degree.

If you find that they have met their burden

as to attempted burglary second degree, you would

then find the defendant guilty of that offense.

If you find from the evidence and law that I

have charged you that the State has not met their

burden of proof as to either attempted burglary

first degree or attempted burglary second degree,

you should acquit the defendant.

An accomplice is defined as an associate in

crime or a partner in crime.  A conviction for a

1    felony offense cannot be had on the testimony of

2    an accomplice unless such testimony is

3    corroborated by other evidence tending to connect

4    the defendant with the commission of the offense.

5    And the rule is that such other evidence to be

6    sufficient must be believed by the jury beyond a

7    reasonable doubt.

8        The proper test for determining whether there

9    is sufficient corroboration of the testimony of an

10    accomplice is first to eliminate the evidence of

11    the accomplice.  And then if upon examination of

12    all other evidence there is sufficient

13    incriminating evidence tending to connect the

14    defendant with the commission of the offense there

15    is sufficient corroboration.

16        A person is legally accountable for the

17    behavior of another constituting a criminal

18    offense if with intent to promote or assist the

19    commission of an offense he procures, induces, or

20    causes such other person to commit the offense or

21    he aids or abets another person in commission of

22    the offense or having a legal duty to prevent the

23    commission of the offense he fails to make the

24    effort he is required to make by law to prevent

25    said offense.  The words "aid or abet" comprehend

1    all assistance rendered by acts or words of

2    encouragement or support or presence actual or

3    constructive to render assistance should it become

4    necessary.

5        Ladies and gentlemen, all 12 of you must

6    agree -- and it will soon be 12 of you -- must

7    agree before you can reach any verdict in the

8    case.  Your verdict must be the verdict each and

9    every juror.  You are the sole judges as to weight

10   that should be given all testimony in the case.

11       It is my duty to decide the law.  It is your

12   duty to determine the facts.  I have no opinion

13   as to the facts of this case.  And I don't want

14   you to think from anything I've said in the charge

15   or otherwise or any ruling that I have made that I

16   think one way or the other about the facts of the

17   case.  Take the testimony of all witnesses

18   together with all proper and reasonable inferences

19   which may be drawn therefrom and apply your common

20   sense.  In a fair, impartial, and honest way

21   determine what you believe to be the truth.

22       You should weigh all evidence and reconcile

23   it if you can reasonably do so.  But if you cannot

24   so reconcile a conflict in evidence you ought to

25   take that evidence which you think is worthy of

1   credit and give it just such weight as you think

2   it is entitled to receive.

3       I have prepared verdict forms in this case

4   for you.  Now, the verdict form must be signed by

5   your foreperson.  And it must correspond to your

6   actual verdict and vote which must be unanimous.

7       When you go back to the jury room you may

8   choose whatever method you think is appropriate in

9   determining who will be the foreperson.  The

10  foreperson will actually sign the appropriate

11  verdict form and will act as a moderator of your

12  deliberations.

13      I told you in the beginning that you're

14  dealing with two separate bodies of law in this

15  particular charge or charges.  This is a charge of

16  attempted burglary first degree or attempted

17  burglary in the second degree.  I went over all of

18  the law about each one of those.  First degree

19  focusing on one or more participant being armed

20  with a deadly weapon.  Second degree does not have

21  that requirement, but it does require an attempted

22  entry into an lawfully occupied dwelling.

23      If after considering all evidence in the case

24  in light of the laws as I have charged you you

25  find the State has met their burden of proving

1    beyond a reasonable doubt all of the elements of

2    attempted burglary first degree, you should find

3    the defendant guilty of that charge.  And your

4    foreperson would need to sign top verdict line

5    which reads as follows:  we, the jury, find the

6    defendant Christopher McCullough guilty of the

7    offense of attempted burglary in the first degree

8    as charged in the indictment.  Your foreperson

9    will have to sign that line.

10       If on the other hand you find from the

11   evidence presented in light of the law that I have

12   instructed you that the State has not met their

13   burden of proving the defendant guilty beyond a

14   reasonable doubt of attempted burglary in the

15   first degree, but they have met their burden of

16   proving the defendant guilty beyond a reasonable

17   doubt of burglary in the second degree, then it

18   would be your duty to convict the defendant of

19   that offense.  And your verdict would read as

20   follows:  we, the jury, find the defendant

21   Christopher McCullough guilty of the offense of

22   attempted burglary in the second degree a lesser

23   included of burglary in the first degree as

24   charged in the indictment.  Your foreperson would

25   need to sign the second verdict form.

1    If on the other hand you find from the

2    evidence presented and law that I have instructed

3    you that the State has not met their burden of

4    proving the defendant guilty beyond a reasonable

5    doubt of either attempted burglary first degree or

6    attempted burglary second degree, then it would be

7    your duty to acquit the defendant.  And your

8    verdict would read as follows:  we, the jury, find

9    the defendant Christopher McCullough not guilty.

10   Your foreperson would need to sign on the third

11   verdict form line.

12        At the very bottom of the page there is a

13   place where your foreperson needs to print his or

14   her name and date today's date on this verdict

15   form.

16        After you have deliberated, after you have

17   reached your unanimous verdict, and after your

18   foreperson has signed the appropriate verdict form

19   he or she needs to simply fold this verdict form

20   in half, knock on the door, I'll have you brought

21   back out here in open court where I'll announce

22   the verdict.

23        Ladies and gentlemen, at one time we had only

24   a jury of 12 on a criminal case.  If any juror

25   became ill, had a family emergency, or anything of

1  that sort in all likelihood a mistrial would have

2  to be declared.  The law was changed so alternate

3  jurors could be here and hear all the evidence and

4  hear the law and be ready to step into the place

5  of any juror who for whatever reason could not

6  continue with their duty.  And believe me over the

7  past few years we've used alternate jurors in so

8  many occasions.  However, here we do not have the

9  need for the use of the alternate jurors.  And

10  those alternate jurors will be released.  You may

11  report to Mr. Story and be discharged from further

12  obligation for this term of court.  The alternate

13  jurors are William Booker and Bobby Clark.  Thank

14  you, gentlemen.  Y'all may report up to Mr.

15  Story's office at the end of the hall.

16      Counsel, y'all make sure that all of the

17  exhibits of evidence that are to go to the jury

18  are properly put together.  What says the State as

19  far as the charge?

20      MR. LISENBY:  State is satisfied.

21      THE COURT:  And defense?

22      MS. KELIUM:  With exceptions already noted

23  defense is satisfied.

24      THE COURT:  Ladies and gentlemen, y'all may

25  retire, deliberate, and reach your verdicts.

1    Y'all need to carry these items with you.

2                    *    *    *

3          (JURY BEGINS DELIBERATION AT 10:32 A.M.)

4                    *    *    *

5          (JURY RETURNED WITH THE FOLLOWING VERDICT

6          AT 11:35 A.M.)

7                    (JURY PRESENT)

8          THE COURT:  Ladies and gentlemen of the jury,

9    have you reached a verdict?  And, first of all,

10   let me ask you, have you chosen -- second, let me

11   ask you if you have chosen a foreperson?

12         FOREPERSON:  Yes, sir.

13         THE COURT:  Let me read and ask you is this

14   your verdict?  We, the jury, find the defendant

15   Christopher McCullough guilty of the offense of

16   attempted burglary in the first degree as charged

17   in the indictment.  Is this your verdict?

18         FOREPERSON:  Yes.

19         THE COURT:  Is there a request for polling of

20   the jury by defense?

21         MS. KELIUM:  No, Your Honor.

22         THE COURT:  No request.  Ladies and

23   gentlemen, I want to thank you for your service

24   throughout these two weeks.  I know it's been a

25   long term of court.  I want you to know without

1    your willingness to sit and serve on these juries

2    we would have made no progress.

3                    (JURY DISMISSED)

4        THE COURT:  Mr. McCullough, you may remain

5    where you are.  We're on the record at this time.

6    Based upon the verdict of the jury, the Court

7    hereby finds that you are guilty of the offense of

8    attempted burglary first degree as charged.  And I

9    adjudicate you guilty of that offense at this

10   time.

11       Is there a request for a pre-sentence report?

12       MS. KELIUM:  One has already been done, Your

13   Honor.  We do not request additional.

14       THE COURT:  Any other applications to be

15   made?

16       MS. KELIUM:  No, Your Honor.

17       THE COURT:  The formal sentencing hearing in

18   this matter will be set for December 16th at 1

19   p.m.  The defendant will be remanded to custody

20   pending sentencing on that date.  You may do

21   whatever with him you need to do at this time

22   before you bring the other folks back in.

23       MR. LISENBY:  Judge, I'd like to put on the

24   record that at sentencing the State will be asking

25   for enhancements under the habitual offender act

for the receiving stolen property second degree

charge that Mr. McCullough admitted on the stand

as well as the enhancement for the use of a

firearm during the course of an offense involving

a Class A felony.

       THE COURT:  So noted.

            END OF PROCEEDINGS

CERTIFICATE OF COMPLETION OF REPORTER'S TRANSCRIPT

CHRISTOPHER MCCULLOUGH

     Appellant

VS

STATE OF ALABAMA

To:  Clerk of the Court
of Criminal
Appeals

Case No:  CC 02-318

Date of Notice
Of Appeal:
4/1/2004

\* \* \* \* \* \* \* \*

I, FRANCES P. LOONEY, OFFICIAL COURT REPORTER

FOR THE FIFTH JUDICIAL CIRCUIT OF ALABAMA, HEREBY

CERTIFY THAT I HAVE THIS DATE COMPLETED AND FILED

WITH THE CLERK OF THE TRIAL COURT THE ORIGINAL AND

THREE COPIES OF A TRUE AND CORRECT TRANSCRIPT OF

ALL THE EVIDENCE AND MATTERS TAKEN IN THE

ABOVE-STYLED CAUSE.  ALL PAGES ARE NUMBERED

SERIALLY, PREFACED BY AN INDEX AND ENDING WITH THE

NUMBER APPEARING AT THE TOP OF THIS CERTIFICATE.

I FURTHER CERTIFY THAT A COPY OF THIS

CERTIFICATE HAS THIS DATE BEEN SERVED ON THE CLERK

OF THE APPELLATE COURT, THE DISTRICT ATTORNEY'S

OFFICE; THE ATTORNEY GENERAL'S OFFICE; AND COUNSEL

FOR THE DEFENDANT.

DATED THIS 27th DAY OF May , 2004.

OFFICIAL COURT REPORTER

FILED IN OFFICE THIS

MAY 27 2004

CHARLES W. STORY
CIRCUIT CLERK
CHAMBERS COUNTY, ALABAMA

My  commission expires 12/27/2005

*** Frances L. Roark ***

COPY

1

2

IN THE CIRCUIT COURT
FIFTH JUDICIAL CIRCUIT OF ALABAMA
CHAMBERS COUNTY

3  STATE OF ALABAMA,                    *

4  Versus                              *    CRIMINAL NO.
                                       *    CC-2002-000318
5                                      *    LaFayette, Al.
                                       *    15 January, 2004
6  CHRISTOPHER McCULLOUGH,             *
        Defendant.                     *

7  **********************************************************

8       TRANSCRIPT OF SENTENCING BEFORE
        THE HONORABLE RAY D. MARTIN,

9           CIRCUIT JUDGE

    A P P E A R A N C E S:
10  For the State            BILL LISENBY, DISTRICT ATTORNEY

11                           FIFTH JUDICIAL CIRCUIT
                             CHAMBERS COUNTY COURTHOUSE
                             LaFAYETTE, AL 36862
12

13                           BY:  BILL LISENBY, DA
                                  AMY NEWSOME, ADA

14

15

16  For the Defendant        KYLA KELIM, ATTNY
                             ATTORNEY AT LAW
17                           POST OFFICE BOX 1977
                             ALEXANDER CITY, AL 35011-1977

18
                             FRANCES L. ROARK, CSR
19                           OFFICIAL COURT REPORTER
                             FR4L035

20

21

22

23

24

25

1    PROCEEDINGS:   In Open Court.

2           THE COURT: On November 14, 2003, a duly impaneled

3    jury returned the the following verdict :  "We, the jury,

4    find the defendant, Christopher McCullough, guilty of the

5    offense of attempted burglary in the first degree, as

6    charged in the indictment. "  Signed by Gerald Morgan,

7    foreperson.

8          If not done so on the record previously, at this

9    time, based upon the verdict of the jury, I find that this

10   defendant is guilty of the offense of attempted burglary in

11   the first degree as charged in the indictment.

12         Now, we'll proceed to matters of sentencing at this

13   time.  And, for the record, the defendant is present before

14   the Court with his counsel, Kyla Kelim.  The District

15   Attorney, Bill Lisenby, is present for the State.

16         Has everyone had an opportunity to review the

17   presentence report prepared by the probation officer in this

18   case?

19           MS. KELIM:  Yes, Your Honor.

20           THE COURT: Is  there anything that needs to be

21   amended, deleted, or changed in regard to the report?

22           MS. KELIM:  Not in substance as such, Your Honor.

23           THE COURT: Very good.  All right.  First, what

24   says defendant in regard to the issue of sentencing?

25           MS. KELIM:  Your Honor, in this case, this is a

1    class B felony with one prior.  Also there was a -- the jury

2    found a firearm was involved, so the same enhancement would

3    apply, to make the range of punishment 10 years to 99 or

4    life.

5         This case was one of a series of events that occurred

6    within a several week period.  Mr. McCullough and his

7    codefendant were arrested this date near the Graggs'

8    property and ultimately charged in four other offenses.  One

9    of those cases went to trial the term before this one, and

10   Mr. McCullough was convicted.

11        The State has, to my knowledge, always put forth the

12   same plea offer to all of us.  There were several attorneys

13   involved before me, and that plea offer, was 35 years.  To

14   my knowledge no formal plea offer other than that was ever

15   made.  The codefendant in this case received a sentence of

16   20 years.  In a prior case Mr. McCullough was convicted of a

17   class A felony, that of burglary in the first degree, and

18   the same range of punishment applied, the same prior offense

19   applied, and in that case, which is a more serious offense,

20   the judge in that case, after a jury conviction, sentenced

21   Mr. McCullough to 15 years.

22        We argue that that sentence was more than

23   appropriate.  The probation officer notes that for several

24   factors Mr. McCullough should be given the maximum sentence,

25   which I can only think means 99 years or life, since that is

1  the range in this case, which is inappropriate given the

2  unremarkable nature of his prior record.

3      He has several offenses going back more than a decade

4  when he was very young.  And the bulk of the other offenses

5  listed are driving offenses.  No doubt his driving record is

6  remarkable for being pretty awful.  He has several

7  speedings, loud music, no seatbelt, vehicle entering

8  roadway, no insurance, suspended license, and definitely he

9  is a terrible driver all the way to the present.  The other

10  offenses, with the exception of one prior felony, which was

11  a receiving stolen property offense in 1993, more than a

12  decade ago, are the pending charges.  Other than the one

13  offense, which I mentioned he was convicted of last term,

14  but none of those are prior offenses.

15      I have represented a whole lot people with worse

16  records than this that weren't  recommended  maximum

17  sentences.  The only other reason proffered for the

18  imposition of such a harsh sentence is a continued bad

19  attitude.  This Court and this forum should not be a

20  personality contest.  If Mr. McCullough has a bad attitude

21  while incarcerated he certainly is  going to suffer an

22  enhanced punishment for that in the form  of not being

23  granted parole.  He will serve day for day a sentence that

24  this court imposes.

25      We certainly are not going to stand here and discount

1    the level of emotion that the victims in this case were put

2    through.  When you are in your home, your home is your

3    castle.  And persons on your property without permission who

4    appear to have bad intentions are going to cause a severe

5    amount of emotional alarm.  And, I would be the last one

6    arguing otherwise.

7           This simply is a case that we were not given an

8    opportunity to take care of in a more economical fashion.

9    I, as a State-appointed attorney, am constantly, on a daily

10   and weekly basis, barraged about cutting costs, cutting my

11   bills, cutting my services, and saving State resources.

12   And, this Court is well aware of the amount that the Court

13   has had cut in State resources.  The State has thought

14   nothing of having to serially try five cases when there is a

15   mechanism to resolve these matters.  The Judge who has heard

16   the sentencing and the trial in the last case, which was a

17   class A felony, gave him what would have been an appropriate

18   sentence:  That of 15 years.  We have endeavored to get a

19   more reasonable offer than 35.  Which simply, in view of the

20   fact, he had a 15-year sentence on a more serious charge,

21   was just not reasonable.  The State fully intends to

22   serially  try all these cases.  This is the second.  We have

23   two more years of cases to look forward to with an

24   additional amount to spent for attorneys fees, jury costs,

25   for witness costs, for investigative costs, and there's no

1   purpose for that.  The State should be held to the same

2   standard that  I am, quietly frankly, in resolving these

3   cases, a matter which we have discussed extensively.

4       The other facts which are really not mentioned in the

5   PSR, while they do mention briefly the other burglaries that

6   were involved in this case, this was an attempted burglary.

7   In the other cases, all of the cases, there were virtually

8   no contact with any of the occupants.  In one, or perhaps

9   two, cases where a home owner was present, upon making their

10  presence known, according to the police reports,

11  Mr. McCullough, he and the codefendant, fled the property,

12  and did not encounter, directly encounter, the home owners.

13  In the two other case, the homes were unoccupied.

14      This is the case that is appropriate for a 15-year

15  sentence, which is what Mr. McCullough has been sentenced

16  to previously for the more serious offense.

17          THE COURT:  Mr.Lisenby?

18          MR. LISENBY:  Yes, Your Honor.  I appreciate the

19  opportunity to address you.  I would, if the court permit,

20  ask that Mr. Gragg be allowed to address you now and then I

21  would like to add some comments after what he says.

22  Mr. Gragg,  was the victim.

23      Tell the Court your name for the record and tell the

24  Court what you would like him to know in regard to the

25  sentencing of Mr. McCullough.

1        MR. GRAGG:  Your Honor, my name is Charles

2    Michael Gragg.  I am one of the victims of Christopher

3    McCullough's crime along with my wife, and my children, and

4    my grandchildren.

5        On March 19th of 2002, our lives pretty much turned

6    upside down.  As a God-fearing Christian, I tended to trust

7    people and look for the good in folks in the past.  And,

8    while we always took ordinary precautions around our house,

9    a security system, et cetera, I never really seriously ever

10    worried about being safe, as defense counsel says, in the

11    privacy of my own home.  Because, my home is my castle, or I

12    thought it was.

13        This has had an absolutely traumatic impact on me, my

14    wife, and my children, directly and indirectly.  I really

15    thought that I had been afraid in my life prior to that day.

16    And I just thought I had been afraid prior to that day.  I

17    literally was scared to death.  I was convinced that

18    somebody was going to die that day.  Because masked guys

19    don't come to your house at 10 o'clock in the morning, or

20    just prior to, on a beautiful, beautiful spring morning.  It

21    is not supposed to happen that way.

22        God intervened that day.  As I believe Mr.Lisenby

23    said, I believe, in his opening remarks of Christopher

24    McCullough's trial, everything went right that day.  Your

25    Honor heard the testimony of his codefendant.  And, in his

1    trial that when he  picked up Billy Norris -- when

2    Christopher McCullough picked up Billy Norris to come to our

3    house for the purpose of parking behind the cemetery and

4    slipping through the woods, they were coming with one intent

5    and that was to get in our home, regardless of what that

6    took or how they had to do it.  And, Your Honor, will recall

7    that Billy Norris testified that when he opened the door of

8    the car to get in at Kroger parking he saw the  roll of duct

9    tape.

10          He said, "What's that for? "

11           He said, "We are going to need this."

12          I was convinced by that testimony that Christopher

13   McCullough was going to get in that house regardless of

14   whether it was occupied or not.  They then came to the house

15   and we heard Billy Norris testify under oath that even when

16   they absolutely were 100 percent certain that the house was

17   occupied, Billy Norris wanted to leave, and Christopher

18   McCullough was determined -- he had his gun, he had his duct

19   tape, he was determined to get in that house, and he said

20   words that haunt me to this day, "It is just too good.  It's

21   just too good."

22          I guess, based on the size of the house -- it is not

23   a huge house,  but it is a nice house.  I am proud of it.  I

24   worked hard for it.  But, it was just too much of a

25   temptation.   He was going to get in there and do whatever

1    he needed to do.              And, Your Honor, somebody

2    would have died that day.  Somebody would have died if they

3    had gotten in that house.  Because I was, for the first time

4    in my life, I was prepared to take another human's life.  I

5    would have done it without hesitation, because I was that

6    afraid.  But had they gotten in that house and gotten by me,

7    they would have had to have killed me, because if they

8    knocked every tooth in my head out  but one, I would have

9    fought with that tooth.  I would have fought with anything I

10   could have gotten my hands on before they would have touched

11   my wife.

12        Your Honor, I respectively -- I request that you

13   consider the testimony by Billy Norris in this trial.  The

14   fact that he was armed with a gun.  The fact that he had

15   duct tape.  The fact he intended on getting in the house

16   knowing someone was there.  I would request, Your Honor,

17   that you consider that.  And, I would not just request, I

18   would beg this Court, to give him the maximum possible

19   sentence.  First of all for this individual trial.

20   Secondly, I would ask, Your Honor, to please consider the

21   fact that he is a convicted felon.  That certainly falls

22   within the Habitual Felony Act.  I know, Your Honor,

23   probably can't consider the up coming felony trials that he

24   is to undergo.  This man is an affront to society.  This man

25   is dangerous.  This man, if and when, I am sure some day he

1   will get out, when that happens, based on his background

2   that I now know a lot about, something bad is going to

3   happen to somebody else, if he doesn't get killed first.

4   So, I would ask that Your Honor not only give him the

5   maximum sentence on our individual crime that was about to

6   occur, because -- I know Your Honor sees every -- probably

7   every type of criminal act that comes through this courtroom

8   or your courtroom that exists.  And I know attempted

9   burglary in the first degree probably doesn't sound very

10  jazzy or serious to a lot of folks.  There was a line and it

11  got crossed early in the process that morning.  The intent

12  was going to be this was going to be worse than an attempted

13  burglary.  This was going to be worse than a burglary.  I

14  pray thanks to God every day that God did intervene and the

15  lady who was in our house did see them.  The Lanette Police

16  Department made it in less than three minutes to my home and

17  captured these guys.  And there's not a night that goes by

18  that I don't wake up and say a prayer.  If I hear a noise or

19  just wake up, I say, "God, please keep us safe."  I am a

20  praying man, but I've never prayed as much as 10 or 12 times

21  a night.  I pray in my own bed in my own home, "God, please,

22  just keep us safe."  I would ask that Your Honor help keep

23  us safe and help keep the members our community safe, and

24  put this man a way.  Thank you for listening.

25       MR. LISENBY:  Judge, what I would like to say is,

1    I do have a certified copy of the conviction of receiving

2    stolen property second degree if I need to introduce that.

3    I know that Mr. McCullough actually admitted that during the

4    course of the trial, and I think that is sufficient for the

5    Habitual Offender purpose, but I have it if necessary.

6            MS. KELIM:   That's fine.

7            MR. LISENBY:   A couple of things I would like to

8    point out with regard to Mr. McCullough's record.   It's a

9    little bit more extensive than just some traffic incidents.

10   The Court has had an opportunity to review it and from

11   talking about it in juvenile court.   Theft of property,

12   breaking and entering into a vehicle back as far as 1989,

13   another receiving stolen property charge in 1992, domestic

14   violence charge in the year 2000, wherein he actually

15   received some jail time, indicating the fact that he is a

16   dangerous individual; and, of course, the felony of

17   receiving stolen property second degree.

18           As defense counsel stated in the other cases, there

19   were no -- there was no contact between Mr. McCullough,

20   Mr. Norris, and the occupants except for the one other case

21   that is still pending.   The case which she referred to

22   earlier that was tried in this court, and in which he was

23   found guilty, was a burglary first degree, because there was

24   a theft of a rifle involved.   It was not because it was an

25   occupied home.   It was not because there was  any physical

1   injury to the occupants.  It was because there was a firearm

2   involved in the commission of the offense:  That being the

3   theft of the firearm from the house itself.

4       Now, the Court there felt that was an appropriate

5   sentence.  This is a much more serious offense here.  These

6   individuals came armed with weapons.  And they came with

7   masks on.  And they came during the middle of the day.  And

8   they were aware of the possibility and the probability that

9   the home was going to be occupied which was evidenced by the

10  fact they did have duct tape with them.

11      Again, as defense counsel said, we did try to work

12  out something with regard to all of these cases, but we had

13  to, as far as the State, we had to take into consideration

14  the fact of all of the cases, this being the most serious,

15  to try to negotiate some kind of plea.  If in fact the

16  defendant wanted to enter a plea, he could have done that at

17  any time without agreement with the State.  That is his

18  right at any time.  He declined to do that.  He declined our

19  offer and he went to trial.  That does not have anything to

20  do with whether we are saving money or not saving money or

21  anything of that nature.

22      Because of the nature of this offense, because of the

23  prior record involved with this defendant, because of the

24  fact that he was armed with a firearm at the time, masked as

25  he went to this occupied home; the State requests that the

1    Court give him a sentence of 60 years in prison.  And, of

2    course, that would not make him eligible for any type of

3    probation.  We would ask for that sentence, Your Honor.

4           THE COURT: Do you have anything to say before the

5    Court passes sentence?

6           MS. KELIM:  The only thing I would  mention, Your

7    Honor, as I stated, no one, me least of all, in this room

8    would ever discount any of the feelings Mr. Gragg and his

9    family have from this sort of invasion of privacy.  However,

10   a lot of their fears are predicated on the words of a

11   convicted liar.  The jury was under no such compulsion to

12   convict Mr. McCullough.  They did not have believe to

13   Mr. Norris.  The -- those series of events were

14   self-serving, obviously, to Mr. Norris.  Mr. Norris  who did

15   not get a 60-year sentence.

16       The State's request, if justice is to be impartially

17   doled out and not a personality contest, is unreasonable.

18          THE COURT:   First, in this case court costs are

19   assessed, Victims' Compensation Fund Award of $100,

20   repayment to the State of Alabama for attorneys fees that

21   have been expended by the State on behalf of the defendant,

22   any medical expenses incurred by Chambers County during any

23   point of the detention of this defendant will likewise be

24   entered.

25       This case was fully tried to a jury.  There is a

1    conviction of attempted burglary first degree.  And, on the

2    record and on the transcript of this case, it will appear as

3    an attempted burglary first degree.  Some of the things that

4    have been so eloquently stated by the victim in this case

5    were the exact impressions this Court had during the trial.

6    This was a premeditated, deliberated, planned, armed assault

7    upon, not the building that is the house of this victim, but

8    it was an assault on the people inside.

9         Now, thankfully, very thankfully, there were no

10   deaths involved.  There was no serious injury involved.  But

11   the very thought of two masked, armed felons outside of a

12   residence in a neighborhood right here in our community

13   during broad daylight hours is about as offensive as it gets

14   to the sensability of a civilized society.  And, this

15   defendant, it is the belief of the Court, even after finding

16   out that this house, this home, was occupied by living human

17   beings, wanted to go forward with the plan to rob what

18   turned out to be these individuals.  Masks, duct tape, guns

19   in broad open daylight.  I think that the only thing that

20   prevented this from being a true tragedy, even more of a

21   tragedy than it is, that being the deaths of person or

22   persons, either the defendants, the occupants, or both, I

23   think, that the only thing that prevented that in this case,

24   was the distant wail of a siren.

25        In my 14 years on the bench to my knowledge, there's

1   never been much more of a prompt response than was made in

2   this case.  In literally a matter of minutes, I think the

3   testimony was three to four minutes from the time they were

4   spotted, there were police tearing through this yard and in

5   hot pursuit of these suspects.

6       I recall from the testimony that there was a rather

7   unsettling moment for this victim as he, being armed,

8   greeted the police, which was no small matter in and of

9   itself.  He would not have been calling in a 9-1-1 emergency

10  call, he would not have been in the door of this residence

11  greeting these police armed with a 12-gauge shotgun, had it

12  not been for the actions of this defendant.  The police, as

13  another potential tragedy, could have shot this homeowner,

14  and that would have been the fault of this defendant as

15  well.

16      In cases such as this, I understand the request of

17  the State and complainant, and I understand the very basis

18  for it.  There's a certain amount of balancing that I have

19  to do as a judge of all cases that I see.  Those being from

20  murder, from capital murder, to property crimes.  So, there

21  is an entire, huge range of things that I must, by law,

22  consider.

23      After consideration of all of those, after

24  consideration of the submissions here today, and the report

25  of the probation officer, the record of the defendant, and

1    the evidence and testimony presented at trial; it is the

2    judgment and sentence of this Court that this defendant be,

3    and hereby is, sentenced  to the penitentiary of the State

4    of Alabama for a term of 40 years.  As such there's no

5    probation that would apply.  The defendant will be remanded

6    to custody at this time, Mr. Carmichael.

7            MR. LISENBY:  Thank you, Your Honor.

8    (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

9                            *****

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE CIRCUIT COURT
FIFTH JUDICIAL CIRCUIT OF ALABAMA
RANDOLPH COUNTY

STATE OF ALABAMA,            *
                            *      CRIMINAL NO.
Versus                      *      CC-2002-000318
                            *      LaFayette, AL
                            *      15 January, 2004
CHRISTOPHER McCULLOUGH,      *
     Defendant.              *
**********************************************************

C E R T I F I C A T E

STATE OF ALABAMA      )

AT LARGE              )


     I do hereby certify that the above and foregoing

transcript of testimony in the matter aforementioned was

taken down by me in computerized machine shorthand and

transcribed under my supervision, and that the foregoing

represents a true and correct transcript of the proceedings

had upon said hearing.

**COPY**

_____
FRANCES L. ROARK, CSR, OFFICIAL
COURT REPORTER, NOTARY PUBLIC
STATE OF ALABAMA AT LARGE

My Commission Expires:  09/23/06.


Delivered and filed with the Circuit Clerk

the _____ day of _____ ,2004.


Post Office Box 763
Wedowee, AL 36278
(256)357-4268